**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Biolase, Inc._, et al._,[1] | Case No. 24-12245 (KBO) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF JOHN R. BEAVER IN SUPPORT**
**OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, John R. Beaver, hereby declare under penalty of perjury:

1.     I am the President and Chief Executive Officer of Biolase, Inc., a Delaware corporation ("Biolase"). Biolase is the parent of wholly-owned subsidiaries BL Acquisition Corp., a Delaware corporation ("BL Acquisition"), BL Acquisition II, Inc., a Delaware corporation ("BL Acquisition II"), and Model Dental Office, LLC, a Delaware limited liability company ("Model Dental" and, together with Biolase, BL Acquisition, and BL Acquisition II, collectively, the "Debtors"). The Debtors, together with their non-debtor affiliates, are referred to herein as the "Company."

2.     I joined Biolase as Senior Vice President and Chief Financial Officer in October 2017 and have assumed roles of varying responsibility over the years, including Interim President and CEO, Executive Vice President, Chief Operating Officer, and Chief Financial Officer. I was named President and CEO on February 22, 2021. I also currently serve on the board of directors of Biolase.

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Biolase, Inc. (2441); BL Acquisition Corp. (4140); BL Acquisition II, Inc. (6022); and Model Dental Office, LLC (9372). The Debtors' headquarters are located at 27042 Towne Centre Drive, Suite 270, Foothill Ranch, CA 92610-2811.

3.      I have substantial leadership and technical experience in finance and business management in both public and private companies.  Prior to joining Biolase, I served as the Chief Financial Officer of Silicor Materials, Inc. ("Silicor"), a global leader in the production of solar silicon, from 2009 to 2013 and 2015 to 2017.  I also served on Silicor's Board of Directors from 2013 to 2015.  While at Silicor, I led debt and equity fundraising efforts to finance the company's transition from start-up to commercial production.  I also supported revenue growth from zero to nearly $100M (annualized) in less than one year, and developed and implemented many of the company's business processes.  From 2013 to 2015, I was Chief Financial Officer for Modumetal, Inc., a nano-laminated alloy coatings company focused on oil and gas applications.  Prior to that, I was Senior Vice President – Finance and Chief Financial Officer at Sterling Chemicals, a mid-sized public commodity chemical manufacturer, from 2007 to 2009.  I also served as Vice President, Corporate Controller at Sterling Chemicals from 2001 to 2007 and as Financial Reporting Manager and Plant Accountant from 1987 to 1995.  From 1997 to 2000, I served as Vice President, Controller at Pioneer Companies, Inc., where I coordinated two major acquisitions which tripled the size of the company.  Prior to that, I served as Controller at Borden Chemicals and Plastics from 1995 to 1997.  I started my career in Finance at Monsanto Company.  I also hold a Bachelor of Business Administration in Accounting from the University of Texas at Austin and am a Certified Public Accountant.

4.      On October 1, 2024 (the "Petition Date"), the Debtors filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "Court") for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  I am knowledgeable and familiar with the Debtors' day-to-day operations, business, and financial affairs, and the circumstances leading to the commencement of these Chapter 11 Cases.  Except as otherwise indicated herein,

2

the statements in this Declaration are based on my personal knowledge, my review of relevant documents, information provided to me by the Debtors or their employees, advisors or professionals, or my opinion based on my experience, knowledge, and information concerning the Company's operations and the industry in which it operates.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

5.    To minimize any disruption or other adverse effect resulting from the filing of the Chapter 11 Cases, on the Petition Date, the Debtors filed various motions seeking certain "first day" relief (collectively, the "First Day Motions").  I submit this declaration (the "Declaration") in support of the First Day Motions and to assist the Court and parties-in-interest in understanding the Debtors, their business, and the circumstances leading to these Chapter 11 Cases. This Declaration is organized into the following sections:

- **Part I** describes the Debtors' business, including their corporate history and operations;
- **Part II** describes the Debtors' corporate and capital structure;
- **Part III** describes the challenges faced by the Debtors over the years;
- **Part IV** provides an overview of the Debtors' M&A initiatives and prepetition sale process leading to the commencement of these Chapter 11 Cases; and
- **Part V** discusses the First Day Motions.

## I.    Corporate History and Business Operations

### A.    General Background

6.    The Debtors are global market leaders in the manufacturing and marketing of dental laser systems.  The Debtors' proprietary systems allow dentists, periodontists, endodontists, pediatric dentists, oral surgeons, and other dental specialists to perform a broad range of minimally invasive dental procedures, including cosmetic, restorative, and complex surgical applications.

3

The Debtors are also developing a business-to-consumer line of business related to cosmetic and pain therapy devices.

7.      The Debtors offer two categories of laser system products: Waterlase (all-tissue) systems and diode (soft-tissue) systems.   The Debtors' flagship brand, the Waterlase, uses a patented combination of water and laser energy and is FDA cleared for over 80 clinical indications to perform most procedures currently performed using drills, scalpels, and other traditional dental instruments for cutting soft and hard tissue.   Waterlase debrides implants without damaging or significantly affecting surface temperature and is an effective, safe solution for preserving sick implants.   Waterlase also disinfects root canals more efficiently than some traditional chemical methods.   The Debtors offer the diode laser systems to perform soft tissue, pain therapy, and cosmetic procedures, including teeth whitening.

8.      The Debtors also manufacture and sell consumable products and accessories for their laser systems.   The Waterlase and diode systems use disposable laser tips of differing sizes and shapes depending on the procedure being performed.   The Debtors market flexible fibers and hand pieces that dental practitioners replace after initially purchasing laser systems.   For the Epic line of diode laser systems, the Debtors sell teeth whitening gel kits.

**B.      The Debtors' Corporate History**

9.      Biolase was originally formed as Societe Endo Technic, SA ("SET") in 1984 in Marseilles, France, to develop and market various endodontic and laser products.   In 1987, SET merged into Pamplona Capital Corp., a public holding company incorporated in Delaware.   In 1994, the name of the company was changed to Biolase Technology, Inc. and, in 2012, to Biolase, Inc.   BL Acquisition was incorporated on May 6, 2003 and the Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on May 9, 2023.   BL Acquisition II was

4

incorporated on January 10, 2005 and the Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on the same day.  Model Dental was formed on August 17, 2022 and the Certificate of Formation of Limited Liability Company was filed with the Secretary of State of the State of Delaware on the same day.

### C.    Business Operations

#### i.    Operations Overview

10.    The Debtors currently manufacture, assemble, and test all their laser systems at the Debtors' 26,000 square foot manufacturing facility in Corona, California.  The Debtors use an integrated approach to manufacturing that includes the assembly of tips, laser hand pieces, fiber assemblies, laser heads, electro-mechanical subassembly, final assembly, and testing.

