## **Exhibit 2**

**DIP Term Sheet**

(See Attached)

*Execution Version*

**Biolase, Inc.**
**Terms and Conditions of**
**Proposed Senior Secured, Super-Priority**
**Debtor-in-Possession Credit Facility**

---

*The terms outlined below in this Terms and Conditions (this "**DIP Term Sheet**") are the terms and conditions for a senior secured, super-priority debtor-in-possession credit facility (hereinafter referred to as the "**DIP Facility**") to be made available to the Debtors (as defined below). This DIP Term Sheet, the Interim Order (as defined below), and the Final Order (as defined below) shall collectively constitute the exclusive and definitive documentation and agreement among the parties for the DIP Facility (the "**DIP Financing Documents**"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in that certain Credit Agreement, dated November 9, 2018, by and among the Debtors and SWK (as such agreement may be modified, amended, or restated from time to time, the "**Pre-Petition Credit Agreement**"):*

---

| | |
|---|---|
| **Borrowers:** | Biolase, Inc., BL Acquisition Corp., BL Acquisition II, Inc., and Model Dental Office, LLC (the "**Debtors**"). |
| **Amount and Type of Facility:** | After entry of the Interim Order (as defined below), the DIP Facility will consist of a consolidated, delayed, multi-draw term loan in the aggregate principal amount of no less than $5.0 million, (the "**DIP Loan Commitment**"), which amount is inclusive of certain amounts outstanding under the Pre-Petition Credit Agreement that were advanced from and after September 3, 2024 (estimated to be approximately $2.5 million) (the "**DIP Facility**"). |
| **Agent:** | SWK Funding LLC ("**SWK**"). |
| **DIP Lenders:** | SWK Funding LLC (the "**DIP Lenders**"). |
| **Borrowing Availability:** | All new advances under the DIP Facility shall be limited by the Budget and the Draw Schedule, unless the Termination Date shall have occurred before any such new advance: |
| | Within this term sheet, the "**Draw Schedule**" shall mean: |
| | from the Petition Date through November 1, 2024 an aggregate amount of $1,429,126.00, with the remainder of the DIP Loan Commitment available after entry of the Final Order; provided, however, the funding necessary to wind down the Debtors' estates after the 363 Sale shall be subject to a budget agreed to by the Debtors and SWK and subject to the Final Order. |
| | The Draw Schedule may be modified and amended from |

time to time only with the consent of SWK and the Debtors.

The availability under the DIP Facility may be reduced by reserves as may be established by SWK in its commercially reasonable discretion from time to time to reflect, among other things, contingencies or risks that arise after the date of this DIP Term Sheet that are reasonably likely to materially impact the DIP Collateral, the liens of SWK and the DIP Lenders upon such DIP Collateral, or the business and operations of the Debtors; *provided, however*, that the cumulative amount of any such reserves shall not exceed ten percent (10%) of the amount of the DIP Facility.

**Budget and Variances:**

Subject to the Budget Variances (as defined below) (i) the Debtors' Budget line items for cash receipts and cash disbursements (excluding fees and expenses of third party professionals engaged by or for the benefit of Debtors or the DIP Lenders (collectively, "**Professional Fees**")) shall each be adhered to, by line item, on a weekly basis and a cumulative basis for the Budget (as defined below) period then ending as described below, provided, however, that amounts not disbursed in a line item shall be deemed to roll over to subsequent weeks and (ii) the Debtors' disbursements for Professional Fees (which shall be reported in a manner so that Professional Fees for each retained professional shall be reflected on its own line item) shall be adhered to on a cumulative basis for that portion of the Budget period then ending, except as to the DIP Lenders' Professional Fees (which DIP Lender Professional Fees shall not be limited by the Budget).

Actual amounts for each cash receipt and cash disbursement from operations line items (which shall not and does not include any Professional Fees) may not vary from the applicable Budget (including any amounts deemed to roll over from a previous week due to not being spent) by (i) more than ten percent (10%) by line item on a trailing three-week basis; or (ii) ten percent (10%) on a cumulative basis (collectively, the "**Budget Variances**").

On or before the third business day of each week, commencing with the first week following the Petition Date, the Debtors shall deliver to SWK an Approved Budget Variance Report.

**Fees:**

Debtors agree to pay the costs and expenses of SWK as set

2

forth in the Section titled "Agent Fees and Expenses" below.