#### ii.    The Debtors' Vendors, Suppliers, and Distributors

11.    The Debtors obtain components and subassemblies for their products from third-party suppliers and vendors, the majority of which are located in the United States, with certain suppliers and vendors based in Canada, England, Germany, China, and Thailand.  The Debtors generally purchase components and subassemblies from a limited group of suppliers through purchase orders.[2]  Three key components used in the Debtors' Waterlase system (power suppliers, laser crystals, and fiber components) are each supplied by separate single-source suppliers.

12.    The Debtors rely on exclusive and non-exclusive third-party distributors for a portion of their sales in the United States and a majority of their sales in countries outside of the United States.  For the fiscal years ended December 31, 2023, 2022, and 2021, revenue from

---

[2]    In general, the Debtors rely on these purchase orders and do not have written supply contracts with many of their key suppliers.

4886-4332-1060

distributors accounted for approximately 31%, 30%, and 35% of the Debtors' total net revenue, respectively.

### iii.    *The Debtors' Customers*

13.    The Debtors market their laser systems worldwide to dental practitioners and also directly to patients.  The Debtors have sold over 47,700 laser systems in over 80 countries around the world.  During the year ending December 31, 2023, the sale of lasers accounted for approximately 61% of the Debtors' total sales, and consumables, accessories, and services accounted for approximately 39% of the Debtors' total sales.

### iv.    *The Debtors' Employees*

14.    The Debtors employ 121 full-time employees, and 120 of those full-time employees work in the United States.  The Debtors also leverage a limited number of temporary employee resources from time to time.  The Debtors' employees fulfill essential roles across various functions, including management, warehouse operations, sales, finance, human resources, and production.  Many are deeply familiar with the Debtors' business and have established crucial relationships with customers, suppliers, and other key stakeholders.

## II.    The Debtors' Prepetition Corporate and Capital Structure

### A.    The Debtors' Corporate Structure

#### i.    *Biolase*

15.    As of June 30, 2024, Biolase had the authority to issue a total of 181,000,000 shares, of which 180,000,000 shares, $0.001 par value per share, were designated as common stock ("Common Stock") and of which 1,000,000 shares, $0.001 par value per share, were designated as preferred stock ("Preferred Stock").  As of August 1, 2024, approximately 36,597,056 shares of

Common Stock were issued and outstanding.  As of June 30, 2024, approximately 24,059 shares of Preferred Stock were issued and outstanding.

16.     Until June 20, 2024, Biolase's Common Stock traded on the Nasdaq Stock Market LLC ("Nasdaq") under the symbol "BIOL." On November 14, 2023, the Nasdaq Listing Qualifications Staff (the "Staff") notified Biolase that it was in violation of the equity requirement in Nasdaq Listing Rule 5550(b)(1) or any of the alternative requirements in Nasdaq Listing Rule 5550(b) (the "Equity Rule").

17.     On February 13, 2024, the Staff notified Biolase that it had determined to grant Biolase an extension of time to regain compliance with the Equity Rule, provided that Biolase evidenced compliance upon filing its periodic report for the period ended March 31, 2024.  On February 16, 2024, the Staff notified Biolase that it was in compliance with the Equity Rule. On March 4, 2024, the Staff notified Biolase that it was in violation of the bid price requirement of Nasdaq Listing Rule 5550(a)(2) (the "Bid Price Rule"). On May 14, 2024, the Staff notified Biolase that it was again in violation of the Equity Rule.

18.     Biolase appeared before the Nasdaq Hearings Panel (the "Panel") on June 4, 2024. At the hearing, Biolase's senior management and outside advisors outlined Biolase's compliance plan for the Panel, which included regaining compliance with the Bid Price Rule (*i.e.*, meet the minimum closing bid price requirement of $1.00) and the Equity Rule (*i.e.*, maintain a stockholders' equity of at least $2.5 million).

19.     On June 17, 2024, Biolase received a letter from Nasdaq notifying it that the Panel had determined to delist Biolase's Common Stock and that trading of Biolase's securities would be suspended at the open of trading on June 20, 2024.

20.     Effective June 20, 2024, Biolase's Common Stock has been trading on the OTC Markets Group platform under the trading symbol "BIOL."

### ii.     The Other Debtors

21.     Biolase owns 100% of the other debtor entities and 100% of three foreign subsidiaries (Biolase Europe, GmbH, Biolase Spain, S.L., and Biolase India Private Limited).  An organizational chart illustrating the corporate structure of the Debtors is set forth below.



### B.     The Debtors' Prepetition Capital Structure

22.     As of the Petition Date, the Debtors have approximately $16,345,000 in total funded debt obligations (excluding accrued interest and certain costs).  The following table depicts the Debtors' prepetition capital structure:

| Funded Debt | Approx. Outstanding Principal | Maturity Date |
|---|---|---|
| SWK Term Loan | $16,195,000 | May 31, 2025 |
| SBA Loan | $150,000 | May 22, 2050 |
| **Total** | **$16,345,000** | |

### i.      The SWK Loan

23.      On November 9, 2018, Biolase entered into a Credit Agreement (as amended, restated, supplemented or modified, the "Credit Agreement") with SWK Funding LLC ("SWK" or the "Prepetition Lender"), as agent and lender.   Pursuant to a Guarantee and Collateral Agreement (the "Guarantee"), dated as of November 9, 2018, in favor of SWK as agent, the other Debtors guaranteed Biolase's obligations under the Credit Agreement and pledged their assets as collateral for their obligations under the Guarantee.

24.      Pursuant to the Credit Agreement, SWK provided Biolase with a senior secured term loan facility in the amount of $12.5 million (the "SWK Term Loan").   The Debtors used approximately $0.9 million of the SWK Term Loan proceeds to pay all amounts owed to Western Alliance Bank under a previous Business Financing Agreement and the remaining proceeds for working capital needs and growth initiatives.   The Credit Agreement has been amended several times to, among other things, increase the total commitments to $15 million, revise certain financial covenants, and extend the maturity date to May 31, 2025.

25.      Pursuant to the Credit Agreement, the SWK Term Loan is secured by a lien on substantially all of Biolase's assets and has a variable interest rate of LIBOR plus 9% with a LIBOR floor of 1.25%.   As of the Petition Date, the aggregate principal outstanding under the SWK Term Loan is approximately $16,195,000, including $2.5 million that was advanced after September 3, 2024.

26.      Following an Event of Default under the Credit Agreement as a result of Biolase's failure to make certain payments under the SWK Term Loan on or about August 15, 2024, Biolase commenced negotiations with SWK.   The parties' negotiations led to a forbearance agreement dated as of August 31, 2024 (the "Forbearance Agreement") pursuant to which SWK agreed to

fund (i) a bridge loan to pay the Debtors' operating expenses until the filing of these Chapter 11 Cases and (ii) a postpetition loan so long as the bridge loan is "rolled-up" into a debtor in possession financing loan (the "DIP Facility") (subject to court approval).