**Termination Date:** The earliest to occur of: (a) the Maturity Date (as defined below); (b) twenty-eight (28) days after the Petition Date (as defined below) if the Final Order has not been entered; (c) acceleration of the obligations under the DIP Facility; (d) the effective date of a confirmed plan of reorganization or liquidation that provides for indefeasible payment in full, in cash of all obligations owing under the DIP Facility and is otherwise acceptable to SWK in its reasonable discretion; (e) the date which is the closing date of any sale of all or substantially all of the Debtors' assets; (f) the entry of an order by the Bankruptcy Court (as defined below) (i) granting relief from the automatic stay permitting foreclosure of any assets of the Debtors with a value in excess of $250,000 in the aggregate, (ii) granting any motion by SWK to terminate the use of cash collateral or lift the stay or otherwise exercise remedies against any cash collateral, (iii) appointing a trustee or an examiner with special powers, or (iv) dismissing or converting the Chapter 11 Case (as defined below); (g) the filing or support by Debtors of a plan of reorganization that (i) does not provide for indefeasible payment in full, in cash of all obligations owing under the DIP Facility and (ii) is not otherwise acceptable to SWK in its reasonable discretion; and (h) entry of a Bankruptcy Court order granting liens or claims that are senior or *pari passu* to the liens securing the DIP Facility. The date on which the earliest of clauses (a) through (h) above occurs and SWK provides notice thereof to the Debtors being referred to hereinafter as the "**Termination Date**." On the Termination Date, the DIP Facility shall be deemed terminated, and SWK shall have no further obligation to provide financing pursuant to the DIP Facility or DIP Financing Documents, except for funding of the Carve Out.

**Non-Default Interest Rate and Payment Terms:** Interest on all outstanding advances under the DIP Facility shall accrue from and after the Petition Date at a per annum rate equal to the non-default rate of interest in force under the Pre-Petition Credit Agreement as of the Petition Date (the "**Non-Default Interest Rate**").

Interest with respect to any outstanding obligations under the Pre-Petition Credit Agreement shall, to the extent permitted by applicable bankruptcy law, accrue from and after the Petition Date at the rate of interest set forth in the

#509079622

4855-3503-1271

Pre-Petition Credit Agreement.

**Default Interest Rate:** Effective immediately upon the occurrence of an Event of Default unless waived in writing by SWK, interest on the outstanding loans under the DIP Facility shall accrue at a rate that is 2% per annum in excess of the Non-Default Interest Rate.

**Loan Payments:** The Debtors promise and agree to pay to SWK and the DIP Lenders all DIP Facility advances, together with interest thereon accruing pursuant to the DIP Financing Documents, in full, in cash, at the times set forth in the DIP Financing Documents, but no later than the Termination Date.

All unpaid principal, interest, fees, costs and expenses on the DIP Facility shall be due and payable in full by the Debtors on the Termination Date, whether at maturity, upon acceleration or otherwise and if such amounts are not paid in full in cash, interest, fees, costs, and expenses in respect of the DIP Facility shall continue to accrue until paid in full.

**Use of Proceeds:** Proceeds of the DIP Facility shall be used solely for the following purposes (and to the extent identified in the Budget): (a) to fund, after application of all other available cash, post-petition operating expenses and working capital needs of the Debtors, including, but not limited to, those activities required to remain in, or return to, compliance with laws in accordance with 28 U.S.C. § 1930; (b) to pay interest, fees and expenses to SWK in accordance with this DIP Term Sheet (whether or not such amounts are reflected in the Budget); (c) to fund fees and expenses incurred in connection with the 363 Sale (as defined below); (d) to pay permitted pre-petition claims and adequate protection payments, if any; (e) to pay Professional Fees provided for in the Budget, including the funding of the Carve Out; and (f) to pay other costs and expenses of administration of the Chapter 11 Case.

Proceeds of the DIP Facility or cash collateral shall not be used (a) to permit the Debtors, or any other party-in-interest or their representatives to challenge or otherwise contest or institute any proceeding to determine (i) the validity, perfection or priority of security interests in favor of SWK, the Pre-Petition Agent, the Pre-Petition Lenders or the DIP

4

Lenders or (ii) the enforceability of the obligations of the Debtors or any guarantor under the Pre-Petition Credit Agreement, any other Pre-Petition Loan Documents, or the DIP Facility, (b) to investigate, commence, prosecute or defend (or support any other person or entity in investigating, commencing, prosecuting, or defending) any claim, motion, proceeding or cause of action against SWK, the Pre-Petition Agent, the Pre-Petition Lenders, or the DIP Lenders and their agents, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims, (c) to investigate, commence, prosecute or defend (or support any other person or entity in investigating, commencing, prosecuting, or defending) any claim or proceeding or cause of action to disallow or challenge the obligations of the Debtors or any guarantor under Pre-Petition Credit Agreement, any other Pre-Petition Loan Documents or the DIP Financing Documents, or (d) to fund acquisitions, capital expenditures, capital leases, or any other similar expenditure other than capital expenditures specifically set forth in the Budget and approved by SWK, provided that a Committee (if any) and its professionals shall be permitted to investigate the liens, claims, and potential causes of action against the Pre-Petition Lenders in connection with the Pre-Petition Credit Agreement, with such investigation fees not to exceed $25,000.

**Cash Management Collections and Remittances:**    The Debtors shall use a cash management system that is the same as or substantially similar to its pre-petition cash management system. Any material changes from such pre-petition cash management system must be acceptable to SWK in its reasonable discretion. The Interim Order and Final Order shall provide SWK and the DIP Lenders with a valid and enforceable lien and security interest on the cash held in the Debtors' bank accounts.