### ii.   The SBA Loan

27.   12.   On May 22, 2020, Biolase executed the standard loan documents required for an unsecured loan (the "SBA Loan") from the U.S. Small Business Administration (the "SBA") under its Economic Injury Disaster Loan assistance program given the impact of the COVID-19 pandemic on the Debtors' business.  The principal amount of the SBA Loan is $150,000, with the proceeds used for working capital needs.  Interest on the SBA Loan accrues at the rate of 3.75% per annum, and installment payments, including principal and interest, are due monthly and are payable through May 22, 2050, with any fixed payments first applied to accrued interest.  Biolase began making payments on the SBA Loan in November 2022.

### iii.   Unsecured Claims

28.   In addition to their funded debt, the Debtors also have significant unsecured debt including amounts owed to trade vendors.  The Debtors routinely incur fixed, liquidated, and undisputed payment obligations in the ordinary course of business to various third- party providers of goods and services.  The Debtors rely on a broad network of vendors to supply inventory.  A majority of these vendors conduct business with the Debtors on a purchase-order-by-purchase-order basis and are paid on prearranged terms.

### III.   Challenges Facing the Debtors Over the Years

29.   The Debtors' dental laser systems represent relatively new technologies in the dental market.  Only a small percentage of dentists use lasers to perform dental procedures. Dentists and patients have been hesitant to adopt laser technologies, which has limited the market

acceptance of the Debtors' products and market share.  Additionally, because dentists have been slow to adopt new technologies on a widespread basis, the Debtors have long sales cycles.  As a result, the Debtors have had to invest a significant amount of time and resources to educate dentists about the benefits of the Debtors' products in comparison to competing products and technologies.

30.    The Debtors' business is also highly sensitive to changes in general economic conditions as a seller of capital equipment to end users in dental professional practices.  Financial markets inside the United States and internationally have experienced extreme disruption in recent years, including extreme volatility in security prices, severely diminished liquidity and credit availability, and declining valuations of investments.  The continued economic downturn and financial market disruptions have had a material adverse effect on the Debtors' business and financial condition.  The Debtors' business is also subject to external macroeconomic pressures.  For example, the imposition of economic sanctions on Russia as a result of the conflict in Ukraine prevented the Debtors from performing existing contracts and pursuing new growth opportunities abroad, which adversely affected the Debtors' business, financial condition and results of operations.

31.    Further, as noted above, the Debtors rely on exclusive and non-exclusive third-party distributors who have significant discretion in determining the efforts and resources they apply to the sale of products.  The Debtors' success depends in part on the relationships with, and the efforts of, third-party distributors.  The Debtors have faced significant challenges and risks in expanding, training, and managing third-party distributors, particularly given their geographically dispersed operations.

32.    A combination of these and other factors led the Debtors to record net losses for the years ending December 31, 2023, 2022, and 2021 in the amounts of $20.6 million, $28.6 million,

4886-4332-1060

and $16.2 million, respectively.  The Debtors had an accumulated deficit of $316.8 million as of December 31, 2023.

### A.    PIPStek Litigation

33.    On January 4, 2023, PIPStek, LLC, a wholly-owned subsidiary of Sonendo, Inc. ("PIPStek"), filed a lawsuit against Biolase in the U.S. District Court for the District of Delaware alleging that Biolase's Waterlase dental laser product infringes PIPStek's patents (the "PIPStek Litigation").  PIPStek's complaint seeks unspecified damages, injunctive relief, and costs and attorneys' fees.  Biolase has answered denying PIPStek's allegations, asserting strong defenses of non-infringement, invalidity, and unenforceability due to unclean hands, and denying PIPStek is entitled to any relief whatsoever.  On June 10, 2024, the parties filed a joint motion seeking to stay all proceedings given settlement discussions, which was granted by the District Court, but which was recently lifted.

### B.    Default Under Credit Agreement

34.    As noted above, on or about August 15, 2024, Biolase failed to make certain payments under the SWK Term Loan, which resulted in an Event of Default under the Credit Agreement.  On August 31, 2024, the Debtors and SWK entered into the Forbearance Agreement pursuant to which SWK agreed to fund (i) a bridge loan to pay the Debtors' operating expenses until the filing of these Chapter 11 Cases and (ii) a postpetition loan so long as the bridge loan is "rolled-up" into the DIP Facility (subject to court approval).

### IV.    The Debtors' Prepetition M&A Initiatives and Marketing Process Leading to the Commencement of These Chapter 11 Cases

### A.    Prepetition M&A Initiatives

35.    To address their operational challenges and liquidity needs, the Debtors engaged in various M&A initiatives for years.  Dating back to 2018, the Debtors reached out to at least forty-

12

five (45) buyout and growth capital private equity firms looking for a sponsor deal, but such efforts proved unsuccessful.

    **B.**      **Prepetition Sale Process**

    36.    More recently, the Debtors began looking for an acquirer for their business. Approximately eighteen (18) months before the Petition Date, the Debtors reached out to approximately fifteen (15) separate parties. To further expand the potential pool of acquirors, the Debtors hired The Benchmark Company, LLC, effective as of January 16, 2024, on a non-exclusive basis to begin a more formal process designed to identify and close "a transaction or related series or combination of transactions involving the sale of assets, or intellectual property, or outstanding stock (or securities convertible into stock) or a merger, acquisition or other business combination, including a recapitalization, a consolidation or a joint venture in the nature of an acquisition." Benchmark contacted twenty-six (26) interested parties regarding the opportunity.

    37.    Over the coming months, the Debtors hired four additional investment bankers, all on a non-exclusive basis, to assist with identifying additional potential buyers. Those bankers included The Benchmark Company, LLC (retained as of January 16, 2024), Pacific Gate Advisors, LLC (retained as of April 5, 2024), Lake Street Capital Markets, LLC (retained as of July 15, 2024; utilized in 2023 as well), Moody Capital Solutions, Inc. (retained as of July 31, 2024), and 431 Group Limited (retained as of August 14, 2024).

    38.    In total, the Debtors and their advisors contacted over thirty (30) potential investors, including strategic and financial investors, to solicit proposals to acquire the Debtors' business or assets. In connection with this solicitation, the Debtors and their advisors prepared, among other things, a confidential information memorandum and an electronic data room. Ultimately, more than one hundred (100) interested parties executed confidentiality agreements and were granted

4886-4332-1060

access to the electronic data room.  Interested parties were also given an opportunity to have meetings with Debtors' management.