**Pre-Petition Obligations:**    As of the date of this DIP Term Sheet, the Debtors owe certain obligations under the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents. The lenders party to the Pre-Petition Credit Agreement are herein referred to collectively as the "**Pre-Petition Lenders**" and each individually a "**Pre-Petition Lender**") and SWK, in its role as Agent for the Pre-Petition Lenders, is hereinafter referred to as the "**Pre-Petition Agent.**"

5

Upon entry of the Final Order, any amounts advanced to the Debtors in respect of the Pre-Petition Credit Agreement from and after September 3, 2024 (including accrued, unpaid interest from the Petition Date) shall be deemed obligations under the DIP Facility.

**Super-Priority Administrative Claim:** Amounts owed by Debtors to SWK pursuant to the DIP Facility (including all accrued interest, fees, costs and expenses) shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code (as defined below), a claim having priority over any or all administrative expenses of the kind specified in, among other sections, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code, subject to payment of the Carve Out.

**Collateral Security:** The DIP Facility (including accrued interest, fees, costs and expenses) shall be secured, subject and subordinate only to any valid, properly perfected, enforceable, non-avoidable prior liens and security interests existing as of the Petition Date that are senior to the liens and security interests in favor of the Pre-Petition Agent and/or the Pre-Petition Lenders, subject to payment of the Carve Out, by first priority senior and priming liens and security interests (the "**DIP Liens**") in all of the Debtors' property, including, without limitation, all of Debtors' existing and future acquired property and interests of any nature whatsoever, real and personal, tangible and intangible, accounts receivable, general intangibles, payment intangibles, supporting obligations, investment property, commercial tort claims, inventory, rolling stock, machinery, equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights, and tax refunds of the Debtors, excluding only Avoidance Actions, but including, subject to entry of the Final Order, Avoidance Proceeds (collectively, the "**DIP Collateral**").

**Lien Validation and Perfection:** All liens authorized and granted pursuant to the Interim Order or the Final Order entered by the Bankruptcy Court approving the DIP Facility or with respect to adequate protection shall be deemed effective and perfected as of the Petition Date, and no further filing, notice or act will be required to effect such perfection.

The Debtors shall stipulate in the Interim Order and Final Order that (i) the liens of the Pre-Petition Agent and the

other Pre-Petition Lenders securing the Pre-Petition Credit Facility are valid, perfected, encumber all assets of the Debtors, and have first priority and (ii) the Debtors have no claims, offsets or any other causes of action against the Pre-Petition Agent or any of the Pre-Petition Lenders that would impair, in any manner, the liens of the Pre-Petition Agent or any of the Pre-Petition Lenders against the Debtors' assets or the obligations of the Debtors to the Pre-Petition Agent and Pre-Petition Lenders under the Pre-Petition Credit Facility.  The Debtors' stipulations shall be binding upon all parties in interest in the Chapter 11 Case, including any committee that is appointed, unless (i) an adversary proceeding is filed by any party-in-interest prior to the expiration of seventy-five (75) days after entry of the Interim Order (the "**Review Period**") against the Pre-Petition Agent or the Pre-Petition Lenders (as applicable) challenging the Pre-Petition Agent or the Pre-Petition Lender's liens (as applicable) or otherwise asserting estate claims against the Pre-Petition Agent or the Pre-Petition Lenders (as applicable), and (ii) a final, non-appealable judgment is entered against the Pre-Petition Agent or the Pre-Petition Lenders (as applicable) in such adversary proceeding; provided, however, that any party-in-interest that fails to file an adversary proceeding within the Review Period shall be forever barred from asserting any claims against the Pre-Petition Agent and the Pre-Petition Lenders on behalf of the Debtors' estate, or challenging in any manner the liens and claims of the Pre-Petition Agent or the Pre-Petition Lenders against the Debtors.  If a chapter 7 or chapter 11 trustee is appointed or elected during the Review Period, then such period with respect to such trustee only, shall be the later of (i) the last day of the Review Period and (ii) the date that is twenty (20) calendar days after the date on which such trustee is appointed or elected.

**Release of Claims**

In consideration of the furnishing of the DIP Facility, the Debtors, subject to the rights of another party to bring a Challenge Action during the Review Period, and upon entry of the Final Order, hereby absolutely releases and forever discharges each of the Pre-Petition Agent and Pre-Petition Lenders and their affiliates, officers, directors, employees, attorneys, and other representatives from any and all claims and causes of action of every kind and nature that exist on the date hereof, including, but not limited to with respect to or relating to the Pre-Petition Credit

Agreement or other Pre-Petition Loan Documents, including (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the Pre-Petition Lenders or Pre-Petition Agent.