39.     The Debtors received ten (10) indications of interest for various portions of the Debtors' business.  The Debtors invited each bidder into the second, more comprehensive round of diligence and worked with each to attempt to improve their bids in advance of the letter of intent ("LOI") deadline.  Id.  As part of this diligence phase, prospective bidders were invited to meet with the Debtors' management.

40.     Following several weeks of additional diligence, the Debtors ultimately received three, non-binding LOIs for the purchase of substantially all of the Debtors' assets, and a term sheet for a sale of a portion of the assets.  Two of the LOIs contemplated an out-of-court asset sale (as well as the term sheet), while the other contemplated a sale through chapter 11.  In evaluating the LOIs and term sheet, the Debtors analyzed, among other considerations: (i) the structure of the proposed transaction; (ii) the form and amount of consideration offered; (iii) the assets to be acquired and liabilities to be assumed; (iv) certainty of close; and (v) execution risks.  The Debtors met regularly with their advisors and consulted with their key stakeholders before and after LOIs were submitted.

41.     PIPStek, who has been in litigation with the Debtors over alleged patent infringement, submitted an LOI that (i) contemplated a chapter 11 sale with a short timeline to complete confirmatory diligence and execute a purchase agreement, (ii) requested a prepetition exclusivity period, and (iii) contemplated DIP financing to bridge to a closing of a sale transaction (the "Original PIPStek LOI").  The Debtors pushed back on the exclusivity request, and after reviewing the LOIs and term sheet with the Debtors' board, management and key stakeholders, including SWK, the Debtors were ultimately able to reach agreement with PIPStek to eliminate

14

the exclusivity request from the Original PIPStek LOI, which was confirmed in a revised LOI, dated August 5, 2024.

42.     At the same time, the Debtors and their advisors continued discussions with the Prepetition Lender (SWK) to gauge its willingness to fund the Debtors to the completion of a sale transaction in chapter 11.  The Prepetition Lender was unwilling to consent to a priming DIP Facility by PIPStek or any other third party.  The Prepetition Lender, however, was willing to provide the Debtors with postpetition financing and expressed a willingness to fund the Debtors with incremental liquidity before the filing of these Chapter 11 Cases to bridge to the Petition Date, with PIPStek as the stalking horse bidder.

### C.     The Debtors Retain SSG Advisors

43.     Thereafter, the Debtors engaged SSG Advisors, LLC ("SSG") on August 28, 2024 to provide prepetition investment banking services.  In that role, SSG has, among other things: (a) continued the marketing process with the parties that submitted LOIs and were engaged with the Debtors before SSG's retention, and solicited additional third-party interest (the "Marketing Process"); and (b) assisted the Debtors in negotiating and documenting an asset purchase agreement with PIPStek and developing bidding procedures for their postpetition marketing process.

44.     I understand that since early September 2024, SSG has contacted over 300 potential investors, including strategic and financial investors, to solicit proposals for the Debtors' assets. As part of that process, the Debtors and their advisors prepared, among other things, a transaction overview "teaser" and SSG updated the pre-existing electronic data room.  Twelve (12) new

interested parties executed confidentiality agreements, were granted access to the electronic data room, and were invited to have a virtual meeting with the Debtors' management.

45.     After numerous discussions with their advisors and the Prepetition Lender, the Debtors determined that pursuing the revised PIPStek LOI was in their best interests and the only viable alternative that existed at the time.  The Debtors and their advisors held numerous calls and discussions and engaged in extensive negotiations with PIPStek over the terms of the potential agreement to purchase substantially all of the Debtors' assets.

### D.     The Stalking Horse APA

46.     Faced with no other actionable sale proposal, the Debtors executed the Asset Purchase Agreement with PIPStek (the "Stalking Horse Bidder" and the "Stalking Horse APA"), pursuant to which it agreed to (a) serve as the Stalking Horse Bidder pursuant to the terms of the Stalking Horse APA; (b) acquire substantially all of the Debtors' assets as a going concern; (c) expose the Stalking Horse APA to higher or better offers through a competitive auction process; and (d) receive standard bid protections in the form of a market rate break-up fee.

47.     Under the terms of the Stalking Horse APA, the Stalking Horse Bidder will purchase the Debtors' assets for aggregate consideration of: (a) $14.0 million in cash paid at closing, subject to a working capital adjustment; plus (b) assumption of certain Assumed Liabilities (as defined in the Stalking Horse APA); plus (c) the Delaware Litigation Settlement Value (as defined in the Stalking Horse APA).

48.     I believe that the Stalking Horse APA represents the current highest and best offer for the Debtors' assets.  I believe that the Stalking Horse APA will enhance the sale process by providing a floor that prospective bidders must clear, which will help ensure that only serious, financially capable bidders participate in the auction.  In addition to providing for the going

concern sale of substantially all the Debtors' assets, the Stalking Horse APA also provides for the assumption and payment of a significant amount of prepetition unsecured claims.

49.     With the benefit of the Stalking Horse APA, the Debtors intend to continue the marketing and sale process by requesting the Court's approval of bidding procedures to govern the sale process, including an auction.  Moreover, the Debtors have instructed SSG to continue marketing the Debtors' assets to potential buyers after the Petition Date and to continue engaging in discussions with any party that executes a confidentiality agreement, with the goal of having as many bidders as possible participate in the auction and ensure a robust sale process that will maximize the value of the Debtors' assets.

**E.     Need For A Timely Process**

50.     The circumstances of these Chapter 11 Cases require that the Debtors run an expedited, but robust, sale process.  Speed and certainty are critical because the Stalking Horse Bid (which will allow the Debtors' business to continue as a going concern) and the Debtors' ability to access the DIP Facility and cash collateral (which will provide the Debtors with the necessary liquidity to fund operations and these Chapter 11 Cases) are both conditioned on adherence to strict sale milestones.  The Debtors simply do not have liquidity to support a protracted sale process.  Additionally, I believe that a protracted sale process could be detrimental to the Debtors' relationships with key vendors and suppliers, without whose support the Debtors will not be able to succeed.