|  |  |
|---|---|
| **506(c) Surcharge/Equities of Case** | Upon entry of the Final Order, the Debtors hereby waive any right to surcharge the prepetition collateral securing the Pre-Petition Credit Agreement or DIP Collateral, whether pursuant to Sections 506(c) or 105(a) of the Bankruptcy Code or any other applicable law. |
|  | Upon entry of the Final Order, SWK, the DIP Lenders, the Pre-Petition Agent and the Pre-Petition Lenders shall not be subject to the "equities-of-the-case" exception of Section 552(b) of the Bankruptcy Code, the equitable doctrine of "marshaling," or any similar claim or doctrine with respect to any DIP Collateral or collateral securing the Pre-Petition Credit Agreement. |
| **Adequate Protection:** | As adequate protection and in consideration for being primed by the DIP Lenders' claims and liens, to the extent of diminution in the Pre-Petition Lenders' interests in the Debtors' collateral securing the amounts due under the Pre-Petition Credit Agreement following the Petition Date on account of granting the Super-Priority Administrative Claim, granting the DIP Liens, the Debtors' use of cash collateral, the subordination of the Pre-Petition Credit Agreement liens thereto and to the Carve Out, the imposition or enforcement of the automatic stay under Section 362(a) of the Bankruptcy Code, and/or otherwise pursuant to Sections 361(a), 363(c) and 364(d)(1) of the Bankruptcy Code, the Pre-Petition Agent and Pre-Petition Lenders (a) shall receive a claim having priority over any and all expenses of the kind specified in, among other sections of the Bankruptcy Code, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, and 1114, subject to payment of the Carve Out and subject to the super-priority administrative claims of SWK and the DIP Lenders under the DIP Facility; and (b) shall have valid, binding, enforceable and perfected liens in all DIP Collateral, subject to payment of the Carve Out and the DIP Liens (the "**SWK Adequate Protection Liens**"). |
|  | The SWK Adequate Protection Liens granted herein in |

8

favor of the Pre-Petition Agent and Pre-Petition Lenders shall not encumber Avoidance Actions, but, subject to entry of the Final Order, shall encumber Avoidance Proceeds.

**Agent Fees and Expenses:** The Debtors shall promptly pay or reimburse SWK when invoiced for all reasonable costs and expenses of counsel (including, without limitation, Delaware counsel) and financial advisors for SWK, which fees and expenses relate to the DIP Facility and the administration and interpretation of, and the enforcement of remedies under, the DIP Facility, regardless of whether such amounts were incurred before or after the Petition Date, including but not limited to, due-diligence, duplication or printing costs, consultation, travel, and attendance at court hearings, regardless of whether the DIP Facility is consummated. SWK shall have the right to charge the DIP Facility for any such fees and costs. Failure to pay such fees and expenses within ten (10) Business Days of delivery of the applicable invoice shall be an Event of Default under the DIP Facility, provided that SWK shall concurrently provide summary invoices to the U.S. Trustee and the Committee and allow such parties at least ten (10) calendar days to review and object to any fees or expenses requested therein.  If any objection is asserted, the Bankruptcy Court shall decide the issue and the Debtors shall not be required to pay any disputed portion of such fees or expenses until the matter is resolved.

**Conditions Precedent to Initial DIP Facility Advance:** The closing of the DIP Facility shall be subject to (a) approval of the Interim Budget (as defined below) and Budget by SWK and receipt of all financial information and projections regarding the Debtors requested by SWK, all in form and substance satisfactory to SWK in its reasonable discretion, (b) entry of an Interim Order and the Final Order approving the DIP Facility, its superpriority administrative claims and all first priority (subject only to the Carve Out) and other liens securing the DIP Facility, and containing such other orders and findings as SWK may require, including automatic modification of the automatic stay upon the occurrence of an Event of Default enabling SWK to exercise certain rights and remedies against the DIP Collateral, which Interim Order or Final Order, as applicable, shall not have been modified or amended without approval of SWK, and shall not have been reversed, vacated or stayed pending appeal, in form and substance satisfactory to SWK in its reasonable discretion, (c) SWK's approval of all material motions and orders filed in the Chapter 11 Case requiring

the expenditure of cash, and (d) continuation of Debtors' present cash management system.

**Additional Conditions to Each Borrowing Under the DIP Facility:**

The funding of each DIP Facility advance shall be subject to the following conditions precedent: (a) There shall exist no Event of Default (or event that would constitute an Event of Default with the giving of notice or lapse of time) under any of the DIP Financing Documents, and the representations and warranties therein shall be true and correct in all material respects when made; (b) There shall have occurred no material adverse change in the Debtors' operations (financial, environmental, or otherwise), performance, or properties (other than as a result of the commencement of the Chapter 11 Case), since the date of this DIP Term Sheet, that has or could be expected to have a Material Adverse Effect on the rights and remedies of SWK or on the ability of the Debtors to perform its obligations under the DIP Facility; (c) Compliance with Bankruptcy Rule 4001 and any applicable Local Bankruptcy Rules, the entry of the Interim Order and the Final Order (as applicable), together with any other order requested by SWK authorizing and approving the DIP Facility in form, substance and amount and providing for the DIP Collateral, all acceptable to SWK in its reasonable discretion; (d) Payment of all fees and expenses owing to SWK in connection with and as provided in the DIP Facility; and (e) The DIP Financing Documents and the Interim and Final Orders shall include such waivers, indemnities, and other provisions as are acceptable to SWK in its reasonable discretion.