51.     Accordingly, the Bidding Procedures propose the following timeline to comply with the milestones set forth in the Stalking Horse Bid and the DIP Facility (the "Milestones"):

| **Two business days after the entry of the Bidding Procedures Order** | Deadline to file and serve Sale Notice |
|---|---|

4886-4332-1060

| **Two business days after the entry of the Bidding Procedures Order** | Deadline to file and serve Assumption and Assignment Notice |
|---|---|
| **November 1, 2024, at 4:00 p.m. (ET)** | Sale Objection Deadline, Cure Objection Deadline, and Contract Objection Deadline |
| **November 1, 2024, at 4:00 p.m. (ET)** | Bid Deadline |
| **November 4, 2024, at 10:00 a.m. (ET)** | Auction (if necessary) |
| **One business day after the conclusion of the Auction** | Deadline to file and serve Notice of Auction Results |
| **November 6, 2024 at 4:00 p.m. (ET)** | Supplemental Sale Objection Deadline and Adequate Assurance Objection Deadline (if necessary) |
| **November 8, 2024, at 12:00 p.m. (ET)** | Deadline to reply to any Sale Objections or Supplemental Sale Objections |
| **November [11], 2024 at [●:● a/p.m.] (ET) (subject to the Court's availability)** | *Proposed* Sale Hearing |

52.     The expedited timeline proposed by the Debtors minimizes the adverse impact on the Debtors' operations, vendors, and employees, and provides adequate opportunity to secure executable bids for the Debtors' assets for the highest or best value.  The amount of work done in the prepetition period by the Debtors and their professionals in connection with the Marketing Process enhances their ability to complete the Marketing Process on the timeframe proposed and does not prejudice parties in interest.  The Debtors are confident that parties who are the most likely to be participants in the Debtors' sale process are either already involved in, or aware of, the prepetition Marketing Process, or will have adequate time to participate under the Debtors' timeline.  The Debtors believe that proceeding with the Marketing Process is preferable to any other alternative and will inure to the benefit of all constituents, including their employees.

### V.     <u>First Day Motions</u>

53.     The Debtors have filed the First Day Motions to facilitate a smooth transition into chapter 11 and minimize disruptions to the Debtors' business operations.  The First Day Motions seek authority to, among other things, secure debtor in possession financing, honor work-force

related compensation and benefit obligations, pay certain prepetition claims, continue using the Debtors' bank accounts, and continue other operations in the ordinary course of business.

54.    The Debtors have narrowly tailored the First Day Motions to (i) continue their operations in chapter 11 to preserve value for the Debtors' estates and their stakeholders; (ii) provide an adequate runway for the Debtors to effectuate a successful sale process; and (iii) establish procedures for the efficient administration of the Chapter 11 Cases.

55.    I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is (a) necessary for the Debtors to (i) minimize disruption and loss of productivity to their business; (ii) effectuate a smooth transition into and operate within, these Chapter 11 Cases, (iii) avoid immediate and irreparable harm; (b) in the best interests of the Debtors' creditors, estates, and other stakeholders; and (c) constitutes a critical element in preserving value during these Chapter 11 Cases until a successful sale can occur.

56.    Additionally, several of the First Day Motions request authority to pay certain prepetition claims.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent that relief is necessary to avoid immediate and irreparable harm."  Given this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors' estates.  Other relief will be deferred for consideration at a later hearing.

**Procedural Motions and Applications**

A.    **Debtors' Motion for an Order Directing Joint Administration of the Debtors' Chapter 11 Cases ("Joint Administration Motion")**

57.    By the Joint Administration Motion, the Debtors request entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes only.  Additionally, the Debtors request that the Court maintain one docket for all of the jointly administered cases under the case number assigned to Biolase, and further that entry of a notation be made on the docket of each Debtor's chapter 11 case (other than the chapter 11 case of Biolase) to reflect the joint administration of these Chapter 11 Cases.

58.    I believe that joint administration of these Chapter 11 Cases is warranted because it will save the Debtors and their estates substantial time and expense by removing the need to prepare, replicate, file, and serve duplicative notices, applications, and orders.  Joint administration will also relieve the Court of entering duplicative orders and maintaining duplicative files and dockets.  The United States Trustee for the District of Delaware and other parties in interest will similarly benefit from joint administration of these Chapter 11 Cases, as it will spare them from the time and effort of reviewing duplicative pleadings and papers.

B.    **Debtors' Application for Authority to Employ and Retain Epiq Corporate Restructuring, LLC ("Epiq") as Claims and Noticing Agent Effective as of the Petition Date ("Epiq Retention Application")**

59.    In the Epiq Retention Application, the Debtors request that the Court appoint Epiq as the claims and noticing agent in these Chapter 11 Cases.  Epiq's duties will include preparing and serving required notices and documents in these cases in accordance with the Bankruptcy Code and the Bankruptcy Rules in the form and manner directed by the Debtors and the Court.

60.    I understand Epiq is a leading chapter 11 administrator with industry professionals that have significant experience in both the legal and administrative aspects of large, complex

chapter 11 cases.   I believe that Epiq's professionals have experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases and that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.   In view of the number of parties in interest in these cases, I understand that the appointment of a claims and noticing agent is required by Local Rule 2002-1(f) and is otherwise in the best interests of the Debtors' estates.

61.    Based on the foregoing, I believe that the relief requested in the Epiq Retention Application should be approved.

### C.    Redaction Motion

62.    By the Redaction Motion, the Debtors request entry of an order authorizing the Debtors to redact certain personal identifying information within the consolidated list of creditors (the "Consolidated Creditor Matrix"), the consolidated list of the Debtors' 30 largest unsecured creditors (the "Consolidated Top 30 Creditors List"), the Debtors' schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules"), and any other filing within these cases that may contain personal identifying information.

63.    I believe that redacting the personal identifying information—including e-mail and home addresses—in respect of individuals who are listed on the Consolidated Creditor Matrix, Consolidated Top 30 Creditors List, Schedules or any other document filed with this Court by the Debtors is necessary to protect these individuals from identity theft and protect their physical safety with respect to publishing their home addresses.  The disclosure of the unredacted home and email addresses of individual creditors is not necessary for the purpose of the relevant parties reviewing the amounts owed to those individuals as part of the chapter 11 process, and redaction would be a less intrusive way of achieving this purpose.

**D.      Debtors' Motion for an Order Seeking Relief from the Requirement to File Lists of Equity Holders ("Equity Security Holders Motion")**

64.      By the Equity Security Holders Motion, the Debtors request entry of an order granting relief from the requirement to file a list of equity security holders.  I understand that bankruptcy courts have authority to modify the requirement to file a list of equity security holders under the Bankruptcy Code.

65.      I believe that the Debtors should be relieved of the requirement to file the list of equity security holders because as of August 1, 2024, debtor Biolase, Inc. had 36,597,056 outstanding shares of common stock that cannot be readily traced to specific individual beneficial owners.  Given the number of equity security holders, preparing and filing the list with the equity security holders' last known addresses will be expensive and time consuming.  The equity security holders will not be prejudiced by the relief requested because, as soon as is practicable after the Petition Date, the Debtors intend to serve registered holders of common stock with a notice of the commencement of these cases.  Additionally, Biolase, Inc. intends to file a Form 8-K with the United States Securities and Exchange Commission that will give notice to the world, including equity security holders of the bankruptcy filing.