**Affirmative and Negative Covenants:**

Debtors shall comply with the following affirmative and negative covenants: (a) compliance with Budget covenants consistent with the section titled "Budget and Variances," (b) the Debtors shall, from and after the Petition Date, satisfy the Milestones; (c) the Debtors shall not make any expenditures or authorize any employee or agent of the Debtors to expend any time with respect to the assets listed on Schedule 1.1(b) of the Stalking Horse Asset Purchase Agreement; (d) the Debtors shall, contemporaneously with closing a sale of substantially all of its assets, remit the net proceeds of such sale to SWK for immediate application to the obligations owed to SWK, the DIP Lenders, and the Pre-Petition Lenders, subject to payment of the Carve Out, the Budget and any agreed wind-down budget; and (e) the Debtors shall not take (or refrain from taking) any action that

|                              | could reasonably be expected to have a Material Adverse Effect. |
|------------------------------|---|
| **Bankruptcy Court Filings:** | As soon as practicable in advance of filing with the Bankruptcy Court, Debtors shall furnish to SWK (i) the motion seeking approval of and proposed forms of the Interim Order and the Final Order, which motion shall be in form and substance satisfactory to SWK and the Debtors, (ii) the motions seeking approval of the bidding procedures and the 363 Sale, and the proposed forms of the orders related thereto, which shall be in form and substance satisfactory to SWK and the Debtors, (iii) all other proposed orders and pleadings related to the DIP Facility, which orders and pleadings shall be in form and substance satisfactory to SWK and the Debtors, (iv) any plan of reorganization or liquidation, and/or any disclosure statement related to such plan (which plan or disclosure statement shall comply with the requirements set forth herein), which shall be in form and substance satisfactory to SWK and the Debtors, (v) any motion and proposed form of order seeking to extend or otherwise modify the Debtors' exclusive periods set forth in Section 1121 of the Bankruptcy Code, (vi) any motion seeking approval of any sale of the Debtors' assets and any proposed form of a related bidding procedures order and sale order (other than those with respect to the bidding procedures and the 363 Sale), and (vii) any other motion filed seeking approval of any matter requiring material expenditures of DIP Collateral must comply with the Budget (each of which must be in form and substance satisfactory to SWK and the Debtors). |
| **Sale Process:**            | The Debtors shall conduct a sale process for the sale of substantially all of its assets in accordance with the Milestones defined below. |
|                              | The management team of the Debtors shall oversee the sale process on behalf of the Debtors and shall exercise its commercially reasonable best efforts to provide SWK with access to all potential bidders and other interested parties and any information provided to the Debtors by such parties. |
|                              | In addition to the reporting required under the Pre-Petition Credit Agreement, the Debtors shall, upon request, provide or cause to be provided to SWK updates and reports regarding the status of the marketing and sale process of the Debtors. Debtors shall also cause its management team to be made available during ordinary business hours and following |

reasonable advance notice to provide periodic telephonic updates of such reports to SWK from time to time, as reasonably requested by SWK.

<u>Milestones</u>. The Debtors shall be required to comply with the following (the "**Milestones**"):

      (a)     On or within two (2) days of the Petition Date, or such later date to which SWK consents in writing in its sole discretion, the Debtors shall file a motion, in form and substance acceptable to SWK, requesting entry of the Sale Procedure Order (as defined below) and seeking approval of the sale in accordance with the Stalking Horse Asset Purchase Agreement to the Stalking Horse Bidder, or such higher bidder as may be identified through the procedures approved in the Sale Procedure Order as the Winning Bidder;

      (b)     On or before the date that is twenty-one (21) days after the Petition Date, or such later date to which SWK consents in writing in its sole discretion, the Bankruptcy Court shall have entered the Sale Procedure Order;

      (c)     On or before the date that is thirty-one (31) days after the Petition Date, or such later date to which SWK consents in writing in its sole discretion, all competing bids under the Sale Procedure Order shall have been submitted;

      (d)     On or before the date that is thirty-five (35) days after the Petition Date, or such later date to which SWK consents in writing in its sole discretion, an auction under the Sale Procedure Order shall have occurred (as applicable);

      (e)     On or before the date that is forty-two (42) days after the Petition Date, or such later date to which SWK consents in writing in its sole discretion, the Bankruptcy Court shall have conducted a hearing to approve the 363 Sale;

      (f)     On or before the date that is forty-five (45) days after the Petition Date, or such later date to which SWK consents in writing in its sole discretion, the Bankruptcy Court shall have entered the Sale Order approving the 363 Sale; and

      (g)     On or before the date that is five (5) days after entry of the Sale Order, provided that the Bankruptcy Court has waived the stay imposed by Bankruptcy Rule 6004(h) or

12

such later date to which SWK consents in writing in its sole discretion, the 363 Sale shall be closed, with proceeds of the 363 Sale paid directly to SWK to be applied to the obligations under the DIP Facility and Pre-Petition Credit Agreement, subject to payment of the Carve Out.