**E.      Debtors' Motion for Entry of an Order Shortening and Limiting the Notice with Respect to the Debtors' Bidding Procedures Motion ("Motion to Shorten Notice")**

66.      By the Motion to Shorten Notice, the Debtors request entry of an order shortening and limiting the notice periods for and scheduling a hearing on the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Designating the Stalking Horse Bidder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (F)*

22

*Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of*

*Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of*

*Certain Executory Contracts and Unexpired Lease, and (C) Granting Related Relief* (the "<u>Bidding</u>

<u>Procedures Motion</u>").  Specifically, the Debtors are seeking to shorten the twenty-one day notice

period for the Bidding Procedures Motion to October 16, 2024, fifteen days from the Petition Date,

and shortening the fourteen day objection deadline to October 11, 2024, eleven days from the

Petition Date.

67.     As noted above, I believe that the relief requested in the Motion to Shorten Notice

is warranted given the Debtors' extensive prepetition marketing efforts and liquidity constraints,

and is necessary to comply with the Milestones in the Stalking Horse Bid and the DIP Facility,

which require closing of the sale by November 15, 2024.  Jeopardizing the DIP loan for failing to

comply with the required timeline would cause substantial harm to the Debtors and their estates

and may require the Debtors to liquidate their assets by alternate and less profitable means.

<b><u>Operational Motions</u></b>

**F.**     <b><u>Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing
Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Use
Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured
Parties, (III) Granting Liens and Superpriority Claims, (IV) Modifying the
Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related
Relief ("DIP Motion")</u></b>

68.     By the DIP Motion, the Debtors seek approval of a secured postpetition financing

facility, in an aggregate amount of no less than $5.0 million, with $1,429,126.00 approved on an

interim basis, under the terms of the DIP Term Sheet (attached to the DIP Motion as Exhibit C).

The Debtors also seek authority to (i) use cash collateral and all other prepetition collateral in

which SWK has an interest within the budget attached to the DIP Motion; and (ii) following entry

of a final order approving the DIP Motion, deem the DIP Obligations (as defined in the DIP

23

Motion) to include the amounts advanced by SWK from and after September 3, 2024, in the amount of $2,500,000.

69.     Postpetition financing is necessary to fund the Debtors' ongoing operations and the administration of these Chapter 11 Cases.  As a result, I believe the DIP Facility will benefit all creditors and stakeholders.  It is critical that the Debtors obtain financing to continue operating their business while they run a comprehensive sale process and complete a sale of substantially all of their assets.  In addition to providing critical funding, the DIP Facility will also provide the Debtors' stakeholders, including customers, employees, and vendors, with confidence in the Debtors' ability to complete a successful sale process and continue operating until the Debtors close on the sale.

70.     The Debtors have concluded that the DIP Lender's proposal is the best alternative available for postpetition financing and that credit cannot be obtained from another party on more favorable terms.  The terms of the DIP Facility were also extensively negotiated.  Consequently, the Debtors believe that the terms of the DIP Facility are fair, reasonable, and adequate under the circumstances.  Moreover, immediate and irreparable harm would result if the DIP Facility is not approved on an interim basis.  The Debtors need immediate access to the DIP Facility for the necessary liquidity to implement and ensure the success of these Chapter 11 Cases and the Debtors' sale efforts.

G.     **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Perform Intercompany Transactions, and (D) Maintain Existing Business Forms; (II) Authorizing the Debtors' Banks to Honor All Related Payment Requests; and (III) Granting Related Relief ("Cash Management Motion")**

71.     By the Cash Management Motion, the Debtors request entry of interim and final orders (i) authorizing the Debtors to (a) continue to operate their cash management system, (b)

24

honor certain prepetition obligations related thereto, (c) perform intercompany transactions in the ordinary course of business and consistent with historical practice, and granting administrative expense status for postpetition intercompany claims, and (d) maintain existing business forms in the ordinary course of business; and (ii) authorizing the Debtors' banks to honor all related payment requests.

72.     The Debtors operate an integrated system of bank accounts to facilitate the collection and disbursement of funds across the debtor entities (the "Cash Management System"). A diagram illustrating the flow of funds through the Cash Management System is attached as Exhibit C to the Cash Management Motion.

73.     As of the Petition Date, the Debtors maintain twelve (12) bank accounts (collectively, the "Bank Accounts"), eleven (11) of which are held at Banc of California ("Banc of CA"), and one (1) of which is held at Bank of America, N.A. ("BofA," and together with Banc of CA, the "Banks").

74.     Six (6) of the Bank Accounts are in the name of and maintained by debtor Biolase at Banc of CA, including: (i) an operating account used to pay, among other things, incidentals, supplies, and direct expenses; (ii) a payroll account used to pay wages and salaries; (iii) a medical account used to pay medical reimbursements to employees; (iv) a concur account used to pay other employee reimbursements; (v) a depository account used for customer deposits that holds all incoming cash (the operating, payroll, medical and concur accounts all sweep to and from this account); and (vi) a money market account, which holds all available cash (the depository account sweeps to and from this account).

75.     Biolase also maintains a depository account at BofA for customer deposits, but which has limited activity.

76.    Debtor Model Dental maintains five (5) Bank Accounts at Banc of CA, including: (i) an operating account; (ii) a payroll account; (iii) a medical account; (iv) a concur account; and (v) a savings account.  Other than the operating account, which is used to pay incidentals, supplies, direct expenses and the like relating to Model Dental, the remaining accounts are not used and are in the process of being closed.

77.    Neither BL Acquisition nor BL Acquisition II maintain any bank accounts.

78.    In the ordinary course of business, each Bank charges certain service charges and other fees and expenses (collectively, the "Bank Fees") related to the Bank Accounts, which are automatically deducted from the Bank Accounts.  Although monthly Bank Fees can fluctuate depending on the amount of transactions in a given month, the Bank Fees average approximately $2,500 to $3,500 per month and are debited mid-month between the 15th and 20th.

79.    Additionally, the Debtors incur credit card payment processing fees ("Payment Processing Fees") related to sale transactions by customers using a credit card.  The Payment Processing Fees are collected by the following third parties who collect such fees on behalf of certain credit card companies: Authorize.net, American Express, and EBIZ Charge.  The Debtors pay approximately $450 (Authorize.net), $16,000 (American Express) and $50,000 (EBIZ) per month on account of Payment Processing Fees.

80.    The Debtors' day-to-day operational and financial transactions are conducted by Biolase.  In the ordinary course of business, Biolase makes certain payments on behalf of Model Dental to settle utilities and rent obligations and balance the books (this is because no cash is received into Model Dental).  Additionally, Biolase and Model Dental engage in non-cash intercompany transactions to allocate expenses.