Notwithstanding anything to the contrary herein, the Bankruptcy Court may set dates with respect to the Milestones beyond the outer dates specified above to accommodate its own schedule and to the extent the Bankruptcy Court makes such an extension, the Milestones hereunder shall be automatically extended by the same period as the Bankruptcy Court's extension.

SWK shall have the right to "credit bid" any secured obligations owed to it by the Debtors in any sale of the Debtors' assets.

**Remedies:**

Following the Termination Date and provided that the Bankruptcy Court does not enter any order to the contrary, within five (5) Business Days following the Debtors' receipt of a Default Notice as defined below, SWK shall have customary remedies, including, without limitation, the right to realize on all DIP Collateral, the right to exercise any remedy available under applicable law, without the necessity of obtaining any further relief or order from the Bankruptcy Court. Consistent with the foregoing sentence, section 362 relief from the stay in favor of SWK shall be embodied in any order approving the DIP Facility and the use of cash collateral.

**Events of Default:**

The term "**Default**" and "**Event of Default**" shall mean the occurrence of any of the following:

- The Chapter 11 Case shall be converted to a case under Chapter 7 of the Bankruptcy Code or be dismissed or a motion requesting such relief shall have been filed which the Debtors fail to timely oppose.

- Filing or support of a proposed plan of reorganization by the Debtors that does not provide for the indefeasible payment in full and in cash of Debtors' obligations outstanding under the DIP Facility, unless otherwise agreed in writing by SWK in its sole discretion.

- Entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan

#509079622

of reorganization that does not require the indefeasible repayment in full, in cash of the DIP Facility as of the effective date of the plan, unless otherwise agreed in writing by SWK in its sole discretion.

- Appointment of a trustee under Section 1104 of the Bankruptcy Code without the express written consent of SWK, or the filing of any motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Appointment of an examiner with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code without the prior written consent of SWK, or the filing of a motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Entry of an order by the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the DIP Facility, the Interim Order, or Final Order, without the prior written consent of SWK or the filing of a motion or other pleading requesting such relief which the Debtors fail to timely oppose.

- Any attempt by Debtors to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, invalidate, reduce or otherwise impair SWK's claims, or to subject any of SWK's collateral to a surcharge pursuant to Section 506(c) of the Bankruptcy Code.

- The Debtors shall request approval of any postpetition financing, other than the DIP Facility, that would not immediately repay all DIP Facility obligations, in full, in cash, on the date of the closing of such postpetition financing.

- Debtors shall apply for an order substituting any assets (other than cash) for all or any portion of the DIP Collateral.

- Other than with respect to the Carve-Out, entry of an order granting liens or claims that are senior or *pari passu* to the liens granted on the DIP Collateral in favor of SWK and/or the DIP Lenders under the DIP Financing Documents.

14

- The Debtors shall assert that any of the DIP Liens are invalid, or any DIP Liens granted to the DIP Agent or DIP Lender shall be determined to be invalid.

- Any payment on, or application for authority to pay any pre-petition claim owing to terminated employees or lease rejection damages without prior written consent of SWK or as otherwise set forth in the Budget.

- If at any time prior to the conclusion of the sale process, SSG ceases to be engaged by the Debtors, ceases to be involved in the sale process, or the sale process is halted without the DIP Agent's consent.

- A final order is entered granting any secured creditor (other than SWK) with a claim in excess of $250,000 relief from the automatic stay.

- Failure to make all payments under the DIP Facility when due (and after giving effect to any applicable grace period).

- Failure to pay any post-petition material indebtedness when due (and after giving effect to any applicable grace period).

- Breach of any covenant set forth in any DIP Financing Document.

- Any material representation or warranty by Debtors is incorrect or misleading in any material respect when made.

- Exclusivity shall have been terminated by the Debtors or the Debtors shall have agreed to any such termination.

- After entry thereof, either of the Sale Procedure Order or the Sale Order shall cease to be in full force and effect, shall have been reversed, stayed, vacated or subject to stay pending appeal or shall have been modified or amended without the prior written consent of SWK.

- Debtors shall take (or support any other Person in taking) any action in order to restrict or prohibit SWK or any DIP Lender or Pre-Petition Lender from submitting a "credit bid" for any assets of the Debtors used as all or part of its bid an amount of secured

15

obligations owed to it by the Debtors.

- Any Challenge Action (as such term is defined in the Interim Order or the Final Order) is commenced by the Debtors against the Pre-Petition Agent or any Pre-Petition Lender.

- The commencement of an action or filing of a motion by the Debtors challenging the rights and remedies of SWK or the DIP Lenders under the DIP Financing Documents or that is otherwise inconsistent with the DIP Financing Documents.

- The Debtors fail to disburse the sale proceeds to the DIP Lenders substantially contemporaneously with the closing of the 363 Sale, subject to payment of the Carve Out.