26

81.     Biolase also settles intercompany balances on behalf of non-debtor affiliates on a bi-monthly basis.  This is because the non-debtor affiliates, which are foreign entities, only maintain a minimum cash operating balance and remit the excess to Biolase.  Although the non-debtor affiliates pay most of their expenses directly, Biolase pays expenses on behalf of one non-debtor affiliate, Biolase Spain, S.L., because that entity does not maintain its own checking or bank accounts.  These expenses consist primarily of sales rep compensation, taxes, and fees and generally does not exceed $30,000 per month.

82.     I believe that the relief sought in the Cash Management Motion is warranted.  The Cash Management System provides material benefits to the Debtors including, among other things, the ability to control corporate funds, ensure the availability of funds when necessary, and reduce costs and administrative expenses by facilitating the movement of funds and developing timely and accurate account balance information.  Disruptions to the Cash Management System could, among other things, lead to delays in satisfying the Debtors' obligations to employees, vendors, and suppliers.  To avoid the potential erosion of value that could ensue from any such interruptions, it is imperative that the Debtors continue using the Cash Management System consistent with the Debtors' historical practice.

**H.     Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtors to (A) Pay Prepetition Wages, Compensation, Employe Benefits, and Other Employee Obligations and (B) Continue Certain Employee Benefit Programs in the Ordinary Course; (II) Authorizing All Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations; and (III) Granting Related Relief ("Employee Wages Motion")**

83.     By the Employee Wages Motion, the Debtors request entry of an order (i) authorizing the Debtors to (a) pay prepetition wages, compensation, employee benefits, and other employee obligations and (b) continue certain employee benefit programs in the ordinary course;

4886-4332-1060

and (ii) authorizing all banks to honor checks for payment of prepetition employee obligations.   In addition to paying their employees on a biweekly basis, the Debtors maintain compensation and benefit programs, including wellness programs, a 401K plan and paid time off (PTO) program, and pay various administrative fees in connection therewith (collectively, the "Employee Programs" and the obligations to the Employees thereunder, the "Employee Obligations").

84.     The Employee Obligations include: (i) $601,780.72 for employee wages; (ii) $1,950.00 for payroll processing fees; (iii) $628,096.60 for employee withholdings, including without limitation, FICA (Social Security and Medicare), federal, state, and local income taxes, garnishments, health care payments, and certain voluntary payroll deductions; (iv) $98,517.78 for the Debtors' sponsored 401(k) retirement savings plan; (v) $1,500.00 for various independent contractors; (vi) $803710.45 for employees' accrued paid time off; (vii) $60,000.00 for certain reasonable expenses incurred within the scope of their employment, including expenses for travel, lodging, ground transportation, meals, supplies, and other business expenses; (viii) $54,000.00 for employee medical, prescription, dental, vision, and other health insurance plans; (ix) $2,600.00 for disability and life and AD&D programs; and (x) $2,248,838.00 for the Debtors' sales incentive program which incentivize sales-related employees with individual specified sales targets.   The Employee Obligations in an aggregate amount will not exceed $2,252,155.55 on an interim basis, and $4,500,993.55 (inclusive of the $2,252,155.55 approved on an interim basis) on final basis.

85.     I believe payment of the Employee Obligations and the continuation of the Employee Programs are necessary to the success of the Debtors' cases and should be authorized by this Court because to effectuate a successful chapter 11 process, and continue operating during these cases, the Debtors need their employees' continued commitment and support.   Therefore, the Debtors are requesting the relief in the Employee Wages Motion to minimize hardship to their

employees resulting from the commencement of these cases.  The Debtors must take all necessary steps to retain employees and bolster their morale to preserve and maximize the value of the Debtors' estates.

I.    **Debtors' Motion for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, and (IV) Granting Related Relief ("Utilities Motion")**

86.    By the Utilities Motion, the Debtors request entry of an order (i) approving the proposed form of adequate assurance of payment to the Debtors' utility providers ("Utility Companies," and individually, a "Utility Company"); (ii) establishing procedures for resolving objections by Utility Companies relating to the Debtors' proposed adequate assurance; and (iii) prohibiting Utility Companies from altering, refusing, or discontinuing services.  In connection with the normal operations of the Debtors' business, the Debtors use water, electric, gas, internet, telecommunications, waste, recycling, and other utility services (collectively, the "Utility Services").  While the Debtors pay for most of their Utility Services directly, some are billed to the Debtors' landlords and passed through to the Debtors under the applicable lease agreements.

87.    The Debtors' proposed adequate assurance deposit (the "Adequate Assurance Deposit") includes: (i) $3,000.00 for the Utility Company providing electricity; (ii) $1,876.00 for the Utility Companies providing waste disposal and recycling services; (iii) $116.50 for the Utility Companies providing first aid and fire safety services; (iv) $208.00 for the Utility Companies providing HVAC services; (v) $6,666.50 for the Utility Company providing internet services; (vi) $1,350.00 for the Utility Company that is the Debtors' cell phone provider; and (vii) $1,551.50 for the Utility Companies providing gas to the Debtors. The Adequate Assurance Deposit—in the

amount of $14,768.50—will be held in a segregated account for the benefit of the Utility Companies for the duration of these cases.

88.     I believe that the relief sought in the Utilities Motion is warranted because Utility Services are essential to preserving the Debtors' ongoing business operations as a going concern and the overall success of the Debtors' sale process and these cases.  Additionally, the proposed adequate assurance payment and procedures for resolving any objections by the Utility Companies proposed in the Utilities Motion, should be approved.  The Utilities Companies should also be prohibited from altering, refusing, or discontinuing service to the Debtors.  Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations would be disrupted.  The relief sought in the Utilities Motion is necessary to ensure that the Debtors maintain continued services from these Utility Companies to allow the Debtors to continue operating in the normal course during these cases.

**J.**     **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Them to (A) Maintain Insurance Policies and Surety Bonds and Honor Obligations Thereunder, and (B) Renew, Amend, Supplement, Extend, or Purchase New Insurance Policies and Surety Bonds, and (II) Granting Related Relief ("Insurance Motion")**

89.     By the Insurance Motion, the Debtors request entry of an order (i) authorizing the Debtors to (a) maintain their existing insurance policies and pay all obligations arising thereunder or related thereto, (b) renew, revise, extend, supplement, or enter into new insurance coverage as needed in their business judgment; and (ii) authorizing all banks to honor payments related thereto.