**Indemnification:** The Debtors shall indemnify and hold SWK, the DIP Lenders, and their officers, directors, employees and formally engaged formally engaged agents (including all of their professionals) (each an "**Indemnified Party**") harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all reasonable fees and disbursements of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in connection with or arising out of or by reason of any investigation, litigation or proceeding arising out of or relating to or in connection with the DIP Facility, the DIP Financing Documents, any obligation, or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Facility, except to the extent the same is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence, fraud, willful misconduct, or breach of their obligations under the DIP Facility. Notwithstanding the foregoing, the Debtors shall not indemnify any Indemnified Party for costs, expenses, or liabilities incurred in connection with a successful Challenge Action brought in accordance with Paragraph 27 of the Interim Order. The indemnification terms and conditions of the Pre-Petition Credit Agreement are hereby incorporated in this DIP Term Sheet.

**Governing Law:** The DIP Financing Documentation shall be governed by the laws of the state of New York, subject to applicable federal bankruptcy laws.

16

**Other Definitions:**

"**363 Sale**" means the sale of all or substantially all of the assets of the Debtors under Section 363 of the Bankruptcy Code.

"**Approved Budget Variance Report**" means a current report that: (i) details the actual amount of cash receipts and disbursements for the prior week for each line item included in the Budget (on a weekly and cumulative basis), (ii) compares such actual cash receipts and disbursements (on a line item by line item basis) with the weekly and cumulative budgeted amounts for each such line item set forth in the Budget for such period, and (iii) provides an explanation for all variances between budgeted and actual amounts.  Each Approved Budget Variance Report will be certified as true and correct by the Debtors' chief financial officer or chief executive officer.

"**Auction**" means an auction held in connection with the 363 Sale and in accordance with the provisions set forth in the Sale Procedure Order.

"**Avoidance Actions**" means any causes of action that could be brought under Sections 544-548 of the Bankruptcy Code or any applicable state fraudulent transfer or similar statute.

"**Avoidance Proceeds**" means the proceeds received from, or property recovered in respect of, Avoidance Actions.

"**Bankruptcy Code**" means Title 11 of the United States Code (11 U.S.C. § 101 et seq.), as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware presiding over the Chapter 11 Case.

"**Budget**" means the budget of Debtors relative to the operations of the Debtors in the Chapter 11 Case for any fiscal period, as delivered to SWK in form and substance satisfactory to SWK. A Budget for the first 8 weeks of the Chapter 11 Case (the "**Interim Budget**") must be approved by SWK and must be attached to the Interim Order.  A Budget covering the period from the date of entry of the Final Order through the Maturity Date must be delivered by the Debtors to SWK (and approved by SWK in its sole discretion) at least two (2) Business Days before any hearing related to final approval of the DIP Facility and

17

must be attached to the Final Order.

"**Carve Out**" means the sum of:

(a)      all fees required to be paid to the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) plus interest at the statutory rate (collectively, the "**Statutory Fees**");

(b)      all reasonable fees and expenses up to $10,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code;

(c)      all unpaid postpetition fees and expenses of the professionals retained by the Debtors pursuant to Sections 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and by the Committee (if any) pursuant to Sections 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Chapter 11 Professionals**"), but only to the extent that such fees and expenses are (i) incurred before or on the first Business Day after delivery by the DIP Agent of a notice of a Termination Event, (ii) within the cumulative amounts set forth in the Budget approved by SWK for such Chapter 11 Professional as of the date of the Termination Event, and (iii) allowed at any time by the Bankruptcy Court under Sections 330, 331, or 363 of the Bankruptcy Code;

(d)      postpetition fees and expenses of (i) the Debtor Professionals incurred after the first Business Day following delivery by the DIP Agent of a notice of the occurrence of a Termination Event in an aggregate amount not to exceed $100,000 to the extent such fees and expenses are allowed at any time by the Bankruptcy Court under Sections 330, 331, or 363 of the Bankruptcy Code and (ii) the Committee Professionals incurred after the first Business Day following delivery by the DIP Agent of a notice of the occurrence of a Termination Event in an aggregate amount not to exceed $15,000, to the extent such fees and expenses are allowed at any time by the Bankruptcy Court under Sections 330, 331, or 363 of the Bankruptcy Code.

Provided, however, that in no event shall the Carve Out for each Chapter 11 Professional exceed the cumulative

18

amounts for postpetition fees set forth for such professional in the Budget.

Provided, further, however, that the Carve Out for Chapter 11 Professionals shall be first paid from any retainers or any professional expense escrow account established by the Debtors.

The Carve Out shall not include payment for any fees and expenses, if any, of the Chapter 11 Professionals incurred directly or indirectly, in respect of, arising from or relating to:

(i) the initiation, joinder, support, or prosecution of any action contesting the indebtedness owed to SWK, the DIP Lenders, the Pre-Petition Agent, or the Pre-Petition Lenders, or the validity of any liens granted to SWK, the DIP Lenders, the Pre-Petition Agent, or the Pre-Petition Lenders;

(ii) preventing, hindering or otherwise delaying (or supporting any other person or entity in preventing, hindering or otherwise delaying), whether directly or indirectly, the exercise by SWK or the Pre-Petition Agent of any of its rights and remedies under the Interim Order, Final Order, or documents comprising the DIP Facility, DIP Financing Documents, Pre-Petition Credit Agreement, or other Pre-Petition Loan Documents;