90.     Thirteen Insurance Policies (collectively, the "Financed Policies") are financed through an insurance premium financing agreement with First Insurance Funding (the "Financing Agreement").  The Debtors also make regular monthly, quarterly, and annual payments on account of the Insurance Policies not covered by the Financing Agreement.  The Debtors pay

approximately $2,879.50 per month for the Insurance Policies on a monthly payment cycle and approximately $51,491.00 per quarter for the Insurance Policies on a quarterly payment cycle.  As of the Petition Date, all of the Insurance Policies and the Financing Agreement, except the Debtors' auto insurance, have been fully paid through the end of their term.  Therefore, the Debtors are only requesting authority to pay their auto insurance and renew any policies that expire during the pendency of these cases.

91.    I believe that the relief sought in the Insurance Motion is warranted because the nature of the Debtors' business and these Chapter 11 Cases render it essential for the Debtors to maintain their Insurance Policies on an ongoing and uninterrupted basis.  Any interruption in insurance coverage would expose the Debtors to a number of risks, including: (a) the possible incurrence of direct liability for the payment of claims that otherwise would have been covered by any insurance policies; (b) the possible incurrence of material costs and other losses that otherwise would have been reimbursed; (c) the possible inability to obtain similar insurance coverage on terms as equally favorable as the present coverage; and (d) the possible incurrence of higher costs for re-establishing lapsed Insurance Policies or obtaining new insurance coverage.  In short, failure to maintain the Insurance Policies could have a detrimental impact on the Debtors' business, assets and the value of their estates.

### K.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees, (II) Authorizing the Debtors' Banks to Honor All Related Payment Requests, and (III) Granting Related Relief ("Taxes Motion")

92.    By the Taxes Motion, the Debtors request entry of interim and final orders (i) authorizing the Debtors to pay certain prepetition taxes and fees, including any penalties and interest thereon (collectively, the "Taxes and Fees"); and (ii) authorizing the Debtors' banks to process and pay checks and electronic fund transfer requests related thereto.  The Debtors also

31

request authority to pay Taxes and Fees owed to the various federal, state, and local governments, including taxing and licensing authorities (collectively, the "Authorities") that may become due during the pendency of the Chapter 11 Cases in the ordinary course of business.

93.    To the best of my knowledge, the Taxes and Fees generally consist of current tax and fee obligations, and are not in respect of catch-up payments, other than any prepetition payments that were interrupted by the commencement of these Chapter 11 Cases.

94.    The Debtors estimate that they have accrued approximately $1,107,894.39 in prepetition Taxes and Fees. The prepetition Taxes and Fees that the Debtors expect will become payable during the Chapter 11 Cases are summarized as follows:

| Category | Description | Interim | Final |
|---|---|---|---|
| **Sales Taxes** | The Debtors remit sales, use, and related taxes and fees to the Authorities in various states in connection with the sale of dental laser systems and consumables. | $176,000 | $313,000 |
| **State & Local Taxes** | The Debtors pay annual state and local taxes to Authorities in various jurisdictions. | $10,000 | $20,000 |
| **Payroll Taxes** | Inclusive of payroll withholding taxes ($628,096.60) and employer taxes ($65,797.79). | $693,894.39 | $693,894.39 |
| **Other Taxes** | Inclusive of long term deferred tax liability ($78,000) and franchise taxes ($3,000). | $0 | $81,000 |
| **Total** | | **$879,894.39** | **$1,107,894.39** |

95.    I believe that payment of the prepetition Taxes and Fees is essential to the Debtors' reorganization. First, the Debtors are required to pay prepetition Taxes and Fees to maintain their good standing to operate in the jurisdictions in which they do business. If such taxes are not paid, state and local authorities may refuse to issue good standing certificates, which are often required

in securities and financing transactions, and may refuse to take other actions requested of them by the Debtors during these Chapter 11 Cases.  The inability to obtain these documents may disrupt the Debtors' ability to operate and thereby diminish value to the detriment of all stakeholders. Second, the Debtors believe that some of these state and local authorities may initiate audits if the Debtors fail to pay the prepetition Taxes and Fees promptly.  Such audits would further divert the Debtors' attention and resources from the Debtors' sale process and otherwise administering these Chapter 11 Cases.  Third, the Debtors' directors and officers may be subject to personal liability in the event certain prepetition Taxes and Fees are not paid to the appropriate authorities.  At a minimum, this would cause distractions and potentially diminish the Debtors' value as a going concern.  For all of these reasons, I believe that payment of the prepetition Taxes and Fees is warranted.

    **L.**      **<u>Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock and (II) Granting Related Relief ("NOL Preservation Motion")</u>**

96.      By the NOL Preservation Motion, the Debtors request entry of interim and final orders (i) approving certain notification and hearing procedures (the "<u>Procedures</u>") related to certain transfers or other dispositions of debtor Biolase, Inc., existing common stock or any beneficial ownership therein (any such record or beneficial ownership of common stock, collectively, the "<u>Common Stock</u>"); and (ii) directing that any purchase, sale, or other transfer or disposition of Common Stock in violation of the Procedures shall be null and void *ab initio*.  The purpose of this relief is to minimize the risk that an "ownership change" occurs before the conclusion of these Chapter 11 Cases.  In doing so, the Debtors intend to maximize the value of their estates by limiting tax liabilities generated during or as a result of the actions taken during the Chapter 11 Cases.

33

97.    As of December 31, 2023, the Debtors had approximately $97 million in federal NOLs, approximately $80 million in state NOLs, and approximately $12 million of Section 163(j) interest expense carryforwards (together with the NOLs and certain other tax attributes, the "Tax Attributes").  The Debtors may generate additional Tax Attributes in the 2024 tax year, including during the pendency of these Chapter 11 Cases.  In the event any of the Debtors' Tax Attributes were to survive, the Debtors may be able to carry forward certain of those Tax Attributes to offset federal taxable income or federal tax liability in future years.

98.    The Debtors have limited the relief requested to the extent necessary to preserve estate value.  Specifically, the proposed interim order and proposed final order will affect only (a) holders of the equivalent of more than 1,646,880.03 shares of Common Stock  (*i.e.*, 4.5 percent or more of beneficial ownership of the Common Stock); and (b) parties who are interested in purchasing sufficient Common Stock to result in such party becoming a holder of 4.5 percent or more of beneficial ownership of the outstanding Common Stock.

99.    The Procedures will enable the Debtors to closely monitor certain transfers of beneficial ownership of Common Stock so as to be in a position to act expeditiously to prevent such transfers, if necessary, with the purpose of preserving the Tax Attributes.

100.    I believe that granting the relief requested in the NOL Preservation Motion will preserve the Debtors' flexibility in implementing an exit plan that makes full and efficient use of the tax attributes and maximizes the value of the Debtors' estates.

[*Remainder of page intentionally left blank*]

4886-4332-1060

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: October 1, 2024

By:      */s/ John R. Beaver*
Name:  John R. Beaver
Title:   Chief Executive Officer