(iii) the commencement, support, or prosecution of any action or proceeding of any claims, causes of action or defenses against SWK, the DIP Lenders, the Pre-Petition Agent, the Pre-Petition Lenders or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from SWK, the DIP Lenders, the Pre-Petition Agent, or the Pre-Petition Lender;

(iv) any request to borrow money other than pursuant to the terms of the Interim Order, the Final Order, or the DIP Financing Documents;

(v) with respect to the Debtors, any of the Debtor Professionals, or any of their successors or assigns (including, without limitation, any trustee, responsible

officer, examiner, estate administrator or representative or similar person appointed in a case for the Debtors under any chapter of the Bankruptcy Code) performing or commencing any investigation or litigation (whether threatened or pending) by the Debtors with respect to any matter released or to be released, waived, or to be waived, or specified as not subject to challenge by the Debtors pursuant to the Interim Order or Final Order; or

(vi) for any other purpose for which proceeds of the DIP Facility may not be used pursuant to this DIP Term Sheet.

"**Chapter 11 Case**" means the voluntary Chapter 11 case commenced by the Debtors in the Bankruptcy Court.

"**Committee**" means any statutory committee appointed in the Chapter 11 Case.

"**Final Order**" means a final, non-appealable order of the Bankruptcy Court, that, without limitation, approves the DIP Facility and grants the liens and security interests contained therein, on terms satisfactory to SWK in its reasonable discretion.

"**Interim Order**" means an interim order of the Bankruptcy Court authorizing Debtors, among other things, to obtain interim financing and incur post-petition indebtedness on terms satisfactory to SWK in its reasonable discretion.

"**Material Adverse Effect**" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, assets, properties, liabilities (actual or contingent) or financial condition of the Debtors; (b) a material impairment of the rights and remedies of any of the DIP Agent, DIP Lender, Pre-Petition Agent, or Pre-Petition Lenders under any of the DIP Financing Documents, Pre-Petition Credit Agreement, or other Pre-Petition Loan Documents, (c) a material adverse effect on the Debtors' ability to perform any of its material obligations under the DIP Financing Documents, Pre-Petition Credit Agreement, or other Pre-Petition Loan Documents , or (d) a material adverse effect upon the legality, validity, binding effect, or enforceability against the Debtors of any of the DIP Financing Documents, Pre-Petition Credit Agreement, or other Pre-Petition Loan

20

Documents.

"**Maturity Date**" means the date that is one hundred twenty (120) days after the Petition Date, or such later date to which SWK consents in writing.

"**Petition Date**" means the date on which the Chapter 11 Case was filed with the Bankruptcy Court.

"**Pre-Petition Loan Documents**" means, collectively, the Pre-Petition Credit Agreement, and each other document relating to, and executed in connection with, the credit facility governed by the Pre-Petition Credit Agreement.

"**Sale Order**" means the order entered by the Bankruptcy Court that is either (i) in form and substance satisfactory to SWK and the Debtors or (ii) that pays in full the DIP Obligations, and that, among other things, approves the 363 Sale, the results of the Auction (if applicable) and the Winning Bidder's bid.

"**Sale Procedure Order**" means an order in form and substance satisfactory to SWK approving the bidding procedures to be applicable to the 363 Sale.

"**SSG**" means SSG Capital Advisors, Inc.

"**Stalking Horse Asset Purchase Agreement**" means an asset purchase agreement by and among the Debtors and the Stalking Horse Bidder that provides for the purchase and sale of substantially all of the assets of the Debtors, which third party purchaser and asset purchase agreement are satisfactory to SWK in its reasonable discretion.

"**Stalking Horse Bidder**" shall mean PIPStek LLC.

"**Termination Event**" means the occurrence of the earlier of:

(i) an Event of Default under the DIP Facility; or

(ii) the Debtors' failure to comply with the terms of the DIP Financing Documents (including, without limitation, their failure to comply with the Budget, subject to the Budget Variances and any other approved variances).

21

"**Winning Bidder**" means the bidder that (a) agrees (at the Auction if applicable) to purchase all or substantially all of the assets of the Debtors pursuant to the Stalking Horse Purchase Agreement, and (b) is acceptable to SWK.

#509079622

4855-3503-1271

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the date first set forth above.

**BORROWERS:**

**BIOLASE, INC.**

By: _____
Name: John R. Beaver
Title:   President and CEO

**BL ACQUISITION I, INC.**

By: _____
Name: John R. Beaver
Title:   President and CEO

**BL ACQUISITION II, INC.**

By: _____
Name: John R. Beaver
Title:   President and CEO

**MODEL DENTAL OFFICE, LLC.**

By: _____
Name: John R. Beaver
Title:  President and CEO

23

**<u>AGENT</u>:**
**SWK FUNDING LLC**

By:  *Jody Staggs*
Name:  Jody Staggs
Title:   President and CEO


**<u>LENDER</u>:**
**SWK FUNDING LLC**

By:  *Jody Staggs*
Name:  Jody Staggs
Title:   President and CEO

24