## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| Biolase, Inc.*, et al.*,[1] | Case No. 24-12245 (KBO) |
| Debtors. | (Jointly Administered) |

### COMBINED JOINT CHAPTER 11 PLAN OF LIQUIDATION AND
### DISCLOSURE STATEMENT OF BIOLASE, INC. AND ITS DEBTOR AFFILIATES

**POTTER ANDERSON & CORROON LLP**
M. Blake Cleary (No. 3614)
Brett M. Haywood (No. 6166)
Maria Kotsiras (No. 6840)
Shannon Forshay (No. 7293)
1313 North Market Street, 6th Floor
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
E-mail:  bcleary@potteranderson.com
        bhaywood@potteranderson.com
        mkotsiras@potteranderson.com
        sforshay@potteranderson.com

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Joshua D. Morse (admitted *pro hac vice*)
Claire K. Wu (admitted *pro hac vice*)
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Telephone: (415) 983-1000
Facsimile: (415) 983-1200
Email: joshua.morse@pillsburylaw.com
       claire.wu@pillsburylaw.com

Dania Slim (admitted *pro hac vice*)
Caroline Tart (admitted *pro hac vice*)
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
Email: dania.slim@pillsburylaw.com
       caroline.tart@pillsburylaw.com

---

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES.**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Biolase, Inc. (2441); BL Acquisition Corp. (4140); BL Acquisition II, Inc. (6022); and Model Dental Office, LLC (9372).  The Debtors' headquarters are located at 27042 Towne Centre Drive, Suite 270, Foothill Ranch, CA 92610-2811.

## TABLE OF CONTENTS

ARTICLE I INTRODUCTION AND EXECUTIVE SUMMARY ................................................ 1

ARTICLE II DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION
OF TIME AND GOVERNING LAW ........................................................................................ 2

    A.    Defined Terms ............................................................................................ 2
    B.    Rules of Interpretation ............................................................................ 15
    C.    Computation of Time .............................................................................. 16
    D.    Governing Law ........................................................................................ 16
    E.    Reference to Monetary Figures ............................................................... 16
    F.    Controlling Document ............................................................................. 17

ARTICLE III BACKGROUND AND DISCLOSURES ............................................................. 17

    A.    The Debtors' Corporate History ............................................................. 17
    B.    The Debtors' Business Operations .......................................................... 17
    C.    The Debtors' Prepetition Corporate Structure ....................................... 19
    D.    The Debtors' Prepetition Capital Structure ............................................ 20
    E.    Challenges Facing the Debtors Over the Years ...................................... 21
    F.    The Debtors' Prepetition M&A Initiatives and Marketing Process Leading
        to the Commencement of These Chapter 11 Cases ................................. 23
    G.    The Chapter 11 Cases ............................................................................. 25
    H.    Assumption and Assignment of Executory Contracts and Unexpired
        Leases in Connection with the Sale ........................................................ 28
    I.    The Committee Settlement ...................................................................... 29
    J.    PIPStek's and Sonendo's Claims and Anticipated Settlement .............. 30

ARTICLE IV ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ..................... 30

    A.    DIP Facility Claims ................................................................................. 30
    B.    Administrative Claims ............................................................................. 31
    C.    Professional Fee Claims .......................................................................... 32
    D.    Priority Tax Claims ................................................................................. 33
    E.    Statutory Fees and Related Reporting Obligations ................................. 34

ARTICLE V CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ....... 34

    A.    Classification of Claims and Interests ..................................................... 34
    B.    Treatment of Claims and Interests .......................................................... 35
    C.    Special Provision Governing Unimpaired Claims .................................. 37
    D.    Subordinated Claims ............................................................................... 37
    E.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting
        Classes ..................................................................................................... 37
    F.    Nonconsensual Confirmation .................................................................. 38
    G.    Acceptance or Rejection of the Plan ....................................................... 38

i

H.     Controversy Concerning Impairment .................................................................. 38
I.     No Waiver ........................................................................................................... 38

ARTICLE VI CONFIRMATION AND VOTING PROCEDURES ........................................... 39

A.     Confirmation Procedures ................................................................................... 39
B.     Procedure for Objections ................................................................................... 39
C.     Requirements for Confirmation ......................................................................... 39
D.     Classification of Claims and Interests ............................................................... 40
E.     Impaired Claims or Interests ............................................................................. 40
F.     Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the
Bankruptcy Code ............................................................................................... 41
G.     Feasibility ........................................................................................................... 42
H.     Best Interests Test and Liquidation Analysis .................................................... 43

ARTICLE VII MEANS FOR IMPLEMENTATION OF THE PLAN ..................................... 44

A.     Restructuring Transactions ................................................................................ 44
B.     Sources of Consideration for Plan Distributions .............................................. 44
C.     The Liquidation Trust ........................................................................................ 45
D.     Cancellation of Securities and Agreements ...................................................... 45
E.     Corporate Action ............................................................................................... 45
F.     Effectuating Documents; Further Transactions ................................................. 46
G.     Section 1146 Exemption .................................................................................... 46
H.     Preservation of Retained Causes of Action ...................................................... 46
I.     Health and Benefit Plans of the Debtors and Post-Effective Date Debtors .......... 47
J.     Closing the Chapter 11 Cases ........................................................................... 47
K.     U.S. Securities and Exchange Commission ...................................................... 47

ARTICLE VIII SUBSTANTIVE CONSOLIDATION .............................................................. 47

ARTICLE IX TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ....................................................................................................................................... 48

A.     Rejection of Executory Contracts and Unexpired Leases .................................... 48
B.     Insurance Policies .............................................................................................. 49
C.     Indemnification Obligations .............................................................................. 50
D.     Claims Based on Rejection of Executory Contracts or Unexpired Leases ........... 50
E.     Preexisting Obligations to the Debtors under Executory Contracts and
Unexpired Leases .............................................................................................. 51
F.     Modifications, Amendments, Supplements, Restatements, or Other
Agreements ........................................................................................................ 51
G.     Reservation of Rights ........................................................................................ 51
H.     Nonoccurrence of Effective Date ...................................................................... 51

ARTICLE X CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING ........ 52

A.     The Plan May Not Be Accepted ........................................................................ 52

ii

|       |                                                                                        |      |
| ----- | -------------------------------------------------------------------------------------- | ---- |
| B.    | The Plan May Not Be Confirmed                                                           | 52   |
| C.    | Distributions to Holders of Allowed Claims Under the Plan May Be Inconsistent with Projections | 52   |
| D.    | Objections to Classification of Claims                                                  | 53   |
| E.    | Failure to Consummate the Plan                                                          | 53   |
| F.    | Debtor Release or Injunction Provisions May Not Be Approved                             | 53   |
| G.    | Reductions to Estimated Creditor Recoveries                                             | 54   |
| H.    | Certain Tax Considerations                                                              | 54   |

**ARTICLE XI THE LIQUIDATION TRUST AND THE LIQUIDATION TRUSTEE ... 60**

|       |                                                                                        |      |
| ----- | -------------------------------------------------------------------------------------- | ---- |
| A.    | Liquidation Trust Criteria                                                              | 60   |
| B.    | Purpose of the Liquidation Trust                                                        | 61   |
| C.    | The Liquidation Trust Assets                                                            | 61   |
| D.    | Beneficiaries of the Liquidation Trust                                                  | 62   |
| E.    | Distribution of the Liquidation Trust Assets                                            | 62   |
| F.    | Transfer of Assets to the Liquidation Trust                                             | 62   |
| G.    | Interests in the Liquidation Trust Assets                                               | 63   |
| H.    | Appointment of the Liquidation Trustee                                                  | 63   |
| I.    | Rights and Powers of the Debtors and the Liquidation Trustee                           | 63   |
| J.    | Distribution and Withholding                                                            | 64   |
| K.    | Insurance                                                                               | 64   |
| L.    | Other Rights and Remedies                                                               | 64   |
| M.    | Priority Claims Reserve                                                                 | 65   |
| N.    | Disputed Claims Reserve                                                                 | 65   |
| O.    | Attribution of Income                                                                   | 65   |
| P.    | Current Basis                                                                           | 66   |
| Q.    | Tax Identification Numbers                                                              | 66   |
| R.    | Wind Down                                                                               | 66   |
| S.    | Termination of the Liquidation Trust and Liquidation Trustee                           | 67   |
| T.    | Transfer of Beneficial Interests                                                        | 68   |

**ARTICLE XII PROVISIONS GOVERNING DISTRIBUTIONS ... 68**

|       |                                                                                        |      |
| ----- | -------------------------------------------------------------------------------------- | ---- |
| A.    | Timing and Calculation of Amounts to Be Distributed                                    | 68   |
| B.    | Delivery of Distributions and Undeliverable, Unclaimed, or Forfeited Distributions     | 68   |
| C.    | Compliance with Tax Requirements                                                        | 70   |
| D.    | Allocations                                                                             | 71   |
| E.    | No Postpetition Interest on Claims                                                      | 71   |
| F.    | Setoffs and Recoupment                                                                  | 71   |
| G.    | Claims Paid or Payable by Third Parties                                                 | 71   |

**ARTICLE XIII PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS AND INTERESTS ... 72**

|       |                                                                                        |      |
| ----- | -------------------------------------------------------------------------------------- | ---- |
| A.    | Allowance of Claims and Interests                                                       | 72   |

4913-3097-6006

B.  Prosecution of Objections to Claims and Interests ............................................. 73
C.  Estimation of Claims ............................................................................................ 73
D.  Expungement or Adjustment to Claims Without Objections ............................... 74
E.  Time to File Objections to Claims ....................................................................... 74
F.  Disallowance of Claims ........................................................................................ 74
G.  Amendments to Claims ......................................................................................... 74
H.  No Distributions Pending Allowance ................................................................... 75
I.  Distributions After Allowance ............................................................................. 75

ARTICLE XIV SETTLEMENT, RELEASE, INJUNCTION AND RELATED
PROVISIONS ........................................................................................................................... 75

A.  Termination of Claims and Interests .................................................................... 75
B.  Release of Liens ................................................................................................... 76
C.  Releases by the Debtors ....................................................................................... 76
D.  Exculpation .......................................................................................................... 77
E.  Injunction ............................................................................................................. 77
F.  Protections Against Discriminatory Treatment ................................................... 78
G.  Document Retention ............................................................................................. 78
H.  Reimbursement or Contribution .......................................................................... 78
I.  Term of Injunctions or Stays ............................................................................... 78

ARTICLE XV CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN .......... 78

A.  Conditions Precedent to the Effective Date ........................................................ 78
B.  Waiver of Conditions ........................................................................................... 79
C.  Effect of Failure of Conditions ........................................................................... 79

ARTICLE XVI MODIFICATION, REVOCATION OR WITHDRAWAL OF THE
PLAN ....................................................................................................................................... 80

A.  Modification and Amendments ............................................................................ 80
B.  Effect of Confirmation on Modifications ............................................................ 80
C.  Revocation or Withdrawal of Plan ...................................................................... 80

ARTICLE XVII RETENTION OF JURISDICTION ................................................................. 80

ARTICLE XVIII MISCELLANEOUS PROVISIONS .............................................................. 83

A.  Immediate Binding Effect .................................................................................... 83
B.  Additional Documents .......................................................................................... 83
C.  Reservation of Rights ........................................................................................... 83
D.  Successors and Assigns ........................................................................................ 83
E.  Dissolution of the Committee .............................................................................. 83
F.  Notices .................................................................................................................. 84
G.  Entire Agreement ................................................................................................. 85
H.  Exhibits ................................................................................................................ 85
I.  Non-Severability of Plan Provisions ................................................................... 85

iv

J.      Votes Solicited in Good Faith ........................................................................... 86

K.    Post-Effective Date Limitation of Notice ......................................................... 86

L.     Inconsistency ..................................................................................................... 86

M.   Closing of Chapter 11 Cases ............................................................................. 86

v

# DISCLAIMERS

EACH HOLDER OF A CLAIM AGAINST THE DEBTORS ENTITLED TO VOTE TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT SHOULD READ THE COMBINED PLAN AND DISCLOSURE STATEMENT IN ITS ENTIRETY BEFORE VOTING.  NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT MAY BE MADE EXCEPT PURSUANT TO THE TERMS HEREOF AND SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE. IF YOU ARE ENTITLED TO VOTE TO ACCEPT THE COMBINED PLAN AND DISCLOSURE STATEMENT, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.  THE DEBTORS URGE YOU TO VOTE TO ACCEPT THE COMBINED PLAN AND DISCLOSURE STATEMENT.

THE COMBINED PLAN AND DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 3016 AND 3017, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST OR INTERESTS IN THE DEBTORS SHOULD EVALUATE THE COMBINED PLAN AND DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.  THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS.  YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.

THE COMBINED PLAN AND DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT, ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND FINANCIAL INFORMATION.  ALTHOUGH THE DEBTORS BELIEVE THAT THE STATEMENTS AND DESCRIPTIONS CONTAINED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE TRUE AND ACCURATE, THEY ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT AND APPLICABLE STATUTORY PROVISIONS.  THE TERMS OF THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT AND APPLICABLE STATUTES GOVERN IN THE EVENT OF ANY DISCREPANCY WITH THE COMBINED PLAN AND DISCLOSURE STATEMENT.   CREDITORS AND OTHER INTERESTED PARTIES SHOULD READ THE COMBINED PLAN AND DISCLOSURE STATEMENT, THE DOCUMENTS RELATED TO THE COMBINED PLAN AND DISCLOSURE STATEMENT, AND THE APPLICABLE STATUTES THEMSELVES FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

1

THE FACTUAL STATEMENTS AND REPRESENTATIONS CONTAINED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED, AND THE DEBTORS DISCLAIM ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS AFTER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED PLAN AND DISCLOSURE STATEMENT.    THE DELIVERY OF THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE DEBTORS INVOLVE MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS DO NOT INTEND TO UPDATE OR REVISE THEIR FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED HEREIN WILL NOT BE REALIZED.

ANY PROJECTED RECOVERIES TO CREDITORS SET FORTH IN THIS DISCLOSURE STATEMENT ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTORS AND THEIR ADVISORS.  ALTHOUGH THE DEBTORS AND THEIR ADVISORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN, THE DEBTORS AND THEIR ADVISORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THIS INFORMATION.

IN CONNECTION WITH THE DEBTORS' SOLICITATION OF ACCEPTANCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT PURSUANT TO SECTION 1126(b) OF THE BANKRUPTCY CODE, THE DEBTORS ARE FURNISHING A SOLICITATION PACKAGE, CONSISTING OF THE COMBINED PLAN AND DISCLOSURE STATEMENT, THE EXHIBITS HERETO, THE CONFIRMATION NOTICE, AND A BALLOT OR NOTICE OF NON-VOTING STATUS, AS APPLICABLE, TO EACH RECORD HOLDER OF CLAIMS ELIGIBLE TO VOTE OR ITS COUNSEL.  THE COMBINED PLAN AND DISCLOSURE STATEMENT IS TO BE USED BY EACH SUCH ELIGIBLE HOLDER SOLELY IN CONNECTION WITH ITS EVALUATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT; USE OF THE COMBINED PLAN AND DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE IS NOT AUTHORIZED.  NOTHING STATED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY.

# ARTICLE I
## INTRODUCTION AND EXECUTIVE SUMMARY[2]

The Debtors propose the following Combined Plan and Disclosure Statement pursuant to sections 1121(a) and 1125(b) of the Bankruptcy Code.

The Plan provides for the disposition of the Debtors' Assets and the distribution of the proceeds in accordance with the priorities and requirements of the Bankruptcy Code. As of the expected Confirmation Date, the Assets will largely consist of Cash and Retained Causes of Action.

The Plan provides for creation of a Liquidation Trust and the appointment of the Liquidation Trustee to serve as the sole director, officer, shareholder, and manager of the Debtors. The Liquidation Trustee will ultimately wind down the Debtors' business affairs and be empowered to, among other things, administer and liquidate all Assets, object to and settle Claims, and prosecute Retained Causes of Action in accordance with the Plan. The Plan provides for the payment of Wind Down Expenses and Distributions to Holders of Allowed Claims, including Administrative Claims, Professional Fee Claims, Priority Tax Claims, Other Priority Claims, Statutory Fees, Secured Claims, and General Unsecured Claims. In addition, the Plan cancels all Interests in the Debtors and provides for the dissolution and wind up of the Debtors' affairs.

ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE COMBINED PLAN AND DISCLOSURE STATEMENT IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

The classification of Claims and Interests against the Debtor pursuant to the Plan is as set forth below and as further detailed in Article V hereof. The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the Claims reconciliation process. Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distributions received by Holders of Allowed Claims. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere in the Combined Plan and Disclosure Statement, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates. The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

---

[2]    Capitalized terms in this section, not otherwise defined herein, shall have the meanings ascribed to them in Article II.

1

| Class | Claim/Interest | Estimated Allowed Amount of Claims[3] | Status | Voting Rights | Projected Recovery[4] |
|---|---|---|---|---|---|
| 1 | Secured Claims | $6,312,179[5] | Impaired | Entitled to Vote | Approx. 82% |
| 2 | Other Priority Claims | $356,528 | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| 3 | General Unsecured Claims | $2,434,829.55 | Impaired | Entitled to Vote | Approx. 10%[6] |
| 4 | Interests | $0 | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |

## ARTICLE II
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

### A.    Defined Terms

As used in the Combined Plan and Disclosure Statement, capitalized terms have the meanings ascribed to them below.

1.    "**10% GUC Distribution**" means the dollar amount equal to a 10% recovery to each Holder of an Allowed General Unsecured Claim (excluding the SWK Deficiency Claims).

2.    "**Administrative Claim**" means a Claim (other than a Claim of the DIP Lender and Prepetition Lender) for the costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; and (b) Allowed Professional Fee Claims in the Chapter 11 Cases.

3.    "**Administrative Claim Bar Date**" means, collectively, the Initial Administrative Claim Bar Date and the Final Administrative Claim Ba Date.

---

[3]    These amounts represent estimated Allowed Claims against the Debtors and do not represent amounts actually asserted by Creditors in Proofs of Claim or otherwise.  The Debtors have not completed their analysis of Claims in the Chapter 11 Cases, and all objections to such Claims have not been Filed or fully litigated and may continue following the Effective Date.  Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time.  Rather, the actual amount of the Allowed Claims may be greater or lower than estimated.

[4]    The estimated percentage recovery is based on, among other things, an estimate of the Allowed Claims against the Debtors in the Chapter 11 Cases.  As noted, the actual amount of the Allowed Claims may be greater or lower than estimated.  Thus, the actual recoveries may be higher or lower than projected depending on, among other things, the amounts and priorities of Claims that are actually Allowed by the Bankruptcy Court and the actual amount of Cash available for Distribution.

[5]    Approximate amount, with interest and fees, as of February 25, 2025.

[6]    Any recovery above 10% would be, as disclosed in Article XI.E, mere speculation and will depend entirely on the value of the Liquidation Trust Assets, including the Retained Causes of Action.

4.      "**Administrative Claim Contingency Amount**" means an amount equal to $550,000 to be funded from the Sale Proceeds per the Final DIP Order and reflected in the Budget by the line item titled "Administrative Claim Contingency" to be used to pay Allowed Administrative Claims (other than Professional Fee Claims); *provided, however*, that the Prepetition Lender and the DIP Lender retain a lien on the foregoing $550,000 and will be entitled to any amounts remaining after payment in full of the Allowed Administrative Claims.

5.      "**Affiliate**" means an "affiliate" as defined in section 101(2) of the Bankruptcy Code.

6.      "**Allowed**" means with reference to any Claim, proof of which was properly and timely Filed on or before the Bar Date or, if no Proof of Claim was Filed, that has been or hereafter is listed by a Debtor on its Schedules and Statements as liquidated in amount and not disputed or contingent and, in each case, as to which: (a) no objection to allowance has been interposed within the applicable period fixed by the Combined Plan and Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or the Bankruptcy Court; or (b) an objection has been interposed and such Claim has been allowed by the Bankruptcy Court, in whole or in part, by a Final Order.

7.      "**Assets**" means any and all right, title, and interest of the Debtors in and to property of whatever type or nature, real or personal, tangible or intangible, including, without limitation, any real estate, buildings, structures, improvements, privileges, rights, easements, leases, subleases, licenses, goods, materials, supplies, furniture, fixtures, equipment, works in progress, accounts, chattel paper, deposit accounts, reserves, deposits, contractual rights, intellectual property rights, Causes of Action, Claims, other causes of action, and any general intangibles, but specifically excludes the Purchased Assets.

8.      "**Avoidance Actions**" means any and all actual or potential avoidance, recovery, subordination, or other Causes of Action that may be brought by or on behalf of any Debtor or its Estate or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Causes of Action under sections 502, 510, 542, 544, 545, 547–553, and 724(a) of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

9.      "**Auction**" means the auction held on November 4, 2024 for the sale of substantially all of the Debtors' Assets.

10.     "**Ballot**" means the ballots on which Holders of Impaired Claims will indicate their acceptance or rejection of the Plan in accordance with the Combined Plan and Disclosure Statement and the Voting Instructions.

11.     "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

12.     "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent of (a) the withdrawal of reference under section 157 of the Judicial Code or (b) the entry of an order or judgment for which it is determined the United States Bankruptcy Court for the District of Delaware does not have

3

constitutional authority to enter such order or judgment and the parties to such dispute do not consent to entry of such order or judgment by the United States Bankruptcy Court for the District of Delaware, the United States District Court for the District of Delaware.

13.     "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

14.     "**Bar Date**" means, collectively, the applicable dates (including the Administrative Claim Bar Date) by which Proofs of Claim and requests for payment of Administrative Claims must be Filed, as established by: (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Combined Plan and Disclosure Statement.

15.     "**Bar Date Order**" means the *Order (I) Establishing Deadlines for the Filing of Proofs of Claim and Requests for Allowance of Administrative Expense Claims, (II) Approving the Forms and Manner of Notice Thereof, and (III) Granting Related Relief* [Docket No. 278].

16.     "**Beneficiaries**" means the Holders of Liquidation Trust Interests, whether individually or as agent on behalf of one or more other Entities.

17.     "**Bidding Procedures**" means the bidding procedures for the sale of substantially all of the Debtors' Assets approved by, and attached as Exhibit 1 to, the Bidding Procedures Order.

18.     "**Bidding Procedures Order**" means the *Order (A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Designating the Stalking Horse Bidder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief* [Docket No. 115].

19.     "**Board of Directors**" means the members of the Debtors' board of directors from any time prior to or after the Petition Date through the Effective Date.

20.     "**Budget**" means the budget attached to the Final DIP Order.

21.     "**Business Day**" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

22.     "**Cash**" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

23.     "**Case Website**" means the website maintained by the Solicitation Agent where parties are able to view the Combined Plan and Disclosure Statement and other documents related to the Chapter 11 Cases https://dm.epiq11.com/case/biolase/info.

24.     "**Causes of Action**" means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character

4

whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, Secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws). For the avoidance of doubt, Causes of Action also includes (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any Avoidance Action or state law fraudulent transfer claim.

25.    "**Chapter 11 Cases**" means the cases initiated on the Petition Date by the Debtors' filing of voluntary petitions for relief in the Bankruptcy Court under chapter 11 of the Bankruptcy Code, which cases are being jointly administered under Case No. 24-12245 (KBO).

26.    "**Claim**" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against the Debtors and the Debtors' Estates.

27.    "**Claims Register**" means the official register of Claims maintained by the Notice, Claims, and Solicitation Agent.

28.    "**Class**" means a class of Claims or Interests as set forth in Article V of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

29.    "**Closing Date**" means November 26, 2024, the day the Sale closed.

30.    "**Combined Plan and Disclosure Statement**" means this combined chapter 11 plan of liquidation and disclosure statement (the disclosure statement portion, the "Disclosure Statement" and the chapter 11 plan portion, the "Plan") including, without limitation, all exhibits, supplements (including the Plan Supplement), appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time.

31.    "**Committee**" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases on October 14, 2024.

32.    "**Committee Retention Applications**" means the applications the Committee filed in these Chapter 11 Cases seeking to retain certain Professionals pursuant to sections 327, 328, or 363 of the Bankruptcy Code.

33.    "**Committee Settlement**" means the settlement among the Debtors, the Committee, and SWK as the Prepetition Lender and the DIP Lender, memorialized in the Final DIP Order and further described in Article III.I herein.

34.    "**Confirmation**" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

35.    "**Confirmation Date**" means the date upon which Confirmation occurs.

36. "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to sections 1128 and 1129 of the Bankruptcy Code.

37. "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

38. "**Consummation**" means the occurrence of the Effective Date.

39. "**Creditor**" means any Person that is the Holder of a Claim against the Debtors as defined in section 101(10) of the Bankruptcy Code.

40. "**Cure Claim**" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

41. "**D&O Liability Insurance Policies**" means all Insurance Policies (including any "tail policy") issued or providing coverage to the Debtors for liabilities against any of the Debtors' current or former directors, managers, and officers, and all agreements, documents, or instruments relating thereto.

42. "**Debtor Retention Applications**" means the applications the Debtors filed in these Chapter 11 Cases seeking to retain certain Professionals pursuant to sections 327, 328, or 363 of the Bankruptcy Code.

43. "**Debtors**" means, collectively: (a) Biolase, Inc. ("Biolase"); (b) BL Acquisition Corp. ("BL Acquisition"); (c) BL Acquisition II, Inc. ("BL Acquisition II"); and (d) Model Dental Office, LLC ("Model Dental").

44. "**DIP Facility**" means the $5 million secured debtor-in-possession facility obtained by the Debtors pursuant to the DIP Term Sheet, the Interim DIP Orders and the Final DIP Order.

45. "**DIP Financing Motion**" means the *Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing and Use Cash Collateral; (II) Granting Adequate Protection; (III) Granting Related Relief* [Docket No. 17].

46. "**DIP Lender**" means SWK Funding LLC.

47. "**DIP Obligations**" means all obligations arising under the DIP Term Sheet.

48. "**DIP Term Sheet**" means that certain *Biolase, Inc. Terms and Conditions of Proposed Senior Secured, Super-Priority Debtor-in-Possession Credit Facility*, dated as of October 1, 2024, as amended, restated, supplemented, or otherwise modified from time to time.

49. "**Disallowed**" means, with respect to any Claim, or any portion thereof, that such Claim, or any portion thereof, is disallowed under the Plan, the Bankruptcy Code, or a Final Order.

50.     "**Disclosure Statement Order**" means the order (a) conditionally approving the Disclosure Statement and (b) approving the Solicitation Procedures.

51.     "**Disputed**" means, with respect to any Claim or Interest, any Claim or Interest that (a) is not yet Allowed and (b) is not Disallowed.

52.     "**Disputed Claims Reserve**" means a Cash reserve, if any, that may be funded by the Liquidation Trustee with a portion of the Liquidation Trust Assets for Distributions to Holders of Disputed Claims if and to the extent that such Disputed Claims become Allowed Claims.

53.     "**Distribution**" means any distribution to the Holders of Allowed Claims against the Debtors pursuant to the Combined Plan and Disclosure Statement.

54.     "**Distribution Record Date**" means the record date for purposes of determining which Holders of Allowed Claims or Allowed Interests are eligible to receive Distributions under the Plan, which date shall be the first day of the Confirmation Hearing, or such other date as is announced by the Debtors or designated in a Final Order of the Bankruptcy Court.

55.     "**Effective Date**" means the date that is the first Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date in Article XV.A of the Combined Plan and Disclosure Statement have been satisfied or waived pursuant to Article XV.B of the Combined Plan and Disclosure Statement, (b) no stay of the Confirmation Order is in effect, and (c) the Debtors declare the Plan effective.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

56.     "**Entity**" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

57.     "**Estates**" means the estates created on the Petition Date in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtors after the Petition Date through the Effective Date.

58.     "**Exculpated Party**" means collectively, and in each case in its capacity as such, (a) the Debtors, (b) the directors, managers (pursuant to the Debtors' corporate organizational documents), and officers of the Debtors who served in such capacity between the Petition Date and the Effective Date, (c) the Professionals retained by the Debtors in the Chapter 11 Cases solely in their capacities as such, except for Ordinary Course Professionals, (d) the Committee, (e) the members of the Committee, solely in their capacities as such, and (f) the Professionals retained by the Committee, solely in their capacities as such.

59.     "**Executory Contract**" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

60.     "**Federal Judgment Rate**" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

4913-3097-6006

61.     "**File**" or "**Filed**" means file or filed with the Bankruptcy Court in the Chapter 11 Cases, or, with respect to the filing of a Proof of Claim (including for any Administrative Claim) or Proof of Interest, file or filed with the Notice, Claims, and Solicitation Agent.

62.     "**Final Administrative Claim Bar Date**" means, for any unpaid Administrative Claim arising on or between November 27, 2024 and the Effective Date, the date that is thirty (30) calendar days after service of the notice of Effective Date, with such date to be provided in the notice of Effective Date.

63.     "**Final Decree**" means the order entered pursuant to section 350 of the Bankruptcy Code, Bankruptcy Rule 3022, and Local Rule 3022-1 closing the Chapter 11 Cases.

64.     "**Final DIP Order**" means the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing and Use Cash Collateral; (II) Granting Adequate Protection; (III) Granting Related Relief* [Docket No. 226].

65.     "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; provided that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable rule of the Bankruptcy Rules may be filed relating to such order shall not cause such order to not be a Final Order.

66.     "**First Day Declaration**" means the *Declaration of John R. Beaver in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 19].

67.     "**First Day Motions**" means the motions the Debtors filed on the Petition Date to facilitate the administration of these Chapter 11 Cases, as further detailed in Article III.E herein.

68.     "**Forbearance Agreement**" means that certain agreement dated as of August 31, 2024 between Biolase and SWK pursuant to which SWK agreed to forbear legal remedies subject to certain conditions and to fund (i) a bridge loan to pay the Debtors' operating expenses until the Petition Date and (ii) the DIP Facility so long as the bridge loan was "rolled-up" into the DIP Facility.

69.     "**General Unsecured Claim**" means any unsecured Claim against the Debtors which is not an Administrative Claim, Professional Fee Claim, Priority Tax Claim, Secured Claim, Other Priority Claim, Subordinated Claim, or Interests.

70.     "**Governmental Bar Date**" means the date by which Proofs of Claim must be Filed with respect to such Claims held by Governmental Units pursuant to the Bar Date Order.

71.     "**Governmental Unit**" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

72.     "**GUC Recovery Amount**" means an amount equal to $300,000 to be funded from the Sale Proceeds per the Final DIP Order and reflected in the Budget by the line item titled "GUC Recovery Amount" to be used to provide a recovery under the Plan to Holders of Allowed General Unsecured Claims; *provided, however*, that the Prepetition Lender and the DIP Lender will retain a lien on the foregoing $300,000 until the Effective Date.

73.     "**Holder**" means an Entity holding a Claim against or an Interest in any Debtor.

74.     "**Impaired**" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75.     "**Initial Administrative Claim Bar Date**" means January 13, 2024 at 5:00 p.m. (prevailing Eastern Time), which is the deadline for Filing requests for allowance and payment of Administrative Claims arising between the Petition Date and November 26, 2024.

76.     "**Insurance Policies**" means all insurance policies that have been issued at any time to or provide coverage to any of the Debtors (or their predecessors) and all agreements, documents or instruments relating thereto.

77.     "**Insurer**" means any company or other Entity that issued or entered into an Insurance Policy, any third-party administrator, and any respective predecessors or affiliates thereof.

78.     "**Interest**" means any equity security as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any Claims against any Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

79.     "**Interim DIP Orders**" means (a) the *Order (I) Authorizing the Debtors to Obtain Postpetition Financing and Use Cash Collateral; (II) Granting Adequate Protection; (III) Granting Related Relief* [Docket No. 66] (the "First Interim DIP Order") and (b) the *Second Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing and Use Cash Collateral; (II) Granting Adequate Protection; (III) Granting Related Relief* (the "Second Interim DIP Order") [Docket No. 168].

80.     "**IRS**" means Internal Revenue Service.

81.     "**Judicial Code**" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

9

82. "**Liquidating Trust Funding Amount**" means an amount equal to $300,000 to be funded from the Sale Proceeds per the Final DIP Order and reflected in the Budget by the line item titled "Liquidating Trust Funding" to (a) establish and fund the Liquidation Trust for the benefit of Holders of Allowed General Unsecured Claims (including the SWK Deficiency Claims) and (b) fund the Wind Down Expenses of the Debtors and their foreign subsidiaries; *provided, however*, that the Prepetition Lender and the DIP Lender retain a lien on the foregoing $300,000 and will be entitled to any amounts remaining after payment in full of the costs described in the preceding subclauses (a) and (b).

83. "**Liquidation Trust**" means the liquidation trust established on the Effective Date pursuant to the Liquidation Trust Agreement and the Combined Plan and Disclosure Statement to administer the Liquidation Trust Assets and make one or more Distribution(s).

84. "**Liquidation Trust Agreement**" means the trust agreement, and related documents, that govern the powers, duties, and responsibilities of the Liquidation Trustee, and which agreement and documents will be subject to the Combined Plan and Disclosure Statement and otherwise in the substance and form included in the Plan Supplement.

85. "**Liquidation Trust Assets**" shall consist of (a) Retained Causes of Action; (b) any other Claims and Causes of Action that are not Purchased Assets under the Sale Order; (c) any other remaining Assets of the Estates, but excluding the Remaining Professional Fee Escrow Amounts (if any); (d) the Interests in the Non-Debtor Affiliates; and (e) the proceeds of each of the foregoing.

86. "**Liquidation Trust Interests**" means the non-certificated beneficial interests of the Liquidation Trust allocable to Holders of Allowed Claims in accordance with the terms of the Combined Plan and Disclosure Statement and the Liquidation Trust Agreement.

87. "**Liquidation Trustee**" means the Person identified in the Plan Supplement and the Liquidation Trust Agreement that will administer the Liquidation Trust under the Liquidation Trust Agreement.

88. "**Local Rules**" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

89. "**Non-Debtor Affiliates**" means Biolase Europe, GmbH, Biolase Spain, S.L., and Biolase India Private Limited.

90. "**Notice, Claims, and Solicitation Agent**" means Epiq Corporate Restructuring, LLC, in its capacity as the notice, claims, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

91. "**OCP Order**" means the *Order (I) Authorizing Debtors to Employ Professionals Used in the Ordinary Course of Business, (II) Waiving Certain Information Requirements of Local Rules 2016-2, and (III) Granting Related Relief* [Docket No. 162].

92. "**Ordinary Course Professionals**" means the Professionals retained pursuant to the OCP Order.

10

93.  **"Other Priority Claim"** means any Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

94.  **"Person"** means a "person" as defined in section 101(41) of the Bankruptcy Code.

95.  **"Petition Date"** means October 1, 2024.

96.  **"PIPStek"** means PIPStek, LLC, a wholly owned subsidiary of Sonendo.

97.  **"PIPStek Action"** means that certain lawsuit filed by PIPStek against Biolase in the U.S. District Court for the District of Delaware alleging that Biolase's Waterlase dental laser product infringed PIPStek's patents and styled as *PIPStek, LLC v. Biolase, Inc.*, Case No. 1:23-cv-00011-JPM.

98.  **"PIPStek Deposit"** means the $1.4 million deposit paid by PIPStek pursuant to the Stalking Horse APA.

99.  **"Plan Supplement"** means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof, the Bankruptcy Code and the Bankruptcy Rules) to be Filed by the Debtors no later than seven days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court. The Plan Supplement will include: (a) a liquidation analysis; (b) the Liquidation Trust Agreement; (c) the identity of the Liquidation Trustee; (d) a schedule of Retained Causes of Action; and (e) any other disclosures required by the Bankruptcy Code.

100.  **"Prepetition Employee Payments Avoidance Actions"** means any Avoidance Actions related to payments made to the Debtors' employees or officers before the Petition Date.

101.  **"Prepetition Investment Bankers"** means The Benchmark Company, LLC, Pacific Gate Advisors, LLC, Lake Street Capital Markets, LLC, Moody Capital Solutions, Inc., and 431 Group Limited.

102.  **"Prepetition Lender"** means SWK Funding LLC.

103.  **"Prepetition Credit Agreement"** means that certain Credit Agreement dated November 9, 2018 by and between Biolase and SWK, as agent and lender, providing for the Prepetition Term Loan, as amended, restated, supplemented, or modified from time to time.

104.  **"Prepetition Guarantee"** means that certain Guarantee and Collateral Agreement dated as of November 9, 2018, in favor of SWK as agent and executed in connection with the Prepetition Credit Agreement, as amended, restated, supplemented, or modified from time to time.

105.  **"Prepetition Secured Obligations"** means the obligations under the Prepetition Term Loan.

4913-3097-6006

106.    "**Prepetition Term Loan**" means that certain term loan credit facility between Biolase and the Prepetition Lender, pursuant to the Prepetition Credit Agreement, which has been amended several times to, among other things, increase the total commitments thereunder to $15 million.

107.    "**Priority Claims Reserve**" means a reserve to be funded on the Effective Date by the Debtors or the Liquidation Trustee, as applicable, to pay all anticipated Allowed Priority Tax Claims and Allowed Other Priority Claims, to the extent such Claims are not Allowed and paid by the Debtors on the Effective Date.  The Priority Claims Reserve shall be maintained and administered by the Liquidation Trustee.

108.    "**Priority Tax Claim**" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

109.    "**Professional**" means an Entity retained pursuant to an order of the Bankruptcy Court in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

110.    "**Professional Fee Claim**" means any Administrative Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date.

111.    "**Professional Fee Escrow Account**" means an account, which may be interest-bearing, funded by the Debtors with Cash on or before the Effective Date in an amount equal to the Professional Fee Escrow Amount.

112.    "**Professional Fee Escrow Amount**" means the total amount of unpaid Professional fees and expenses estimated pursuant to Article IV.C.3 of the Plan, not to exceed the cumulative amounts set forth in the Budget.

113.    "**Proof of Claim**" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

114.    "**Proof of Interest**" means a written proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

115.    "**Pro Rata**" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in the same Class.

116.    "**Purchased Assets**" means the "Purchased Assets" as defined in the Purchaser's APA.

117.    "**Purchaser**" means MegaGen Implant Co., Ltd.

118.    "**Purchaser's APA**" means the asset purchase agreement between the Debtors and the Purchaser approved by the Sale Order and the final version of which was filed at Docket No. 272.

119. "**Released Party**" means collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Prepetition Lender; (c) the DIP Lender; (d) the Purchaser; (e) the Committee (but not its members); (f) as to the foregoing (a) through (d) each such Entity's current and former Affiliates, subsidiaries, officers, directors, independent directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants (except for accountants who provided audit services to the Debtors), investment bankers, consultants, representatives, and other Professionals, each in their capacity as such; and (g) the Committee members, solely in their capacities as such.

120. "**Remaining Administrative Claim Contingency Amounts**" means any remaining funds of the Administrative Claim Contingency Amount after Administrative Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Holders of such Administrative Claims pursuant to one or more Final Orders of the Bankruptcy Court.

121. "**Remaining Professional Fee Escrow Amounts**" means any remaining funds held in the Professional Fee Escrow Account after all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.

122. "**Restructuring Transactions**" means the transactions described in Article VII.A of the Plan.

123. "**Retained Causes of Action**" means, collectively, all of the Debtors' Causes of Action which do not constitute Purchased Assets under the Purchaser's APA, including the Avoidance Actions; *provided*, *however*, that the Retained Causes of Action shall not include any Prepetition Employee Payments Avoidance Actions.

124. "**Sale**" means the transactions between the Debtors and the Purchaser in connection with the Purchaser's APA.

125. "**Sale Hearing**" means the hearing held by the Bankruptcy Court on November 12, 2024, at which the Bankruptcy Court approved the sale of substantially all of the Debtors' assets to the Purchaser pursuant to the Purchaser's APA.

126. "**Sale Order**" means the *Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 225].

127. "**Sale Proceeds**" means the proceeds from the Sale.

128. "**SBA**" means the U.S. Small Business Administration.

129. "**SBA Loan**" means that certain $150,000 unsecured loan entered into by and between Biolase and the SBA under the SBA's Economic Injury Disaster Loan assistance program.

130. "**Schedules and Statements**" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by each of the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules may have been or may be amended, modified, or supplemented from time to time.

131. "**SEC**" means the United States Securities and Exchange Commission.

132. "**Secured**" means when referring to a Claim: (a) secured by a lien on property in which the applicable Estate has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order of the Bankruptcy Court, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's valid interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan as a Secured Claim.

133. "**Secured Claim**" means Claims which are: (a) Secured by a valid and perfected lien in collateral which is enforceable pursuant to applicable law, the amount of which is equal to or less than the value of such collateral (i) as set forth in the Combined Plan and Disclosure Statement, (ii) as agreed to by the Holder of such Claim and the Debtors, or (iii) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (b) subject to a valid right of setoff under section 553 of the Bankruptcy Code.

134. "**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

135. "**Security**" means a security as defined in section 2(a)(1) of the Securities Act.

136. "**Solicitation Date**" means the date when the Debtors commence the solicitation process in accordance with the Disclosure Statement Order.

137. "**Solicitation Procedures**" means the form of solicitation procedures approved by the Disclosure Statement Order.

138. "**Sonendo**" means Sonendo, Inc.

139. "**Stalking Horse Bidder**" means PIPStek.

140. "**Stalking Horse APA**" means the asset purchase agreement between the Debtors and the Stalking Horse Bidder approved by the Bidding Procedures Order and filed at Docket No. 115.

141. "**Statutory Fees**" means all fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930, and any interest thereupon.

142. "**SWK**" means SWK Funding LLC.

14

143.    "**SWK Deficiency Claims**" means the Claims of the Prepetition Lender under the Prepetition Credit Agreement after taking into account the Prepetition Secured Obligations or DIP Obligations following the Closing Date.

144.    "**U.S.**" means the United States of America.

145.    "**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

146.    "**Unexpired Lease**" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

147.    "**Unimpaired**" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

148.    "**Voting Classes**" means Classes 1 and 3.

149.    "**Voting Deadline**" means 4:00 p.m. (ET) on February 14, 2025.

150.    "**Voting Instructions**" means the instructions on the Ballot for voting on the Plan.

151.    "**Wind Down Expenses**" means the expenses to be incurred in complying with the Combined Plan and Disclosure Statement and winding down the Chapter 11 Cases, including, but not limited to, the liquidation of any residual Assets, preparation and filing of final tax returns, making Distributions to Holders of Allowed Claims, the Claims reconciliation and objection process, the dissolution of each Debtor, and all actual and necessary fees, costs, expenses, and obligations incurred or owed by the Liquidation Trustee or its agents, employees, attorneys, advisors, or other Professionals in administering the Combined Plan and Disclosure Statement and the Liquidation Trust (including, without limitation, reasonable compensation for services rendered, and reimbursement for actual and necessary expense incurred by the Liquidation Trustee and its agents, employees, and Professionals) arising after the Effective Date through and including the date upon which the Bankruptcy Court enters a Final Decree closing the Chapter 11 Cases, in each case which shall be solely payable prior to any Distribution to Beneficiaries.

## B.    Rules of Interpretation

For purposes of the Combined Plan and Disclosure Statement: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references to "Articles" are references to Articles of the Combined Plan

15

and Disclosure Statement; (6) unless otherwise specified, all references to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Combined Plan and Disclosure Statement in its entirety rather than to a particular portion of the Combined Plan and Disclosure Statement; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Combined Plan and Disclosure Statement; (9) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (11) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (12) any effectuating provisions may be interpreted by the Liquidation Trustee in a manner that is consistent with the overall purpose and intent of the Combined Plan and Disclosure Statement all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (13) any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (14) all references to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; and (15) any term used in capitalized form that is not otherwise defined shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

## C.    Computation of Time

Unless otherwise specifically stated, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## D.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided, however*, that corporate or limited liability company governance matters relating to the Debtors not incorporated in Delaware shall be governed by the laws of the state of incorporation or formulation of the applicable Debtor.

## E.    Reference to Monetary Figures

All references in the Combined Plan and Disclosure Statement to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

4913-3097-6006

F.    **Controlling Document**

In the event of an inconsistency, ambiguity, or conflict between the Plan and the Plan Supplement, the Plan Supplement shall control.  In the event of any inconsistency, ambiguity, or conflict between the Plan or the Plan Supplement on the one hand, and the Confirmation Order on the other, the Confirmation Order shall control.

## ARTICLE III
## BACKGROUND AND DISCLOSURES

A.    **The Debtors' Corporate History**

Biolase was originally formed as Societe Endo Technic, SA ("SET") in 1984 in Marseilles, France, to develop and market various endodontic and laser products.  In 1987, SET merged into Pamplona Capital Corp., a public holding company incorporated in Delaware.  In 1994, the name of the company was changed to Biolase Technology, Inc. and, in 2012, to Biolase, Inc.

BL Acquisition was incorporated on May 6, 2003 and the Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on May 9, 2003.  BL Acquisition II was incorporated on January 10, 2005 and the Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on the same day.  Model Dental was formed on August 17, 2022 and the Certificate of Formation of Limited Liability Company was filed with the Secretary of State of the State of Delaware on the same day.

B.    **The Debtors' Business Operations**

As of the Petition Date, the Debtors were global market leaders in the manufacturing and marketing of dental laser systems.  The Debtors' proprietary systems allowed dentists, periodontists, endodontists, pediatric dentists, oral surgeons, and other dental specialists to perform a broad range of minimally invasive dental procedures, including cosmetic, restorative, and complex surgical applications.  The Debtors were also developing a business-to-consumer line of business related to cosmetic and pain therapy devices.

The Debtors offered two categories of laser system products: Waterlase (all-tissue) systems and diode (soft-tissue) systems.  The Debtors' flagship brand, the Waterlase, used a patented combination of water and laser energy and was FDA cleared for over 80 clinical indications to perform most procedures currently performed using drills, scalpels, and other traditional dental instruments for cutting soft and hard tissue.  Waterlase debrides implants without damaging or significantly affecting surface temperature and is an effective, safe solution for preserving sick implants.  Waterlase also disinfects root canals more efficiently than some traditional chemical methods.  The Debtors offered the diode laser systems to perform soft tissue, pain therapy, and cosmetic procedures, including teeth whitening.

The Debtors also manufactured and sold consumable products and accessories for their laser systems.  The Waterlase and diode systems used disposable laser tips of differing sizes and shapes depending on the procedure being performed.  The Debtors marketed flexible fibers and hand pieces that dental practitioners replaced after initially purchasing laser systems.  For the Epic line of diode laser systems, the Debtors sold teeth whitening gel kits.

17

1.    **The Debtors' Leases**

As of the Petition Date, the Debtors manufactured, assembled, and tested all their laser systems at their 26,000 square foot manufacturing facility in Corona, California (the "Manufacturing Facility"). The Debtors leased the Manufacturing Facility pursuant to a five-year real property lease agreement with Green River Properties, LLC that was set to expire on June 30, 2025.

The Debtors also had office space in Lake Forest, California pursuant to a 66-month real property lease agreement with Foothill Corporate I MT LLC that commenced on July 1, 2020. On May 26, 2022, the Debtors entered into an additional lease at the Lake Forest location to add space for an additional training facility and model dental office. The additional lease commenced on March 8, 2023 and was set to expire on December 31, 2025.

As of the Petition Date, the Debtors also leased additional office space and certain office equipment under various operating lease arrangements.

2.    **The Debtors' Vendors, Suppliers, and Distributors**

The Debtors used an integrated approach to manufacturing that included the assembly of tips, laser hand pieces, fiber assemblies, laser heads, electro-mechanical subassembly, final assembly, and testing. The Debtors would obtain components and subassemblies for their products from third-party suppliers and vendors, the majority of which were located in the United States, with certain suppliers and vendors based in Canada, England, Germany, China, and Thailand. The Debtors generally purchased components and subassemblies from a limited group of suppliers through purchase orders.[7] Three key components used in the Debtors' Waterlase system (power suppliers, laser crystals, and fiber components) were each supplied by separate single-source suppliers.

The Debtors relied on exclusive and non-exclusive third-party distributors for a portion of their sales in the United States and a majority of their sales in countries outside of the United States. For the fiscal years ended December 31, 2023, 2022, and 2021, revenue from distributors accounted for approximately 31%, 30%, and 35% of the Debtors' total net revenue, respectively.

3.    **The Debtors' Customers**

The Debtors would market their laser systems worldwide to dental practitioners and also directly to patients. As of the Petition Date, the Debtors had sold over 47,700 laser systems in over 80 countries around the world. During the year ending December 31, 2023, the sale of lasers accounted for approximately 61% of the Debtors' total sales, and consumables, accessories, and services accounted for approximately 39% of the Debtors' total sales.

4.    **The Debtors' Employees**

As of the Petition Date, the Debtors employed 121 full-time employees, and 120 of those full-time employees worked in the United States. The Debtors also leveraged a limited number of temporary employee resources from time to time. The Debtors' employees fulfilled essential roles across

---

[7]    Generally, the Debtors would rely on purchase orders and did not have written supply contracts with many of their key suppliers.

various functions, including management, warehouse operations, sales, finance, human resources, and production. Many were deeply familiar with the Debtors' business and had established crucial relationships with customers, suppliers, and other key stakeholders.

## C.      The Debtors' Prepetition Corporate Structure

### 1.      Biolase

As of June 30, 2024, Biolase had the authority to issue a total of 181,000,000 shares of stock, of which 180,000,000 shares, at $0.001 par value per share, were designated as common stock and of which 1,000,000 shares, at $0.001 par value per share, were designated as preferred stock. As of August 1, 2024, approximately 36,597,056 shares of common stock were issued and outstanding. As of June 30, 2024, approximately 24,059 shares of preferred stock were issued and outstanding.

Until June 20, 2024, Biolase's common stock traded on the Nasdaq Stock Market LLC ("Nasdaq") under the symbol "BIOL." On November 14, 2023, the Nasdaq Listing Qualifications Staff (the "Staff") notified Biolase that it was in violation of the equity requirement in Nasdaq Listing Rule 5550(b)(1) or any of the alternative requirements in Nasdaq Listing Rule 5550(b) (the "Equity Rule").

On February 13, 2024, the Staff notified Biolase that it had determined to grant Biolase an extension of time to regain compliance with the Equity Rule, provided that Biolase evidenced compliance upon filing its periodic report for the period ended March 31, 2024. On February 16, 2024, the Staff notified Biolase that it was in compliance with the Equity Rule. On March 4, 2024, the Staff notified Biolase that it was in violation of the bid price requirement of Nasdaq Listing Rule 5550(a)(2) (the "Bid Price Rule"). On May 14, 2024, the Staff notified Biolase that it was again in violation of the Equity Rule.

Biolase appeared before the Nasdaq Hearings Panel (the "Panel") on June 4, 2024. At the hearing, Biolase's senior management and outside advisors outlined Biolase's compliance plan for the Panel, which included regaining compliance with the Bid Price Rule (*i.e.*, meet the minimum closing bid price requirement of $1.00) and the Equity Rule (*i.e.*, maintain a stockholders' equity of at least $2.5 million).

On June 17, 2024, Biolase received a letter from Nasdaq notifying it that the Panel had determined to delist Biolase's common stock and that trading of Biolase's securities would be suspended at the open of trading on June 20, 2024. On June 20, 2024, Biolase's common stock began trading on the OTCQB market platform operated by OTC Markets Group, Inc. (the "OTC") under the trading symbol "BIOL."

On October 2, 2024, the day after the Petition Date, Biolase received notice from the OTC that it no longer met the Standards for Continued Eligibility for OTCQB. Consequently, on October 3, 2024, Biolase's shares of common stock began trading on the Pink Market platform operated by the OTC under the "BIOLQ" ticker symbol.

### 2.    The Other Debtors

Biolase owns 100% of the other Debtors and 100% of the Non-Debtor Affiliates.    An organizational chart illustrating the Debtors' corporate structure is set forth below.



### D.    The Debtors' Prepetition Capital Structure

As of the Petition Date, the Debtors had approximately $16,345,000 in total funded debt obligations (excluding accrued interest and certain costs).  The following table depicts the Debtors' prepetition capital structure:

| Funded Debt | Approx. Outstanding Principal | Maturity Date |
|---|---|---|
| SWK Term Loan | $16,195,000 | May 31, 2025 |
| SBA Loan | $150,000 | May 22, 2050 |
| **Total** | **$16,345,000** | |

### 1.    The Prepetition Term Loan

On November 9, 2018, Biolase entered into the Prepetition Credit Agreement with SWK, as agent and lender.  Pursuant to the Prepetition Guarantee, the other Debtors guaranteed Biolase's obligations under the Prepetition Credit Agreement and pledged their assets as collateral for their obligations under the Prepetition Guarantee.

Pursuant to the Prepetition Credit Agreement, SWK provided Biolase with a senior secured term loan facility in the amount of $12.5 million.  The Debtors used approximately $0.9 million of the Prepetition Term Loan proceeds to pay all amounts owed to Western Alliance Bank under a previous Business Financing Agreement and used the remaining proceeds for working capital

needs and growth initiatives. The Prepetition Credit Agreement was amended several times to, among other things, increase the total commitments to $15 million, revise certain financial covenants, and extend the maturity date to May 31, 2025.

Pursuant to the Prepetition Credit Agreement, the Prepetition Term Loan was secured by a lien on substantially all of Biolase's assets and had a variable interest rate of LIBOR plus 9% with a LIBOR floor of 1.25%. As of the Petition Date, the aggregate principal outstanding under the Prepetition Term Loan was approximately $16,195,000, including $2.5 million that was advanced after September 3, 2024.

Following an event of default under the Prepetition Credit Agreement as a result of Biolase's failure to make certain payments under the Prepetition Term Loan on or about August 15, 2024, Biolase commenced negotiations with SWK. The parties' negotiations led to the Forbearance Agreement dated as of August 31, 2024 pursuant to which SWK agreed to fund (i) a bridge loan to pay the Debtors' operating expenses until the filing of these Chapter 11 Cases and (ii) a postpetition loan so long as the bridge loan was "rolled-up" into a debtor in possession financing loan (subject to court approval).

### 2. __The SBA Loan__

On May 22, 2020, Biolase executed the standard loan documents required for an unsecured loan from the SBA under its Economic Injury Disaster Loan assistance program given the impact of the COVID-19 pandemic on the Debtors' business. The principal amount of the SBA Loan is $150,000, with the proceeds used for working capital needs. Interest on the SBA Loan accrues at the rate of 3.75% per annum, and installment payments, including principal and interest, are due monthly and are payable through May 22, 2050, with any fixed payments first applied to accrued interest. Biolase began making payments on the SBA Loan in November 2022.

### 3. __Unsecured Claims__

In addition to their funded debt, as of the Petition Date, the Debtors also had significant unsecured debt including amounts owed to trade vendors. The Debtors routinely incurred fixed, liquidated, and undisputed payment obligations in the ordinary course of business to various third-party providers of goods and services. The Debtors relied on a broad network of vendors to supply inventory. A majority of these vendors conducted business with the Debtors on a purchase-order-by-purchase-order basis and were paid on prearranged terms.

### E. __Challenges Facing the Debtors Over the Years__

The Debtors' dental laser systems represented relatively new technologies in the dental market. Only a small percentage of dentists use lasers to perform dental procedures. Dentists and patients have been hesitant to adopt laser technologies, which limited the market acceptance of the Debtors' products and market share. Additionally, because dentists have been slow to adopt new technologies on a widespread basis, the Debtors had long sales cycles. As a result, the Debtors

4913-3097-6006

had to invest a significant amount of time and resources to educate dentists about the benefits of the Debtors' products in comparison to competing products and technologies.

The Debtors' business was also highly sensitive to changes in general economic conditions as a seller of capital equipment to end users in dental professional practices. Financial markets inside the United States and internationally have experienced extreme disruption in recent years, including extreme volatility in security prices, severely diminished liquidity and credit availability, and declining valuations of investments. The continued economic downturn and financial market disruptions have had a material adverse effect on the Debtors' business and financial condition. The Debtors' business was also subject to external macroeconomic pressures. For example, the imposition of economic sanctions on Russia as a result of the conflict in Ukraine prevented the Debtors from performing existing contracts and pursuing new growth opportunities abroad, which adversely affected the Debtors' business, financial condition and results of operations.

Further, as noted above, the Debtors relied on exclusive and non-exclusive third-party distributors who had significant discretion in determining the efforts and resources applied to the sale of products. The Debtors' success depended in part on the relationships with, and the efforts of, third-party distributors. The Debtors faced significant challenges and risks in expanding, training, and managing third-party distributors, particularly given their geographically dispersed operations.

A combination of these and other factors led the Debtors to record net losses for the years ending December 31, 2023, 2022, and 2021 in the amounts of $20.6 million, $28.6 million, and $16.2 million, respectively. The Debtors had an accumulated deficit of $316.8 million as of December 31, 2023.

## 1.    **PIPStek Action**

On January 4, 2023, PIPStek filed the PIPStek Action alleging that Biolase's Waterlase dental laser product infringed PIPStek's patents. PIPStek's complaint sought unspecified damages, injunctive relief, and costs and attorneys' fees. On May 3, 2023, Biolase answered denying PIPStek's allegations, asserting defenses of non-infringement, invalidity, and unenforceability due to unclean hands, and denying PIPStek is entitled to any relief whatsoever. As explained in Article III.J below, the Debtors, PIPStek and Sonendo are engaged in active settlement discussions that would resolve the PIPStek Action and other claims.

## 2.    **Default Under the Prepetition Credit Agreement**

As noted above, on or about August 15, 2024, Biolase failed to make certain payments under the Prepetition Term Loan, which resulted in an event of default under the Prepetition Credit Agreement. On August 31, 2024, the Debtors and SWK entered into the Forbearance Agreement pursuant to which SWK agreed to fund (i) a bridge loan to pay the Debtors' operating expenses until the filing of these Chapter 11 Cases and (ii) a postpetition loan so long as the bridge loan is "rolled-up" into a debtor in possession financing loan (subject to court approval).

**F.     The Debtors' Prepetition M&A Initiatives and Marketing Process Leading to the Commencement of These Chapter 11 Cases**

1.     **Prepetition M&A Initiatives**

To address their operational challenges and liquidity needs, the Debtors engaged in various merger and acquisition initiatives for years. Dating back to 2018, the Debtors reached out to at least forty-five (45) buyout and growth capital private equity firms looking for a sponsor deal, but such efforts proved unsuccessful.

2.     **Prepetition Sale Process**

More recently, the Debtors began looking for an acquirer for their business. Approximately eighteen (18) months before the Petition Date, the Debtors reached out to approximately fifteen (15) separate parties. To further expand the potential pool of acquirors, the Debtors hired The Benchmark Company, LLC ("<u>Benchmark</u>"), effective as of January 16, 2024, on a non-exclusive basis to begin a more formal process designed to identify and close "a transaction or related series or combination of transactions involving the sale of assets, or intellectual property, or outstanding stock (or securities convertible into stock) or a merger, acquisition or other business combination, including a recapitalization, a consolidation or a joint venture in the nature of an acquisition." Benchmark contacted twenty-six (26) interested parties regarding the opportunity.

Over the coming months, the Debtors hired four additional investment bankers, all on a non-exclusive basis, to assist with identifying additional potential buyers. Those bankers included Benchmark (retained as of January 16, 2024), Pacific Gate Advisors, LLC (retained as of April 5, 2024), Lake Street Capital Markets, LLC (retained as of July 15, 2024, and used in 2023 as well), Moody Capital Solutions, Inc. (retained as of July 31, 2024), and 431 Group Limited (retained as of August 14, 2024).

In total, the Debtors and their advisors contacted over thirty (30) potential investors, including strategic and financial investors, to solicit proposals to acquire the Debtors' business or assets. In connection with this solicitation, the Debtors and their advisors prepared, among other things, a confidential information memorandum and an electronic data room. Ultimately, more than 100 interested parties executed confidentiality agreements and were granted access to the electronic data room. Interested parties were also given an opportunity to have meetings with the Debtors' management.

The Debtors received ten (10) indications of interest for various portions of the Debtors' business. The Debtors invited each bidder into the second, more comprehensive round of diligence and worked with each to attempt to improve their bids in advance of the letter of intent ("<u>LOI</u>") deadline. As part of this diligence phase, prospective bidders were invited to meet with the Debtors' management.

Following several weeks of additional diligence, the Debtors ultimately received three, non-binding LOIs for the purchase of substantially all of the Debtors' assets, and a term sheet for a sale of a portion of the assets. Two of the LOIs contemplated an out-of-court asset sale (as well as the term sheet), while the other contemplated a sale through chapter 11. In evaluating the LOIs and term sheet, the Debtors analyzed, among other considerations: (i) the structure of the proposed

23

transaction; (ii) the form and amount of consideration offered; (iii) the assets to be acquired and liabilities to be assumed; (iv) certainty of close; and (v) execution risks. The Debtors met regularly with their advisors and consulted with their key stakeholders before and after LOIs were submitted.

PIPStek, who has been in litigation with the Debtors over alleged patent infringement, submitted an LOI that (i) contemplated a chapter 11 sale with a short timeline to complete confirmatory diligence and execute a purchase agreement, (ii) requested a prepetition exclusivity period, and (iii) contemplated DIP financing to bridge to a closing of a sale transaction. The Debtors pushed back on the exclusivity request, and after reviewing the LOIs and term sheet with the Debtors' board, management and key stakeholders, including SWK, the Debtors were ultimately able to reach agreement with PIPStek to eliminate the exclusivity request, which was confirmed in a revised LOI, dated August 5, 2024.

At the same time, the Debtors and their advisors continued discussions with the Prepetition Lender to gauge its willingness to fund the Debtors through closing of a sale in chapter 11. The Prepetition Lender was unwilling to consent to a priming DIP Facility by PIPStek or any other third party. The Prepetition Lender, however, was willing to provide the Debtors with postpetition financing and expressed a willingness to fund the Debtors with incremental liquidity before the filing of these Chapter 11 Cases to bridge to the Petition Date, with PIPStek as the stalking horse bidder.

### 3.   **The Debtors Retain SSG Advisors**

Thereafter, the Debtors engaged SSG Advisors, LLC ("SSG") on August 28, 2024 to provide prepetition investment banking services. In that role, SSG (a) continued the marketing process with the parties that submitted LOIs and were engaged with the Debtors before SSG's retention, and solicited additional third-party interest; and (b) assisted the Debtors in negotiating and documenting an asset purchase agreement with PIPStek and developing the Bidding Procedures.

By the Petition Date, SSG had contacted over 300 potential investors, including strategic and financial investors, to solicit proposals for the Debtors' Assets. As part of that process, the Debtors and their advisors prepared, among other things, a transaction overview "teaser" and SSG updated the pre-existing electronic data room. Twelve (12) new interested parties executed confidentiality agreements, were granted access to the electronic data room, and were invited to have a virtual meeting with the Debtors' management.

After numerous discussions with their advisors and the Prepetition Lender, the Debtors determined that pursuing PIPStek's revised LOI was in their best interests and the only viable alternative at the time. The Debtors and their advisors held numerous calls and engaged in extensive negotiations with PIPStek over the terms of the potential agreement to purchase substantially all of the Debtors' assets.

### 4.   **The Stalking Horse APA**

Faced with no other actionable sale proposal, the Debtors executed the Stalking Horse APA with PIPStek, pursuant to which it agreed to (a) serve as the Stalking Horse Bidder; (b) acquire substantially all of the Debtors' assets as a going concern; (c) pay a $1.4 million deposit; (d) expose the Stalking Horse APA to higher or better offers through a competitive auction process; and (e) receive standard bid protections in the form of a market rate break-up fee.

24

Under the terms of the Stalking Horse APA, the Stalking Horse Bidder would purchase the Debtors' assets for aggregate consideration of: (a) $14.0 million in cash paid at closing, subject to a working capital adjustment; (b) assumption of certain assumed liabilities; and (c) the Delaware Litigation Settlement Value (as defined in the Stalking Horse APA).

With the benefit of the Stalking Horse APA, the Debtors planned to continue the marketing and sale process by requesting the Bankruptcy Court's approval of the Bidding Procedures to govern the sale process, including the Auction. SSG also continued to market the Debtors' Assets to potential buyers after the Petition Date and engaged in discussions with parties that executed a confidentiality agreement, with the goal of having as many bidders as possible participate in the auction and ensure a robust sale process that would maximize the value of the Debtors' Assets.

## G.    The Chapter 11 Cases

### 1.    First Day Relief

On the Petition Date, the Debtors filed the First Day Motions. The First Day Motions requested relief from the Bankruptcy Court to, among other things: (a) jointly administer the Chapter 11 Cases; (b) appoint the Notice, Claims, and Solicitation Agent; (c) pay employee wages; (d) maintain the Debtors' cash management system; (e) pay taxes; (f) pay insurance obligations; (g) maintain utilities; and (h) obtain postpetition financing (discussed in further detail below). In support of the First Day Motions, the Debtors relied upon the First Day Declaration. The First Day Motions were all approved.

### 2.    DIP Financing

On the Petition Date, the Debtors filed the DIP Financing Motion. Pursuant to the DIP Financing Motion, the Debtors sought approval of the DIP Facility from the DIP Lender in the amount of $5 million, with $2.5 million in new money borrowing capacity and $2.5 million of the prepetition bridge loan "rolled-up" into the DIP Facility (*i.e.*, deemed to be DIP Obligations). The Debtors entered these Chapter 11 Cases with minimal cash on hand. Access to the DIP Facility and use of cash collateral was therefore critical to ensure the Debtors' smooth entry into chapter 11. The DIP Facility was market-tested and evaluated by the Debtors and their Professionals. The Bankruptcy Court entered the First Interim DIP Order on October 3, 2024 [Docket No. 66], the Second Interim DIP Order on October 28, 2024 [Docket No. 168], and the Final DIP Order on November 15, 2024 [Docket No. 226], in each case approving the DIP Financing Motion.

### 3.    Motion to Reject Prepetition Investment Banker Agreements

On the Petition Date, the Debtors filed a motion [Docket No. 8] to reject the agreements with the Debtors' Prepetition Investment Bankers given the Debtors' retention of SSG to lead the postpetition marketing process. On December 10, 2024, the Bankruptcy Court approved the Debtors' rejection of the agreements with the Prepetition Investment Bankers effective as of the Petition Date [Docket No. 277].

### 4.    The Debtors' Retention of Professional Advisors

In October 2024, the Debtors filed the Debtor Retention Applications to retain:

- Epiq Corporate Restructuring, LLC as Notice, Claims, And Solicitation Agent [Docket No. 4] and administrative advisor [Docket No. 73]; and

- B. Riley Advisory Services as financial advisor [Docket No. 74];

- SSG Advisors, LLC as investment banker [Docket No. 75];

- Potter Anderson & Corroon LLP, as legal counsel [Docket No. 76];

- Pillsbury Winthrop Shaw Pittman LLP, as legal counsel [Docket No. 77]; and

- Carroll & Carroll, P.C. as special counsel [Docket No. 78].

On October 25, 2024, the Debtors withdrew the Debtor Retention Application for Carroll & Carroll [Docket No. 163], and the Bankruptcy Court approved the remaining Debtor Retention Applications. The foregoing Professionals are, in part, responsible for the administration of these Chapter 11 Cases. The postpetition compensation of all of the Debtors' Professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the Bankruptcy Court's approval.

5. **Ordinary Course Professionals**

On October 7, 2024, the Debtors filed a motion [Docket No. 71] seeking entry of an order establishing a process for: (a) retaining Ordinary Course Professionals including accountants, attorneys, and other Professionals on an "as needed" basis without the submission of separate, formal retention applications; and (b) the allowance and payment of compensation and reimbursement of expenses of such Ordinary Course Professionals. On October 25, 2024, the Bankruptcy Court entered the OCP Order [Docket No. 162].

6. **Appointment of the Committee**

On October 14, 2024, the U.S. Trustee appointed the Committee in these Chapter 11 Cases with the following members: (a) Ultradent Products, Inc., (b) Vantron Technology Inc., and (c) Axian Technology, Inc.

In November 2024, the Committee Filed the Committee Retention Applications to retain:

- Brinkman Law Group, PC, as legal counsel [Docket No. 219];

- Esbrook P.C., as legal counsel [Docket No. 223]; and

- Dundon Advisers LLC, as financial advisor [Docket No. 247].

The Committee Retention Applications were approved on December 12, 2024. The postpetition compensation of all of the Committee Professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the Bankruptcy Court's approval.

4913-3097-6006

7.     **Schedules and Statements of Financial Affairs**

On October 14, 2024, the Debtors filed their respective Schedules and Statements [Docket Nos. 85–92]. The Debtors held a meeting of creditors pursuant to section 341 of the Bankruptcy Code on November 6, 2024.

8.     **Bar Date**

On December 10, 2024, the Bankruptcy Court entered the Bar Date Order.  The Bar Date Order established the Bar Date, the Governmental Bar Date, and the Initial Administrative Claim Bar Date for Administrative Claims arising from the Petition Date through and including November 26, 2024.  A copy of the *Notice of Deadline for Filing Proofs of Claim and Requests for Allowance of Administrative Claims* can be found at Docket No. 286.

Pursuant to the Bar Date Order, all Creditors holding or wishing to assert a Claim against the Debtors or the Debtors' Estates, accruing before the Petition Date, and which remain unpaid, including Claims arising under section 503(b)(9) of the Bankruptcy Code, are required to file a Proof of Claim by January 13, 2025 at 5:00 p.m. (prevailing Eastern Time).

Additionally, pursuant to the Bar Date Order, all creditors holding or wishing to assert Administrative Claims against the Debtors or their Estates, accruing from the Petition Date through and including November 26, 2024, are required to file any such Administrative Claims by January 13, 2025 at 5:00 p.m. (prevailing Eastern Time).  Administrative Claims arising from November 27, 2024 through the Effective Date must be filed by the Final Administrative Claim Bar Date.

9.     **The Sale**

On October 17, 2024, the Bankruptcy Court entered the Bidding Procedures Order (i) approving the Bidding Procedures for the sale of substantially all of the Debtors' Assets; (ii) designating PIPStek, as the Stalking Horse Bidder; (iii) scheduling the Auction and the Sale Hearing to consider approval of the proposed sale to the Stalking Horse Bidder or the successful bidder at the Auction; (iv) approving the form and manner of notice of the Bidding Procedures, the Auction and the Sale Hearing; and (v) approving procedures for the assumption and assignment of Executory Contracts and Unexpired Leases in connection with the Sale.

On October 17, 2024, notice of the Bidding Procedures, the Auction and the Sale Hearing was served on the Sale Notice Parties (as defined in the Bidding Procedures Order), which included parties that previously expressed an interest in acquiring the Debtors' Assets.  *See* Docket No. 147. On October 24, 2024, the Debtors also published notice of the Bidding Procedures, the Auction, and the Sale Hearing in the national edition of USA Today.  *See* Docket No. 141.

On November 4, 2024, the Debtors held the Auction in accordance with the Bidding Procedures Order.  After multiple rounds of bidding, the Purchaser submitted the highest and best bid for the purchase of substantially all of the Debtors' Assets, which bid consisted of $20,050,000 in cash

consideration.  On November 5, 2024, the Debtors filed the *Notice of Auction Results* declaring the Purchaser as the successful bidder [Docket No. 189].

On November 15, 2024, the Bankruptcy Court entered the Sale Order [Docket No. 225] approving the Sale to the Purchaser.  The Sale closed on November 26, 2024.  *See* Docket No. 272.

Pursuant to the Purchaser's APA, the Purchaser purchased substantially all of the Debtors' Assets excluding (i) any Assets principally related to the Debtors' foreign subsidiaries; (ii) any deposits or prepaid charges and expenses related to the Debtors' foreign subsidiaries or excluded liabilities; (iii) any amounts paid to the Debtors pursuant to the Purchaser's APA; (iv) all cash deposited into any of the Debtors' bank accounts before the Closing Date; (v) any contracts or leases of the Debtors that have not been assumed and assigned through the Sale; (vi) rights to any employee retention tax credits earned before the Closing Date; (vii) any "employee benefit plan" (within the meaning of Section 3(3) of ERISA); (viii) the D&O Liability Insurance Policies; (ix) any equity interests of the Debtors and their subsidiaries; (x) all bank accounts of the Debtors; (xi) all Causes of Action (including counterclaims) and defenses solely relating to Assets excluded from the Sale; (xii) any nontransferable permits, licenses, authorizations, certificates, and franchises of the Debtors; (xiii) all rights related to insurance policies providing insurance coverage to, or for the benefit of, Assets excluded from the Sale; (xiv) any tax refunds or credits that arose while the Debtors were operating their business; (xv) any avoidance actions under the Bankruptcy Code; and (xvi) the Debtors' foreign subsidiaries.

## H.    Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with the Sale

In connection with the Sale, the Debtors assumed and assigned various Executory Contracts and Unexpired Leases to the Purchaser.  In accordance with the Bidding Procedures Order, on October 21, 2024, the Debtors filed and served the *Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Sale of Substantially All Assets* [Docket No. 120] (the "Original Cure Notice") on counterparties to Executory Contracts and Unexpired Leases that might be assumed and assigned to the successful bidder at the Auction.

On October 24, 2024, the Debtors filed the *Amended Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Sale of Substantially All Assets* [Docket No. 139] (the "First Amended Cure Notice"), which amended and superseded the Original Cure Notice.

On November 1, 2024, the Debtors filed the *Second Amended Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Sale of Substantially All Assets* [Docket No. 181] (the "Second Amended Cure Notice"), which amended and superseded the First Amended Cure Notice.

On November 22, 2024, the Debtors filed the *Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Sale of Substantially All Assets* [Docket No. 261], which supplemented the Second Amended Cure Notice.

On November 27, 2024, the Debtors filed the final schedule of Executory Contracts and Unexpired Leases assumed and assigned to the Purchaser as of the Closing Date. *See* Docket No. 272.

## I.   **The Committee Settlement**

Pursuant to the Final DIP Order, and as more fully described therein, the Debtors, the Committee, and SWK, in its capacity as the Prepetition Lender and the DIP Lender, reached the Committee Settlement pursuant to which:

- The Committee agreed to support and not object to the Sale, entry of the Sale Order, or entry of the Final DIP Order.

- SWK would receive $13 million of the Sale Proceeds within three (3) business days of Closing Date.

- The Committee waived its right to assert or assist (directly or indirectly) in asserting a Challenge Action (as defined in the Final DIP Order) effective upon the Closing Date.

- The Budget was revised to:

  o add a line item titled "Liquidating Trust Funding" in the amount of $300,000 funded from the Sale Proceeds to (a) establish and fund the Liquidation Trust for the benefit of Holders of Allowed General Unsecured Claims (including the SWK Deficiency Claims) and (b) fund the Wind Down Expenses of the Debtors and their foreign subsidiaries; *provided, however*, that the Prepetition Lender and the DIP Lender retain a lien on the foregoing $300,000 and will be entitled to any amounts remaining after payment in full of the costs described in the preceding subclauses (a) and (b);

  o add a line item titled "Administrative Claim Contingency" in the amount of $550,000 funded from the Sale Proceeds to be used to pay Administrative Claims (other than Professional Fee Claims, which are separately accounted for in the Budget); *provided, however*, that the Prepetition Lender and the DIP Lender retain a lien on the foregoing $550,000 and will be entitled to any amounts remaining after payment in full of the foregoing Administrative Claims;

  o add a line item titled "GUC Recovery Amount" in the amount of $300,000 funded from the Sale Proceeds to be used to provide a recovery under the Plan to Holders of Allowed General Unsecured Claims; *provided, however*, that the Prepetition Lender and the DIP Lender will retain a lien on the foregoing $300,000 until the Effective Date; and

  o increase the line item for Professional Fee Claims of the Committee's Professionals to $550,000 in the aggregate.

- The Debtors, the Committee and SWK agreed that the Combined Plan and Disclosure Statement would provide a ratable Distribution to Holders of all Allowed General

Unsecured Claims (including the SWK Deficiency Claims), equal to the lesser of (a) the GUC Recovery Amount and (b) the dollar amount equal to a 10% recovery to Holders of all Allowed General Unsecured Claims (excluding the SWK Deficiency Claims) (*i.e.*, the 10% GUC Distribution). If the 10% GUC Distribution is less than $300,000, then the Prepetition Lender and the DIP Lender will be entitled to the difference between the GUC Recovery Amount and the 10% GUC Distribution. By way of example, if the 10% GUC Distribution equals $200,000, then the Prepetition Lender and the DIP Lender will be entitled to $100,000 (*i.e.*, the difference between $300,000 and $200,000).

Finally, the Debtors, the Committee and SWK agreed that the Combined Plan and Disclosure Statement would provide for (a) customary releases and exculpations of the Debtors, the Committee's Professionals, and the members of the Committee, solely in their capacity as such; and (b) customary mutual releases by and among the Debtors, SWK, and the Committee relating to the Debtors, the Debtors' estates, their business operations, and the Sale.

## J.     PIPStek's and Sonendo's Claims and Anticipated Settlement

On October 1, 2024, Sonendo filed a proof of claim for no less than $59 million for Biolase's alleged infringement of Sonendo's patents. *See* Proof of Claim No. 3 on the Notice, Claims, and Solicitation Agent's Claims Register.[8] Sonendo alleges claims for (i) no less than $29 million in prepetition lost profits of sales in the United States due to alleged infringing products and technology sold by Biolase from 2021 to 2024; (ii) unliquidated and contingent future loss profits of sales in the United States for 2025 through 2026 of no less than $24 million; (iii) unliquidated and contingent treble damages under 35 U.S.C. § 284; and (iv) unliquidated and contingent attorneys' fees recoverable under 35 U.S.C. § 284 of no less than $6 million based on industry survey estimates. *See id.* Sonendo also alleges that Biolase is liable to Sonendo for infringement outside of the United States, including in Canada and several European countries.

The Debtors, PIPStek and Sonendo are engaged in active settlement discussions and are close to resolving their respective claims. The Debtors hope to file a motion seeking approval of a global settlement in the near term.

## ARTICLE IV

## ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth below in Article V.

## A.     DIP Facility Claims

Pursuant to the terms of the Committee Settlement and the Final DIP Order, SWK received $13 million of the Sale Proceeds, which SWK applied to fully satisfy the DIP Obligations and

---

[8]     On the Bankruptcy Court's claims register, Sonendo's claim appears as Claim 1-1.

partially satisfy the Prepetition Secured Obligations. Consequently, the Debtors do not anticipate making any additional payments on account of Claims under the DIP Facility. To the extent any Claim arising under the DIP Facility has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, the Debtors will pay the full unpaid amount of such Claim in Cash on the Effective Date or as soon as reasonably practicable thereafter.

**B.     Administrative Claims**

Except to the extent that a Holder of an Allowed Administrative Claim and the Debtors or the Liquidation Trustee, as applicable, agree to less favorable treatment with respect to such Allowed Administrative Claim, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim will be paid the full unpaid amount of such Allowed Administrative Claim in Cash: (a) on the Effective Date or as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Claim becomes due or as soon as reasonably practicable thereafter; (b) if such Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Claim becomes due or as soon as reasonably practicable thereafter; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or Liquidation Trustee, as applicable; or (d) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court; *provided that* any Allowed Administrative Claim that has been assumed by the Purchaser under the Purchaser's APA shall not be an obligation of the Debtors or the Liquidation Trustee and shall not be entitled to any recovery from the Estates under the Plan.

Administrative Claims incurred or arising on or before November 26, 2024 are governed by the Bar Date Order and must be filed by the Initial Administrative Claim Bar Date.

Requests for payment of Administrative Claims arising after November 26, 2024 through the Effective Date must be Filed on or before the Final Administrative Claim Bar Date. Any such Administrative Claim must be filed with the Bankruptcy Court with a copy served on Debtors' counsel (before the Effective Date) and the Liquidation Trustee and its counsel (after the Effective Date), as applicable, by regular mail, overnight courier, or hand delivery to the Notice, Claims, and Solicitation Agent at the following addresses by the Administrative Claim Bar Date:

31

(by first-class mail)
Biolase, Inc.
Claims Processing Center
c/o Epiq Corporate Restructuring, LLC
P.O. Box 4420
Beaverton, OR 97076-4420

(by overnight mail, courier or hand delivery)
Biolase, Inc.
Claims Processing Center
c/o Epiq Corporate Restructuring, LLC
10300 SW Allen Blvd.
Beaverton, OR 97005

Except as otherwise ordered by the Bankruptcy Court, any Holder of Administrative Claim that does not File and serve a request for payment of its Administrative Claim by the applicable date shall be forever barred, estopped, and enjoined from asserting such Administrative Claim against the Debtors or the Debtors' property and such Administrative Claim shall be deemed released against the Debtors, their Estates, or the Liquidation Trustee, as of the Effective Date. Unless the Debtors or the Liquidation Trustee (or other party with standing) object to a timely-filed and properly served Administrative Claim, such Administrative Claim shall be deemed Allowed in the amount requested. In the event that the Debtors or the Liquidation Trustee object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative Claim should be Allowed and, if so, in what amount.

## C.    Professional Fee Claims

### 1.    Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than 45 days after the Effective Date unless no final request for payment of such Professional Fee Claims is required pursuant to an order of the Bankruptcy Court. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The Debtors or the Liquidation Trustee (as applicable) shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash, on the later of (i) the Effective Date, or as soon as reasonably practicable thereafter, and (ii) the date such Professional Fee Claim becomes an Allowed Claim by a Final Order of the Bankruptcy Court or as soon as reasonably practicable thereafter.

### 2.    Professional Fee Escrow Account

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish (if not previously established) and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee

32

Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No liens, claims, or interests shall encumber the Professional Fee Escrow Account or the Cash held in the Professional Fee Escrow Account. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates of the Debtors or the Liquidation Trust.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or the Liquidation Trustee, as applicable, from the funds held in the Professional Fee Escrow Account; *provided that* the Debtors' and the Liquidation Trustee's obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall be paid to the Prepetition Lender in accordance with the Plan without any further action or order of the Bankruptcy Court.

3.      **Professional Fee Escrow Amount**

The Professionals shall provide a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five Business Days before the anticipated Effective Date; *provided that* such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professionals' final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be used by the Debtors to determine the amount to be funded into the Professional Fee Escrow Account, provided that the Liquidation Trustee shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

D.      **Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtors, or the Liquidation Trustee, as applicable, agree to a less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, at the Debtors' or the Liquidation Trustee's option, either (i) the full unpaid amount of such Allowed Priority Tax Claim in Cash on the later of the Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter), or (ii) equal annual installment payments in Cash, of a total value equal to the Allowed amount of such Priority Tax Claim, over a period ending not later than five (5) years after the Petition Date, in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan (other than Cash payments made to a class of creditors under section 1122(b) of the Bankruptcy Code); provided that any

33

Allowed Priority Tax Claim that has been expressly assumed by the Purchaser under the Purchaser's APA shall not be an obligation of the Debtors or the Liquidation Trustee.

Once an Allowed Priority Tax Claim has been paid in full, any liens securing such Allowed Priority Tax Claim shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule, or the vote, consent, authorization, or approval of any Person.

## E.    Statutory Fees and Related Reporting Obligations

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable which come due and payable either prior to or after the Effective Date shall be paid by the Debtors or the Liquidation Trustee, as applicable.  The Debtors and the Liquidation Trustee, as applicable, shall file all monthly operating reports when they become due, using UST Form 11-MOR or UST Form 11-PCR.  Each and every one of the Debtors and the Liquidation Trust shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the entry of an order by the Bankruptcy Court that closes, dismisses, or converts to a case under chapter 7 of the Bankruptcy Code for each of the Chapter 11 Cases of the Debtors.  All parties' rights with respect to Statutory Fees are expressly reserved.

## ARTICLE V
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

## A.    Classification of Claims and Interests

Except for the Claims addressed in Article IV of the Combined Plan and Disclosure Statement, all Claims against and Interests in the Debtors are classified in the Classes set forth in this Article V for all purposes, including voting, Confirmation, and Distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving Distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The Plan shall apply as a substantively consolidated Plan for all of the Debtors.  All of the potential Classes for the Debtors are set forth herein.

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the Claims reconciliation process.  Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein or the actual Distributions received by Holders of Allowed Claims.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only.  In addition to the cautionary notes contained elsewhere in the Combined Plan and Disclosure Statement, it is underscored that

34

the Debtors make no representation as to the accuracy of these recovery estimates.  The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received or errors discovered).

| Class | Claim/Interest | Estimated Allowed Amount of Claims[9] | Status | Voting Rights | Projected Recovery[10] |
|---|---|---|---|---|---|
| 1 | Secured Claims | $6,312,179[11] | Impaired | Entitled to Vote | Approx. 82% |
| 2 | Other Priority Claims | $356,528 | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| 3 | General Unsecured Claims | $2,434,829.55 | Impaired | Entitled to Vote | Approx. 10%[12] |
| 4 | Interests | $0 | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |

### B.    Treatment of Claims and Interests

Subject to Article XI hereof, each Holder of an Allowed Claim against or Allowed Interest in the Debtors, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, and release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors, or the Liquidation Trustee, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

---

[9]     These amounts represent estimated Allowed Claims against the Debtors and do not represent amounts actually asserted by Creditors in Proofs of Claim or otherwise.  The Debtors have not completed their analysis of Claims in the Chapter 11 Cases, and all objections to such Claims have not been Filed or fully litigated and may continue following the Effective Date.  Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time.  Rather, the actual amount of the Allowed Claims may be greater or lower than estimated.

[10]    The estimated percentage recovery is based on, among other things, an estimate of the Allowed Claims against the Debtors in the Chapter 11 Cases.  As noted, the actual amount of the Allowed Claims may be greater or lower than estimated.  Thus, the actual recoveries may be higher or lower than projected depending on, among other things, the amounts and priorities of Claims that are actually Allowed by the Bankruptcy Court and the actual amount of Cash available for Distribution.

[11]    Approximate amount, with interest and fees, as of February 25, 2025.

[12]    Any recovery above 10% would be, as disclosed in Article XI.E, mere speculation and will depend entirely on the value of the Liquidation Trust Assets, including the Retained Causes of Action.

4913-3097-6006

1.      Class 1 – Secured Claims under the Prepetition Term Loan

(a)     *Classification:* Class 1 consists of the Allowed Secured Claims under the Prepetition Term Loan.

(b)     *Treatment:* The Prepetition Lender shall receive, either (i) Cash on the Effective Date, or as soon as reasonably practicable, equal to (A) the Sale Proceeds remaining after payment of or reserving for amounts provided for in the Budget, including the Liquidating Trust Funding Amount, the Administrative Claim Contingency Amount, the GUC Recovery Amount, and Professional Fee Escrow Amount, <u>and</u> (B) the net proceeds from the sale of the Debtors' remaining assets after payment of the Wind Down Expenses, including payment of the Remaining Administrative Contingency Amounts and Remaining Professional Fee Escrow Amounts, and the Prepetition Lender shall retain a lien on all Assets of the Estates other than the GUC Recovery Amount and Liquidating Trust Funding Amount, <u>and</u> (C) all proceeds from any Prepetition Employee Payments Avoidance Actions, or (ii) such other treatment as may be agreed upon by the Prepetition Lender and the Debtors, prior to the Effective Date, or Liquidation Trustee, after the Effective Date.

(c)     *Voting:* Class 1 is Impaired under the Plan.  The Prepetition Lender is entitled to vote to accept or reject the Plan.

2.      Class 2 – Other Priority Claims

(a)     *Classification:* Class 2 consists of all Other Priority Claims.

(b)     *Treatment*:  Except to the extent that the Holder of an Allowed Other Priority Claims agrees to less favorable treatment, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash of the Allowed amount of such Claim (as determined by settlement or Final Order of the Bankruptcy Court) on the Effective Date, or as soon as reasonably practicable, or such other treatment rendering such Claim Unimpaired.

(c)     *Voting:* Class 2 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.      Class 3 – General Unsecured Claims

(a)     *Classification*: Class 3 consists of all General Unsecured Claims (including the SWK Deficiency Claims).

(b)     *Treatment*: Except to the extent that the Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed General Unsecured Claim shall receive (i) its *pro rata* share of the

36

Liquidation Trust Interests and (ii) the lesser of (A) its *pro rata* share of the GUC Recovery Amount, and (B) its 10% GUC Distribution.

(c) *Voting*: Class 3 is Impaired under the Plan.  Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

4. Class 4 – Interests

(a) *Classification:* Class 4 consists of all Interests in the Debtors.

(b) *Treatment:* On the Effective Date, all Interests in the Debtors shall be cancelled, and the Holders of Interests shall receive no Distribution under the Plan.

(c) *Voting:* Class 4 is Impaired under the Plan.  Holders of Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

## C. **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, including, without limitation, Article XII.G, nothing under the Plan shall affect the Debtors' rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are Unimpaired.  Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

## D. **Subordinated Claims**

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Liquidation Trustee reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## E. **Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.  If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

37

**F.**     **Nonconsensual Confirmation**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.   The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.   The Debtors reserve the right to modify the Plan in accordance with Article XVI of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**G.**     **Acceptance or Rejection of the Plan**

      1.     <u>Voting Classes</u>

Classes 1 and 3 are entitled to vote on the Plan.

      2.     <u>Presumed Acceptance of the Plan</u>

Pursuant to the Bankruptcy Code, Class 2 is deemed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

      3.     <u>Presumed Rejection of the Plan</u>

Pursuant to the Bankruptcy Code, Class 4 is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

**H.**     **Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court may, after notice and a hearing, determine such controversy on or before the Confirmation Date.

Bankruptcy Rule 3018(a) provides that the "court after notice and hearing may temporarily allow [a] claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan." Fed. R. Bankr. P. 3018(a).  If any Holder of a Claim seeks to have its Claim temporarily allowed for purposes of voting to accept or reject the Plan pursuant to Bankruptcy Rule 3018(a), such Holder is required to file a motion (the "<u>3018 Motion</u>") for such relief by no later than **January 24, 2025 at 4:00 p.m. (ET)**.  The deadline for any party in interest to object to any 3018 Motion is **January 31, 2025 at 11:59 p.m. (ET)**.  Any such 3018 Motion may be resolved by agreement between the Debtors and the movant without the requirement for further order or approval of the Bankruptcy Court.

**I.**     **No Waiver**

Nothing contained in this Plan shall be construed to waive the Debtors' or Liquidation Trustee's right to object on any basis to any Claim, including after the Effective Date.

## ARTICLE VI
## CONFIRMATION AND VOTING PROCEDURES

### A.    Confirmation Procedures

The Disclosure Statement Order, among other things, will conditionally approve the Combined Plan and Disclosure Statement for solicitation purposes only and authorize the Debtors to solicit votes to accept or reject the Plan.   The Confirmation Hearing will be scheduled for **February 25, 2025 at 9:30 a.m. (ET)** at the Bankruptcy Court, 824 North Market Street, 6th Floor, Courtroom #3, Wilmington, Delaware 19801 to consider (i) final approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (ii) Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.  The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.     **Unless an objection is timely Filed and served, it may not be considered by the Bankruptcy Court.**

### B.    Procedure for Objections

Any objection to interim approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code or final approval of the Disclosure Statement and Confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on (i) counsel to the Debtors, Pillsbury Winthrop Shaw Pittman LLP, Four Embarcadero Center, 22nd Floor, San Francisco, CA 94111-5998 (Attn: Joshua D. Morse (joshua.morse@pillsburylaw.com) and Dania Slim (dania.slim@pillsburylaw.com); (ii) counsel to the Debtors, Potter Anderson & Corroon LLP, 1313 N. Market Street, 6th Floor, Wilmington, DE 19801-6108 (Attn: Blake Cleary (bcleary@potteranderson.com) and Brett Haywood (bhaywood@potteranderson.com)); (iii) Office of the United States Trustee, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Malcolm Bates (Malcolm.M.Bates@usdoj.gov)); (iv) counsel for the Prepetition Lender and the DIP Lender, Holland & Knight LLP, One Arts Plaza, 1722 Routh Street, Suite 1500, Dallas, TX 75201 (Attn:  Brent McIlwain, Esq. (Brent.McIlwain@hklaw.com) and Ryan Magee, Esq. (Ryan.Magee@hklaw.com) and Wilson Sonsini Goodrich & Rosati, PC, 222 Delaware Avenue, Suite 800, Wilmington, DE 19801 (Attn: Erin R. Fay (efay@wsgr.com)); and (v) counsel for the Committee: (a) Brinkman Law Group, PC, 543 Country Club Drive, Suite B, Wood Ranch, CA 93065 (Attn: Daren Brinkman (dbrinkman@brinkmanlaw.com) and 515 Madison Ave., 9th Floor, New York, NY 10022 (Attn: Jory Cook (jory@brinkmanlaw.com)) and (b) Esbrook P.C., 1000 N. West Street, Suite 1200, Wilmington, DE 19801 (Attn: Scott J. Leonhardt (scott.leonhardt@esbrook.com); in each case, by no later than **February 14, 2024 at 4:00 p.m. (ET)** in connection with approval of the Disclosure Statement and Confirmation of the Plan. Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

### C.    Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if it meets all of the applicable requirements of section 1129 of the Bankruptcy Code.  Among other requirements, the Plan (a) must be accepted

4913-3097-6006

by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (b) must be feasible. The Bankruptcy Court must also find that the Plan (x) classifies Claims and Interests in a permissible manner; (y) complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (z) has been proposed in good faith.

Additionally, pursuant to section 1126 of the Bankruptcy Code, under the Combined Plan and Disclosure Statement, only the Voting Classes are entitled to vote.

## D.     Classification of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity security holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those Claims which, pursuant to section 1123(a)(1) of the Bankruptcy Code, need not be and have not been classified). The Debtors are also required, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny Confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation. Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

## E.     Impaired Claims or Interests

Pursuant to the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject the plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are altered under such plan. In addition, if the holders of claims or interests in an impaired

class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, Holders of Claims in Classes 1 and 3 are Impaired and are entitled to vote on the Plan.  Under the Plan, Holders of Claims or Interests in Class 4 are Impaired and will not receive or retain any property under the Plan on account of such Claims or Interests and, therefore, are not entitled to vote on the Plan and are deemed to reject the Plan.  Under the Plan, Holders of Claims in Class 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 1 AND 3.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE.  PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY.  YOU MAY ALSO SUBMIT A BALLOT THROUGH THE ONLINE PORTAL ON THE DEBTORS' CASE WEBSITE AT  HTTPS://DM.EPIQ11.COM/CASE/BIOLASE/INFO, UNDER THE "CASE ACTIONS" SECTION BY CLICKING ON "E-BALLOT".  IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE NOTICE, CLAIMS, AND SOLICITATION AGENT AT:

Biolase, Inc.
c/o Epiq Ballot Processing,
10300 SW Allen Boulevard
Beaverton, OR 97005

Email: Biolaseinfo@epiqglobal.com

Telephone: (888) 884-0959 for U.S. claimants or (503) 619-1698 for International claimants

THE NOTICE, CLAIMS, AND SOLICITATION AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.  IF YOU BELIEVE YOU NEED LEGAL ADVICE, THEN YOU SHOULD CONSULT WITH YOUR ATTORNEY.

## F.    <ins>Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the Bankruptcy Code</ins>

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan.  A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, determined without including any acceptance of the plan by any insider holding a claim in that class, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (i) "does not discriminate unfairly" and (ii) is "fair and equitable," with respect to each non-

accepting impaired class of claims or interests. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Class of Claims or Interests that votes or is deemed to reject the Plan, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

The Debtors believe that the requirements of section 1129(b) of the Bankruptcy Code are satisfied. The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists; courts typically examine the facts and circumstances of each particular case to determine whether unfair discrimination exists. At a minimum, however, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without sufficient justifications for doing so. The Debtors believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, except where there is sufficient justification for different treatment. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors and equity holders, as follows:

Secured Creditors. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value at least equal to the amount of its allowed secured claim as of the effective date, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens with such liens attaching to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

Unsecured Creditors. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value as of the effective date equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan on account of such junior claim or interest.

Equity Interests. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of such interest, or (ii) the holder of any interest that is junior to such non-accepting class will not receive or retain any property under the plan on account of such junior interest.

The Debtors believe that the Distributions provided under the Plan satisfy the foregoing tests (also known as the absolute priority rule), where required.

**G.    Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or

any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). For purposes of this test, the Debtors have analyzed the ability of the Debtors and the Liquidation Trustee to meet their obligations under the Plan. Based on the Debtors' analysis, the Debtors and the Liquidation Trustee will have sufficient assets to accomplish their tasks under the Plan. Therefore, the Debtors believe that the transactions to be effectuated pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

## H.    Best Interests Test and Liquidation Analysis

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the bankruptcy court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 case was converted to a case under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

Here, the Debtors believe, and a liquidation analysis will show that, the Combined Plan and Disclosure Statement satisfies the best interests test as the recoveries expected to be available to Holders of Allowed Claims under the Combined Plan and Disclosure Statement will be greater than the recoveries expected in a liquidation under chapter 7 of the Bankruptcy Code.

The Purchased Assets have already been sold to the Purchaser under the Sale Order, and the Debtors have limited Assets remaining in their Estates. While a liquidation under chapter 7 of the Bankruptcy Code would have the same goal, the Debtors believe that the Combined Plan and Disclosure Statement provides the best source of recovery for several reasons. First, the Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would not provide for a timely Distribution. Second, the Debtors believe Distributions would likely be smaller because a chapter 7 trustee and his/her Professionals would have to expend significant time and resources familiarizing themselves with the Debtors' history (including foreign non-debtor subsidiaries), the Retained Causes of Action, and any other Cause of Action.

Under the Combined Plan and Disclosure Statement, the Wind Down Expenses, including the fees of the Liquidation Trustee and fees for the Liquidation Trustee's Professionals, will be paid out of the Liquidation Trust Assets prior to any Distribution being made to Creditors.

At this time, there are no alternative plans available to the Debtors. The closing of the Sale has already occurred, and the Debtors are no longer a going concern enterprise and have few Assets remaining, if any, to administer. Therefore, the Debtors believe that the Combined Plan and Disclosure Statement provides the greatest possible value to all stakeholders under the circumstances and has the greatest chance of being confirmed and consummated.

**ARTICLE VII**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

**A.      Restructuring Transactions**

On the Effective Date, or as soon as reasonably practicable thereafter, the Liquidation Trustee shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect the transactions described herein, including, as applicable, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions (collectively, the "Restructuring Transactions"). The actions to implement the Restructuring Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (iv) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

**B.      Sources of Consideration for Plan Distributions**

Payments to be made under the Plan shall be funded from (i) Cash held by the Debtors as of the Effective Date, including the Liquidating Trust Funding Amount, Administrative Claim Contingency Amount and the GUC Recovery Amount; and (ii) net proceeds of Retained Causes of Action and other remaining Assets of the Estates, including Interests in the Non-Debtor Affiliates.

Reserves for payment of claims not yet allowed and for Disputed Claims may be funded on the Effective Date, or as soon as reasonably practicable thereafter, and, in the case of the Professional Fee Claims, held in the Professional Fee Escrow Account until such Professional Fee Claims become Allowed Claims by a Final Order of the Bankruptcy Court.

44

C.    **The Liquidation Trust**

On or prior to the Effective Date, the Debtors will execute the Liquidation Trust Agreement and will take all other steps necessary to establish the Liquidation Trust pursuant to the Liquidation Trust Agreement as further described in Article XI hereof.  On the Effective Date or as soon as reasonably practicable thereafter, and in accordance with the terms of the Plan, the Debtors will transfer to the Liquidation Trust all of their rights, title, and interests in all of the Liquidation Trust Assets.

Nothing in the Plan shall constitute a waiver of any privilege claims over any of the documents, including any privileged documents, that are produced to or received by the Liquidation Trust or Liquidation Trustee.  For the avoidance of doubt, the Liquidation Trust is a successor-in-interest to the Debtors, and thus, the transfer of any privileged documents as provided herein does not impair or waive any privilege.

D.    **Cancellation of Securities and Agreements**

On the Effective Date, except as otherwise specifically provided for in the Plan: (i) the obligations of the Debtors under the DIP Term Sheet, the Prepetition Credit Agreement and the Prepetition Guarantee and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any ownership interest in the Debtors giving rise to any Claim or Interest shall be cancelled solely as to the Debtors, and the Liquidation Trustee shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing any such ownership interest in the Debtors shall be released. Notwithstanding the foregoing, no Executory Contract or Unexpired Lease (i) that has been, or will be, assumed pursuant to section 365 of the Bankruptcy Code or (ii) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date.

E.    **Corporate Action**

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects. All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the Debtors' corporate structure, and any corporate action required by the Debtors or the Liquidation Trustee in connection with the Plan or the Debtors' corporate structure shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, members, or officers of the Debtors or the Liquidation Trustee.  Before, on, or after the Effective Date, the appropriate officers, security holders, directors, and managers of the Debtors or the Liquidation Trustee, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtors. The authorizations and approvals contemplated by this Article VII.E shall be effective notwithstanding any requirements under non-bankruptcy law.

## F.    Effectuating Documents; Further Transactions

On and after the Effective Date, the Liquidation Trustee is authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Restructuring Transactions in the name of and on behalf of the Debtors after the Effective Date, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

## G.    Section 1146 Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers of property under or in connection with the Plan or pursuant to: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Liquidation Trust; (ii) the Restructuring Transactions; (iii) the creation, modification, consolidation, termination, refinancing, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iv) the making, assignment, or recording of any lease or sublease; or (v) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, transfer tax, conveyance fee, intangibles or similar tax, sales tax, use tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146 of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## H.    Preservation of Retained Causes of Action

The Debtors reserve and, as of the Effective Date, assign to the Liquidation Trust the Retained Causes of Action and the Liquidation Trustee's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  **No Person or Entity may rely on the absence of a specific reference in the Combined Plan and Disclosure Statement or the Plan Supplement to any such Cause of Action against it as any indication that the Debtors or the Liquidation Trustee, as applicable, will not pursue any and all available Retained Causes of Action against it.  The Debtors or the Liquidation Trustee, as applicable, expressly reserve all rights to prosecute any and all Retained Causes of Action against any Person or Entity, except as otherwise expressly provided in the Plan, including Article XIV of the Plan**.  The Liquidation Trustee expressly reserves all Retained Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the

46

doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Retained Causes of Action as a consequence of the Confirmation or Consummation of the Plan.

The Liquidation Trustee reserves and shall retain such Retained Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Causes of Action that a Debtor may hold against any Person or Entity shall vest in the Liquidation Trust.  The Liquidation Trustee shall retain and may exclusively enforce any and all such Retained Causes of Action.  The Liquidation Trustee shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**I.**      **Health and Benefit Plans of the Debtors and Post-Effective Date Debtors**

Unless otherwise assumed by the Purchaser pursuant to the Purchaser's APA or transferred to other Entities participating in such plans, any health and/or benefit plans, including any 401(k) plans, of the Debtors existing as of the Effective Date, including all such plans pursuant to which any Debtor is an administrator or in which current or former employees of any Debtor participate, shall be terminated by the Liquidation Trustee in accordance with applicable law.  As a result of such termination, any employees of a non-debtor Entity participating in such plans may no longer have a plan in which to participate.

**J.**      **Closing the Chapter 11 Cases**

After the Effective Date, the Liquidation Trustee may file a motion to close the Chapter 11 Cases of each of the Debtors for all purposes.  For the avoidance of doubt, the closing of such cases shall not have any effect, in any manner, on the Retained Causes of Action that the Liquidation Trustee may assert in accordance with the Plan and the Liquidation Trust Agreement.

**K.**      **U.S. Securities and Exchange Commission**

Notwithstanding any language to the contrary in the Combined Plan and Disclosure Statement or the Confirmation Order, no provision of the Plan or the Confirmation Order shall (i) preclude the SEC from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair, or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-debtor person or entity in any forum.

**ARTICLE VIII**
**SUBSTANTIVE CONSOLIDATION**

The Plan shall serve as a motion by the Debtors seeking entry of an order substantively consolidating each of the Estates into a single consolidated estate for all purposes associated with confirmation and consummation of the Plan.

47

The entry of the Confirmation Order shall constitute approval by the Bankruptcy Court of the substantive consolidation of the Debtors and their respective Estates for all purposes relating to the Plan, including for purposes of voting, Confirmation, and Distributions.  If this substantive consolidation is approved, then for all purposes associated with the Confirmation and Consummation of the Plan, all assets and liabilities of the Debtors shall be treated as though they were merged into a single economic unit, and all guarantees by any Debtor of the obligations of any other Debtor, to the extent such exist, shall be considered eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be treated as one collective obligation of the Debtors.  Moreover, (a) no Distribution shall be made under the Plan on account of any Intercompany Interest, if any, held by any Debtor in any of the other Debtors except to the extent necessary to effect the substantive consolidation provided for herein, (b) all guaranties of any Debtor of the obligations of any of the other Debtors, to the extent such exist, shall be eliminated so that any Claim against any Debtor, and any guaranty thereof executed by any of the other Debtors, shall be one obligation of the consolidated Debtors' Estates, and (c) every Claim that is timely Filed or to be Filed in the Chapter 11 Cases of any of the Debtors shall be deemed Filed against the consolidated Estates and shall be one Claim against, and one obligation of, the Estates.

Notwithstanding any provision of the Plan to the contrary, any Holder of multiple Allowed Claims against more than one Debtor that arise from the contractual, joint, joint and several, or several liability of such Debtors, the guaranty by one Debtor of another Debtor's obligation or other similar circumstances, shall be entitled to one Allowed Claim that, in the aggregate, does not exceed the amount of the underlying Claim giving rise to such multiple Claims. Claims against more than one of the Debtors arising from the same injury, damage, cause of action, or common facts shall be Allowed only once as if such Claim were against a single Debtor.

Any alleged defaults under any applicable agreement, including Executory Contracts and Unexpired Leases, with the Debtors arising from substantive consolidation under the Plan shall be deemed unenforceable as of the Effective Date.

**ARTICLE IX**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.**     **Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided herein, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (i) is the subject of a motion to assume such Executory Contracts or Unexpired Leases that is pending on the Effective Date; (ii) is a contract, release, or other agreement or document entered into in connection with the Plan; or (iii) is an Insurance Policy.

Entry of the Confirmation Order by the Bankruptcy Court shall, subject to and upon the occurrence of the Effective Date, constitute a Final Order approving the rejection of the Executory Contracts and Unexpired Leases rejected pursuant to the Plan.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.

B.    **Insurance Policies**

Notwithstanding anything to the contrary in the Combined Plan and Disclosure Statement, the Plan Supplement, the Confirmation Order, the Liquidation Trust Agreement, any Bar Date notice or Claim objection, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of or object to any releases):

     a.  all Insurance Policies are treated as and deemed to be Executory Contracts under the Plan and, on the Effective Date, each of the Debtors or the Liquidation Trustee, as applicable, shall be deemed to have assumed all Insurance Policies;

     b.  on and after the Effective Date, the Liquidation Trustee, on behalf of the Debtors, shall become and remain liable in full for all of the Debtors' obligations under the Insurance Policies regardless of whether such obligations arise before or after the Effective Date, and without the need or requirement for Insurers to file or serve any Proof of Claim, Cure Claim, or a request, application, claim, proof or motion for payment or allowance of any Administrative Claim;

     c.  nothing alters, modifies, amends, impairs or otherwise affects the terms or conditions of any Insurance Policy or the rights and obligations thereunder; and

     d.  the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article XIV of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit: (i) claimants with valid workers' compensation claims or direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (ii) the Insurers to administer, handle, defend, settle, or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in Article XIV of the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing; and (iii) to the extent permissible under applicable non-bankruptcy law and in accordance with the terms of the Insurance Policies, the Insurers to cancel any Insurance Policies, and take other actions relating to the Insurance Policies (including effectuating a setoff).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' or the Liquidation Trustee's, as applicable, assumption of each of the Insurance Policies.  In addition, on and after the Effective Date, the Liquidation Trustee shall not terminate or otherwise reduce, limit, or restrict the coverage under any of the D&O Liability Insurance Policies with respect to conduct occurring prior thereto, and all directors, managers, officers, members, and trustees of the Debtors who served in such capacity at any time prior to the Effective Date, subject to the terms and conditions of the D&O Liability Insurance Policies, shall be entitled to the full benefits of any such D&O Liability Insurance Policy for the full term of such policy regardless of

49

whether such directors, managers, officers, members, or trustees remain in such positions after the Effective Date.    Notwithstanding anything to the contrary in Article XIV, all of the Debtors' current and former directors', managers', officers', members', and trustees' rights, if any, as beneficiaries of the D&O Liability Insurance Policies are preserved to the extent set forth herein.

## C.    <u>Indemnification Obligations</u>

Subject to the last sentence of this paragraph, any obligations of the Debtors pursuant to their organizational documents, including amendments, entered into any time prior to the Effective Date, to indemnify, reimburse, or limit the liability of any Person pursuant to the Debtors' organizational documents, policy of providing employee indemnification, applicable state law, or specific agreement in respect of any claims, demands, suits, Causes of Action, or proceedings against such Persons based upon any act or omission related to such Persons' service with, for, or on behalf of the Debtors prior to the Effective Date with respect to all present and future actions, suits, and proceedings relating to the Debtors shall survive Confirmation of the Plan and except as set forth herein, remain unaffected thereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement, or limitation of liability accrued or is owed in connection with an occurrence before or after the Petition Date; *provided, however*, that all monetary obligations under this provision shall be limited solely to available insurance coverage and neither the post-Effective Date Debtors, the Liquidation Trust, nor any of the assets thereof shall be liable for any such obligations.

Any Claim based on the Debtors' indemnification obligations shall not be a Disputed Claim or subject to any objection under section 502(e)(1)(B) of the Bankruptcy Code.    The Debtors' indemnification obligations shall not apply to or cover any Claims, suits, or actions against a Person that result in a Final Order determining that such Person is liable for fraud, willful misconduct, gross negligence, bad faith, self-dealing, or breach of the duty of loyalty.

## D.    <u>Claims Based on Rejection of Executory Contracts or Unexpired Leases</u>

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court by the later of (i) the date set forth in an order of the Bankruptcy Court (including the Confirmation Order) authorizing the Debtors to reject contracts or leases pursuant to section 365 of the Bankruptcy Code (unless the order authorizing such rejection provides otherwise), (ii) thirty (30) days after the claimant is served with notice of the applicable court order, and (iii) thirty (30) days after the date of service of the notice of Effective Date.    **Absent further order of the Bankruptcy Court, any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time may be forever barred, estopped, and enjoined from: (a) asserting such Claim against the Debtors, their Estates, the Liquidation Trust, the Liquidation Trustee, or the property of any of the foregoing, or thereafter filing a Proof of Claim with respect thereto in the Chapter 11 Cases; (b) being treated as a Creditor of the Debtors for the purposes of voting on the Plan with respect to such Claim; and (c) receiving or being entitled to receive any payment or Distribution from the Debtors or the Liquidation Trust, as applicable, with respect to such Claim, without further order of the Bankruptcy**

4913-3097-6006

**Court**. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims.

## E.    Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contracts or Unexpired Leases, to the extent of applicable law. In particular, to the extent afforded by applicable law, the Liquidation Trustee expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide warranties or continued obligations concerning goods previously purchased or services previously received by the Debtors contracted from non-debtor counterparties to rejected Executory Contracts or Unexpired Leases.

## F.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

## G.    Reservation of Rights

Nothing in the Plan shall constitute an admission by the Debtors that any contract or lease is an Executory Contract or Unexpired Lease or that the Liquidation Trustee has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Liquidation Trust, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

## H.    Nonoccurrence of Effective Date

If the Effective Date does not occur, then the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

4913-3097-6006

## ARTICLE X
## CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.    The Plan May Not Be Accepted

The Debtors can make no assurances that the requisite acceptances of the Plan will be received.  If the Plan is not accepted by Creditors, then the Chapter 11 Cases may be converted to chapter 7 of the Bankruptcy Code.

### B.    The Plan May Not Be Confirmed

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan.  Even if the Bankruptcy Court determines that the Combined Plan and Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met.  Moreover, there can be no assurance that modifications to the Combined Plan and Disclosure Statement will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes.  If the Plan is not confirmed, then the Plan will need to be revised and it is unclear whether a chapter 11 reorganization or liquidation of the Debtors' assets could be implemented and what Distribution the Holders of Allowed Claims would receive.  If an alternative cannot be agreed to, it is possible that the Debtors would have to liquidate their remaining assets in chapter 7, in which case it is likely that the Holders of Allowed Claims would receive less favorable treatment than they would receive under the Plan.  There can be no assurance that the terms of any such alternative would be similar to or as favorable to Creditors as those proposed in the Plan.

### C.    Distributions to Holders of Allowed Claims Under the Plan May Be Inconsistent with Projections

Projected Distributions are based on good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution.  There can be no assurance that the estimated Claim amounts set forth in the Plan are correct.  These estimated amounts are based on certain assumptions with respect to a variety of factors.  Both the actual amount of Allowed Claims in a particular Class and the funds available for Distribution to such Class may differ from the Debtors' estimates.  If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates,

or the funds available for Distribution to such Class are lower than the Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

## D.      Objections to Classification of Claims

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtors believe that all Claims and Interests have been appropriately classified in the Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.  The Debtors believe that under the Bankruptcy Rules, they would be required to re-solicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest.  The Debtors believe that the Plan complies with the requirement of equal treatment.  To the extent that the Bankruptcy Court finds that the Plan does not satisfy this requirement, the Bankruptcy Court could deny Confirmation of the Plan.  Issues or disputes relating to classification or treatment could result in a delay in the Confirmation and Consummation of the Plan and could increase the risk that the Plan will not be consummated.

## E.      Failure to Consummate the Plan

The Plan provides for certain conditions that must be satisfied or waived prior to the Effective Date.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.

## F.      Debtor Release or Injunction Provisions May Not Be Approved

The Combined Plan and Disclosure Statement contains releases for the Debtors and certain exculpations and injunction language.  Parties are urged to read these provisions carefully to

understand how Confirmation and Consummation of the Plan will affect any Claim, interest, right, or action with regard to the Debtors and certain third parties.

THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BIND ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.

There can be no assurance that the releases and injunction provided in Article XIV of the Plan will be granted.  If the Bankruptcy Court does not grant such relief, this may result in the Plan not being confirmed or a plan of liquidation that differs from the Plan.

## G.     Reductions to Estimated Creditor Recoveries

The Allowed amount of Claims in any Class could be greater than projected, which, in turn, could cause the amount of Distributions to Creditors in such Class to be reduced substantially.  The amount of Cash realized from the liquidation of the Debtors' remaining assets could be less than anticipated, which could cause the amount of Distributions to Creditors to be reduced substantially.

## H.     Certain Tax Considerations

### 1.     Certain U.S. Federal Income Tax Consequences

A summary description of certain U.S. federal income tax consequences of the Combined Plan and Disclosure Statement is provided below.  The description of tax consequences below is for informational purposes only and, due to lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various U.S. federal income tax consequences of the Combined Plan and Disclosure Statement as discussed herein.  Only the potential material U.S. federal income tax consequences to the Debtors and to hypothetical Holders of Claims who are entitled to vote to accept or reject the Combined Plan and Disclosure Statement are described below.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated and proposed thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect.  No opinion of counsel has been sought or obtained with respect to any tax consequences of the Combined Plan and Disclosure Statement, and no tax opinion is being given in the Combined Plan Disclosure Statement.  No rulings or determinations of the IRS or any other tax authorities have been obtained or sought with respect to any tax consequences of the Combined Plan and Disclosure Statement, and the discussion below is not binding upon the IRS or such other authorities.  No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Combined Plan and Disclosure Statement.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of the U.S. federal income tax consequences below is based on the Tax Code, the Treasury Regulations, judicial decisions, and administrative rulings and pronouncements of the IRS and other applicable authorities, all as in effect on the date hereof.  Legislative, judicial, or administrative changes or interpretations enacted or promulgated in the future could alter or

modify the analyses and conclusions set forth below. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to the Holders of Claims. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences discussed below.

THIS DISCUSSION DOES NOT ADDRESS THE FOREIGN, STATE, OR LOCAL TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT, NOR DOES IT PURPORT TO ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT TO SPECIAL CLASSES OF TAXPAYERS (SUCH AS FOREIGN ENTITIES, NONRESIDENT ALIEN INDIVIDUALS, CERTAIN EXPATRIATES OR FORMER LONG-TERM RESIDENTS OF THE UNITED STATES, GOVERNMENTAL AUTHORITIES, OR AGENCIES, PASS-THROUGH ENTITIES SUCH AS PARTNERSHIPS AND HOLDERS THROUGH SUCH PASS-THROUGH ENTITIES, S CORPORATIONS, RETIREMENT PLANS, INDIVIDUAL OR TAX-DEFERRED ACCOUNTS, MUTUAL FUNDS, INSURANCE COMPANIES, BANKS, OR OTHER FINANCIAL INSTITUTIONS, SMALL BUSINESS INVESTMENT COMPANIES, REGULATED INVESTMENT COMPANIES, CERTAIN SECURITIES TRADERS, BROKER-DEALERS, REAL ESTATE INVESTMENT TRUSTS, AND TAX-EXEMPT ORGANIZATIONS). FURTHERMORE, ESTATE AND GIFT TAX ISSUES ARE NOT ADDRESSED HEREIN AND TAX CONSEQUENCES RELATING TO THE ALTERNATIVE MINIMUM TAX AND MEDICARE TAX ARE NOT DISCUSSED HEREIN.

(a)     *Consequences to the Debtors*

Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of any cancellation of indebtedness ("COD") income recognized during the taxable year. COD income generally equals the excess of the adjusted issue price of the indebtedness discharged over the sum of (i) the amount of cash, (ii) the issue price of any new debt, and (iii) the fair market value of any other property (including stock) transferred by a debtor in satisfaction of such discharged indebtedness. COD income also includes any interest that has been previously accrued and deducted but remains unpaid at the time the indebtedness is discharged.

Section 108(a)(1)(A) of the Tax Code provides an exception to this rule, however, where a taxpayer is in bankruptcy and where the discharge is granted or is effected pursuant to an approved plan of reorganization by the bankruptcy court. In such a case, instead of recognizing income, the taxpayer is required, under section 108(b) of the Tax Code, to reduce certain of its tax attributes by the amount of COD income. The attributes of the taxpayer are to be reduced in the following order: current year Net Operating Losses ("NOLs") and NOL carryovers, general business and minimum tax credit carryforwards, capital loss carryforwards, the basis of the taxpayer's assets, and finally, foreign tax credit carryforwards. The reduction in the foregoing tax attributes generally occurs after the calculation of a debtor's tax for the year in which the debt is discharged. Section 108(b)(5) of the Tax Code permits a taxpayer to elect to first apply the reduction to the basis of the taxpayer's depreciable assets, with any remaining balance applied to the taxpayer's other tax attributes in the order stated above. In addition to the foregoing, section 108(e)(2) of the Tax Code provides a further exception to the realization of COD income upon the discharge of

55

debt in that a taxpayer will not recognize COD income to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for federal income tax purposes.

The Debtors may realize COD income as a result of the Combined Plan and Disclosure Statement. The ultimate amount of any COD income realized by the Debtors is uncertain because, among other things, it will depend on the fair market value of all assets transferred to Holders of Claims issued on the Effective Date.

In general, if a debtor sells property to a third party it will recognize taxable income equal to the difference between the amount realized on the sale and its tax basis in such assets sold. In addition, if a debtor conveys appreciated (or depreciated) property (*i.e.*, property having an adjusted tax basis less (or greater) than its fair market value) to a creditor in cancellation of debt, the debtor must recognize taxable gain or loss (which may be ordinary income or loss, capital gain or loss, or a combination of each) equal to the excess or shortfall, respectively, of such fair market value over the debtor's adjusted tax basis in such property.

(b)     *Tax Consequences in Relation to the Liquidation Trust*

On the Effective Date, the Debtors and the Liquidation Trustee will execute the Liquidation Trust Agreement and will take all steps necessary to establish the Liquidation Trust in accordance with the Combined Plan and Disclosure Statement, which shall be for the benefit of the Beneficiaries. Additionally, on the Effective Date, the Debtors will transfer or assign and will be deemed to transfer or assign to the Liquidation Trust all of their rights, title, and interest in and to all of the Liquidation Trust Assets, and in accordance with section 1141of the Bankruptcy Code, the Liquidation Trust Assets will automatically vest in the Liquidation Trust free and clear of all Claims and liens, subject only to (i) the claims and liens of the Prepetition Lender, (ii) the Liquidation Trust Interests, and (iii) the expenses of the Liquidation Trust, as provided for in the Liquidation Trust Agreement and herein. The tax consequences of the Plan in relation to the Liquidation Trust and the Beneficiaries thereof are subject to uncertainties due to the complexity of the Plan and the lack of interpretive authority regarding certain changes in the tax law.

The Liquidation Trust shall be governed by the Liquidation Trust Agreement and administered by the Liquidation Trustee. The powers, rights, responsibilities, and compensation of the Liquidation Trustee shall be specified in the Liquidation Trust Agreement. The Liquidation Trustee shall hold and distribute the Liquidation Trust Assets in accordance with the Combined Plan and Disclosure Statement and the Liquidation Trust Agreement. Other rights and duties of the Liquidation Trustee and the Beneficiaries shall be as set forth in the Liquidation Trust Agreement.

After the Effective Date, the Debtors shall have no interest in the Liquidation Trust Assets. To the extent that any Liquidation Trust Assets cannot be transferred to the Liquidation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Liquidation Trust Assets will be deemed to have been retained by the Debtors and the Liquidation Trust will be deemed to have been designated as a representative of the Debtors pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Liquidation Trust Assets on behalf of the Debtors for the benefit of the Beneficiaries. Notwithstanding the

4913-3097-6006

foregoing, all net proceeds of such Liquidation Trust Assets will be transferred to the Liquidation Trust, to be distributed in accordance with the Combined Plan and Disclosure Statement.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Liquidation Trust is intended to be treated as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d), and the Liquidation Trustee will take this position on the Liquidation Trust's tax return accordingly.  The Beneficiaries will be treated as the grantors of the Liquidation Trust and as the deemed owners of the Liquidation Trust Assets.  For U.S. federal income tax purposes, the transfer of assets to the Liquidation Trust will be deemed to occur as (i) a first-step transfer of the Liquidation Trust Assets to the Holders of Allowed Claims and (ii) a second-step transfer by such Holders to the Liquidation Trust.  As a result, the transfer of the Liquidation Trust Assets to the Liquidation Trust should be a taxable transaction, and the Debtors should recognize gain or loss equal to the difference between the tax basis and fair value of such assets.  In addition, as detailed above, if the total fair value of the Liquidation Trust Assets is less than the total of the Allowed Claims (that have been deducted for federal income tax purposes) the Debtors will recognize COD income equal to such difference.

As soon as possible after the transfer of the Liquidation Trust Assets to the Liquidation Trust, the Liquidation Trustee shall make a good faith valuation of the Liquidation Trust Assets.  This valuation will be made available from time to time, as relevant for tax reporting purposes.  Each of the Debtors, Liquidation Trustee, and the Holders of Claims receiving Liquidation Trust Interests shall take consistent positions with respect to the valuation of the Liquidation Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.  The Liquidation Trust shall in no event be dissolved later than five years from its creation unless the Bankruptcy Court, upon motion within the six month period prior to the fifth anniversary (or within the six month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five years with a private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidation Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets.

If the Liquidation Trust were not to qualify as a "liquidating trust," as described above, the Liquidation Trustee will take the position that it is a partnership for U.S. federal income tax purposes.  In either case, each Beneficiary will include its distributive share of income, as reported to it by the Liquidation Trustee, and may not receive sufficient Cash to satisfy its tax liability.  The IRS may take the position that the Liquidation Trust should be taxed as a corporation for U.S. federal income tax purposes.  If the IRS were to prevail in that position, the Liquidation Trust would be subject to U.S. federal income tax which would reduce the return to a Beneficiary.  Each Beneficiary is urged to consult with its own tax advisor.

As detailed above, the transfer of the Liquidation Trust Assets to the Liquidation Trust could give rise to taxable income or loss equal to the difference between the tax basis and fair value of the Liquidation Trust Assets.

With respect to any COD income recognized due to the transfer of the Liquidation Trust Assets to the Liquidation Trust, section 108(a)(1)(A) of the Tax Code should apply and thus any COD income should be excluded.  However, any NOLs (or other tax attributes) remaining after the use

of said NOLs to offset taxable income generated by the asset transfers will be reduced by the amount of such COD income excluded above.

(c)    *Consequences to Holders of Class 3 General Unsecured Claims*

Pursuant to the Combined Plan and Disclosure Statement, each Holder of a Class 3 Allowed General Unsecured Claim against the Debtors will receive in satisfaction of its Claim the lesser of (a) its *pro rata* share of the GUC Recovery Amount and (b) an amount equal to 10% of its Allowed General Unsecured Claim. The U.S. federal income tax treatment to Holders of Allowed General Unsecured Claims may depend in part on the tax basis a Holder has in its Claim, and, in some circumstances, what gave rise to or the nature of the Holder's Claim.

As set forth above, for federal income tax purposes, the Class 3 General Unsecured Claims will be satisfied by the deemed transfer to them of the Liquidation Trust Assets followed by a deemed contribution of said assets to the Liquidation Trust in exchange for the lesser of (a) its *pro rata* share of the GUC Recovery Amount and (b) an amount equal to 10% of its Allowed General Unsecured Claim. It is intended that the Liquidation Trust be treated as a liquidating trust for federal income tax purposes and, if it does not so qualify, as a partnership for federal income tax purposes.

Because of the nature of the Liquidation Trust Assets, the deemed transfer by the Debtors of the Liquidation Trust Assets could cause a Holder to recognize gain, or loss, due to said transfer. The Liquidation Trust Assets that will be deemed transferred to Holders of Class 3 General Unsecured Claims consist of various assets including the Retained Causes of Action and proceeds thereof. To the extent that the (i) fair market value of the *pro rata* beneficial interest in the Liquidation Trust Assets that a Holder of a Class 3 General Unsecured Claim receives, exceeds (or is less than) (ii) the Holder's tax basis in such Claim, the Holder should recognize gain (or loss) on such deemed transfer equal to such excess. The Holder's tax basis in a Claim will generally be equal to the Holder's cost therefor (subject to the below discussion regarding original issue discount ("OID")). Such gain (or loss) could be capital or ordinary in nature depending on the status of the Holder, the genesis and nature of the Claim being satisfied, the Holder's holding period of the Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the Holder's hands, any gain or loss realized will generally be characterized as a capital gain or loss, and will constitute long-term capital gain or loss if the Holder has held such Claim for more than one year.

A Creditor who receives Cash in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest or OID. A Creditor who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a Distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as interest, regardless of whether such Creditor realizes an overall gain or loss as a result of surrendering its Claim. A Creditor who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Creditor realizes an overall gain or loss as a result of the Distribution it may receive under the Plan on account of its Claim. Pursuant to Article XII.D of the Plan, Distributions with respect to a

58

Claim will be allocated first to the principal portion of such Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Claim, if any. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes.

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a Holder of a Claim who exchanges the Claim for an amount may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity). Any gain recognized by a Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

Under the Plan, a portion of the payment received by Holders of Allowed Claims may be attributable to accrued interest or OID on such Claims. Such amount should be taxable to that Holder as interest income if such accrued interest or OID has not been previously included in the Holder's gross income for U.S. federal income tax purposes. Conversely, Holders of Claims may be able to recognize a deductible loss to the extent any accrued interest or OID on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtors. If the payment does not fully satisfy all principal and interest or OID on Allowed Claims, the extent to which payment will be attributable to accrued interest or OID is unclear. Whether the applicable Holder of such Claims will recognize a loss or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the Holder and its Claims. Creditors should consult their own tax advisors.

(d)    *Information Reporting and Withholding*

In connection with the Combined Plan and Disclosure Statement, the Debtors and the Liquidation Trustee will comply with all applicable withholding and information reporting requirements imposed by U.S. federal, state, local, and foreign taxing authorities, and all Distributions under the Plan will be subject to those withholding and information reporting requirements. Holders of Claims may be required to provide certain tax information as a condition to receiving Distributions pursuant to the Plan. In the case of any non-U.S. Holders, if applicable, the Liquidation Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate or is otherwise excluded from withholding). As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders. Accordingly, such Holders should consult their tax advisors with respect to

the U.S. federal income tax consequences of the Plan, including owning an Interest in the Liquidation Trust.

In general, information reporting requirements may apply to Distributions pursuant to the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding with respect to Distributions made pursuant to the Plan, unless a U.S. Holder provides the applicable withholding agent with a taxpayer identification number, certified under penalties of perjury, as well as certain other information, or otherwise establish an exemption from backup withholding. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a credit against a U.S. Holder's U.S. federal income tax liability, if any, and may entitle a U.S. Holder to a refund; provided that the required information is timely furnished to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders of Claims or Interests are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holder's tax returns.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.

**ARTICLE XI**
**THE LIQUIDATION TRUST AND THE LIQUIDATION TRUSTEE**

**A.**    **Liquidation Trust Criteria**

On the Effective Date, the Liquidation Trust will be established and become effective for the benefit of the Beneficiaries. The Liquidation Trust Agreement shall (i) be in form and substance consistent in all respects with the Plan and satisfactory to the Debtors and the Committee and (ii) contain customary provisions for trust agreements used in comparable circumstances, including any and all provisions necessary to ensure continued treatment of the Liquidation Trust as a grantor trust and the Beneficiaries as the grantors and owners thereof for U.S. federal income tax purposes. All relevant parties will take all actions necessary to cause title to the Liquidation Trust Assets to be transferred to the Liquidation Trust. The powers, authority, responsibilities, and duties of the Liquidation Trust and the Liquidation Trustee are set forth in and will be governed by the Liquidation Trust Agreement, the Plan, and the Confirmation Order.

## B.        Purpose of the Liquidation Trust

The Liquidation Trust will be established for the primary purpose of liquidating its assets; pursuing the Retained Causes of Action; reconciling and objecting to asserted Claims; and making distributions to Beneficiaries in accordance with Treas. Reg. § 301.7701-4(d), Revenue Procedure 94–45, 1994.28 I.R.B. 124, the Plan, the Confirmation Order, and the Liquidation Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust.

Establishing the Liquidation Trust pursuant to the Plan is in the best interests of the Debtors' Estates and their stakeholders.  The Liquidation Trust provides a mechanism by which potential recoveries for Beneficiaries can be preserved for investigation and prosecution by the Liquidation Trustee, without the burdensome administrative cost of continuing the Chapter 11 Cases.  Allowing the Liquidation Trustee to pursue the Retained Causes of Action provides the best chance for Beneficiaries to receive a recovery on their Allowed Claims.

Further, to continue the Chapter 11 Cases or convert these cases to chapter 7 would result in greater administrative and professional fees and expenses that would likely decrease, if not erase, any recovery that Beneficiaries may receive from the prosecution of the Retained Causes of Action.

## C.        The Liquidation Trust Assets

As detailed herein, the Liquidation Trust Assets include: (a) Retained Causes of Action; (b) any other Claims and Causes of Action that are not Purchased Assets under the Sale Order; (c) any other remaining Assets of the Estates, but excluding the Remaining Professional Fee Escrow Amounts (if any); (d) the Interests in the Non-Debtor Affiliates; and (e) the proceeds of each of the foregoing.

### 1.        Retained Causes of Action

Pursuant to the Purchaser's APA, the Purchaser acquired substantially all of the Debtors' Assets except for the Retained Causes of Action.  The Retained Causes of Action are being preserved and contributed by the Debtors to the Liquidation Trust so that the Liquidation Trustee can investigate and prosecute, if appropriate, the Retained Causes of Action with any resulting recoveries to be distributed to Beneficiaries.  The value of the Retained Causes of Action is not reasonably calculable at this time and will depend on, among other things, the viability of any such Retained Causes of Action, the creditworthiness of the defendants of any such Retained Causes of Action, and the cost of investigating and bringing any Retained Causes of Action on behalf of the Liquidation Trust.  As a result, there is no guarantee that any Retained Causes of Action will be prosecuted, successful, or viable.

### 2.        Remaining Assets of the Estates

Pursuant to the Committee Settlement and the Final DIP Order, the Debtors, the Committee, the Prepetition Lender, and the DIP Lender agreed to set aside certain funds to fund the wind down of the Debtors' Estates.  *See* Final DIP Order ¶ 41.  As set forth in the Final DIP Order, the Budget includes (i) an additional line item titled "Liquidating Trust Funding" in the amount of $300,000;

61

(ii) an additional line item titled "Administrative Claim Contingency" in the amount of $550,000; and (iii) an additional line item titled "GUC Recovery Amount" in the amount of $300,000. *Id.*

On the Effective Date, the Debtors estimate that they will have approximately [$4.2 million] of Cash on hand, inclusive of the Liquidating Trust Funding Amount, the Administrative Claim Contingency Amount, the GUC Recovery Amount, and the Professional Fee Escrow Amount.

The Debtors will also transfer all other remaining Assets in their possession to the Liquidation Trust as of the Effective Date or as soon thereafter as is practicable, including all Retained Causes of Action, the Interests in the Non-Debtor Affiliates, and contractual rights and obligations, if any, of the Debtors under the Purchaser's APA.

The Liquidation Trustee will also review whether any Insurance Policies held by the Debtors provide a source of recovery to Beneficiaries, including whether any such Insurance Policies cover the Retained Causes of Action.

For the avoidance of doubt, the Liquidation Trust Assets <u>shall not include</u>: (a) Cash held in the Professional Fee Escrow Account for the benefit of Professional Fee Claims and the Remaining Professional Fee Escrow Amounts, which shall be paid to the Prepetition Lender; and (b) Causes of Action released pursuant to Article XIV.C hereof or exculpated pursuant to Article XIV.E hereof.

## D.    Beneficiaries of the Liquidation Trust

Pursuant to the Liquidation Trust Agreement, the Beneficiaries of the Liquidation Trust will be identified as the Holders of Liquidation Trust Interests, whether individually or as agent on behalf of one or more other Entities. To the extent that Holders of Allowed General Unsecured Claims are entitled to Distributions from the Liquidation Trust under the terms of the Combined Plan and Disclosure Statement, such Holders are each a Beneficiary.

## E.    Distribution of the Liquidation Trust Assets

The Liquidation Trust Assets, including any recovery from the prosecution of the Retained Causes of Action, if any, will be distributed in accordance with the Plan, the Confirmation Order, and the Bankruptcy Code.

As detailed herein, projected recoveries for the Beneficiaries are approximately 10%, which is tied to the 10% GUC Distribution. Recoveries for Beneficiaries in excess of the 10% GUC Distribution will depend on the value of the Liquidation Trust Assets, including the Retained Causes of Action. This value is not reasonably calculable at this time and will depend on, among other things, the viability of the Retained Causes of Action, the creditworthiness of any defendants of such Retained Causes of Action, and the cost to investigate and prosecute Retained Causes of Action.

## F.    Transfer of Assets to the Liquidation Trust

The Debtors and the Liquidation Trustee will establish the Liquidation Trust for the benefit of the Beneficiaries pursuant to the Liquidation Trust Agreement, with the Beneficiaries to be treated as the grantors and deemed owners of the Liquidation Trust Assets. The Debtors will irrevocably

transfer, assign, and deliver to the Liquidation Trust all of their rights, title, and interests in the Liquidation Trust Assets, notwithstanding any prohibition on assignment under non-bankruptcy law. The Liquidation Trust will accept and hold the Liquidation Trust Assets in the Liquidation Trust for the benefit of the Beneficiaries, subject to the Plan and the Liquidation Trust Agreement.

On the Effective Date, all Liquidation Trust Assets will vest and be deemed to vest in the Liquidation Trust in accordance with section 1141 of the Bankruptcy Code; provided that the Liquidation Trust, with the consent of the Liquidation Trustee, may abandon or otherwise not accept any Liquidation Trust Assets that the Liquidation Trustee believes, in good faith, have no value to the Liquidation Trust. Any Assets the Liquidation Trust so abandons or otherwise does not accept shall not vest in the Liquidation Trust. As of the Effective Date, all Liquidation Trust Assets vested in the Liquidation Trust shall be free and clear of all liens, Claims, and Interests except as otherwise specifically provided in the Plan or in the Confirmation Order. Upon the transfer by the Debtors of the Liquidation Trust Assets to the Liquidation Trust or abandonment of Liquidation Trust Assets by the Liquidation Trust, the Debtors will have no reversionary or further interest in or with respect to any Liquidation Trust Assets or the Liquidation Trust. Notwithstanding anything herein to the contrary, the Liquidation Trust and the Liquidation Trustee shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

Upon the occurrence of the Effective Date, the Debtors' remaining books and records that were not sold pursuant to the Purchaser's APA shall be transferred to the Liquidation Trust, which shall continue to preserve all financial books and records, emails, and other financial documents relating to the Debtors' business that are currently in the Debtors' possession in accordance with Article XI.L hereof.

For the avoidance of doubt, and notwithstanding anything herein to the contrary, the Debtors shall not transfer or be deemed to have transferred to the Liquidation Trust any Claims or Causes of Action (i) released pursuant to Article XIV.C hereof to the extent of any such release or (ii) exculpated pursuant to Article XIV.E hereof to the extent of any such exculpation.

**G.      Interests in the Liquidation Trust Assets**

Each Beneficiary shall have a beneficial interest in the Liquidation Trust Assets as provided for in Article V.B.

**H.      Appointment of the Liquidation Trustee**

The Liquidation Trustee shall be appointed and identified in the Plan Supplement.

**I.      Rights and Powers of the Debtors and the Liquidation Trustee**

      1.      **Powers of the Debtors and the Liquidation Trustee**

All Distributions under the Plan shall be made on the Effective Date by the Debtors or thereafter by the Liquidation Trustee or its designees. If an Administrative Claim is Allowed after the Effective Date, then the Liquidation Trustee shall pay such Allowed Administrative Expense Claim from the Administrative Claim Contingency Amount in accordance with Article IV.B. Similarly, Allowed Administrative Expense Claims that are not paid on the Effective Date shall

63

be paid by the Liquidation Trustee from the Administrative Claim Contingency Amount in accordance with Article IV.B.  After the Effective Date, the Liquidation Trustee shall have the right to object to, allow, or otherwise resolve any Claim.

The Debtors and the Liquidation Trustee, as applicable, shall not be required to give any bond or surety or other security for the performance of their respective duties unless otherwise ordered by the Bankruptcy Court.  Additionally, if the Bankruptcy Court requires the Debtors or the Liquidation Trust, as applicable, to post a bond or surety, then all costs and expenses of procuring any such bond or surety shall be paid with Cash from the Liquidation Trust.

2. **Expenses Incurred On or After the Effective Date**

Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Liquidation Trustee on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Liquidation Trustee shall be paid in Cash from the Liquidation Trust Assets without any further notice to or action, order, or approval of the Bankruptcy Court.

**J.   Distribution and Withholding**

Notwithstanding anything in the Plan to the contrary, the Liquidation Trustee will make, or cause to be made, all Distributions under the Plan other than (i) those Distributions made by the Debtors on the Effective Date and (ii) Distributions from the Professional Fee Escrow Account in accordance with this Plan.

The Liquidation Trustee may withhold from amounts distributable to any Person or Entity any and all amounts, determined in the Liquidation Trustee's sole discretion, required to be withheld by the Plan, or applicable law, regulation, rule, ruling, directive, or other governmental requirement.

**K.   Insurance**

The Liquidation Trustee may maintain customary insurance coverage for the protection of the Liquidation Trustee and Professionals retained by the Liquidation Trust on and after the Effective Date.  The cost of such insurance shall be deemed a Wind Down Expense.

**L.   Other Rights and Remedies**

In addition to the Liquidation Trustee's rights and duties with respect to the Liquidation Trust, on and after the Effective Date, the Liquidation Trustee will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court.

On the Effective Date, the Liquidation Trust shall: (i) take possession of all books, records, and files of the Debtors and their Estates, in all forms including electronic and hard copy, other than the Debtors' Professionals' work product and other documents; and (ii) provide for the retention and storage of such books, records, and files until such time as the Liquidation Trust determines, in accordance with the Liquidation Trust Agreement, that their retention is no longer necessary or required.  Any and all rights to conduct investigations with respect to Retained Causes of Action or claims not released by the Debtors and to assert such Causes of Action shall vest with the

64

Liquidation Trust and shall continue until dissolution of the Liquidation Trust and the Liquidation Trust shall be deemed a successor in interest to the Debtors with all requisite standing and authority to pursue such rights, including the Retained Causes of Action, as if neither the Confirmation Date nor the Effective Date had occurred. The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Liquidation Trustee.

## M.    Priority Claims Reserve

On the Effective Date, the Liquidation Trustee shall establish the Priority Claims Reserve by depositing Cash from the Liquidation Trust Assets in the amount of all anticipated Allowed Priority Tax Claims and Allowed Other Priority Claims. The Priority Claims Reserve shall be used to pay Allowed Priority Tax Claims and Allowed Other Priority Claims. If all or any portion of a Priority Tax Claim or Other Priority Claim shall become a Disallowed Claim, or is reclassified as a General Unsecured Claim, then the amount on deposit in the Priority Claims Reserve attributable to such Disallowed Claim or reclassified Claim, including any interest that has accrued on such amount while on deposit in the Priority Claims Reserve, shall remain in the Priority Claims Reserve to the extent that the Liquidation Trustee determines necessary to ensure that the Cash remaining in the Priority Claims Reserve is sufficient to ensure that Allowed Priority Tax Claims and Allowed Other Priority Claims will be paid in accordance with the Plan.

## N.    Disputed Claims Reserve

The Liquidation Trustee may maintain, in accordance with the Liquidation Trustee's powers and responsibilities under the Plan and the Liquidation Trust Agreement, a Disputed Claims Reserve. The Liquidation Trustee may, in its reasonable discretion, distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein and in the Liquidation Trust Agreement, as Disputed Claims are resolved pursuant to Article XIII hereof, and such amounts may be distributed on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date.

The Liquidation Trust will pay taxes on the taxable net income or gain allocable to Holders of Disputed Claims on behalf of such Holders. In the event, and to the extent, any Cash retained on account of Disputed Claims in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts distributable by the Liquidation Trust as a result of the resolutions of such Disputed Claims.

## O.    Attribution of Income

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Liquidation Trustee of a private letter ruling if the Liquidation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustee), allocations of taxable income of the Liquidation Trust (other than taxable income allocable to the Liquidation

Trust's claims reserves) among Holders of Claims will be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, the Liquidation Trust had distributed all of its Assets (valued at their tax book value) to the Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent Distributions from the Liquidation Trust. Similarly, taxable loss of the Liquidation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidation Distribution of the remaining Liquidation Trust Assets. The tax book value of the Liquidation Trust Assets for purpose of this paragraph shall equal their fair market value on the date the Liquidation Trust Assets are transferred to the Liquidation Trust, adjusted in accordance with tax accounting principles prescribed by the IRS, the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

**P.      Current Basis**

All income of the Liquidation Trust will be subject to tax on a current basis.

**Q.      Tax Identification Numbers**

The Liquidation Trustee may require any Beneficiary to furnish to the Liquidation Trustee its Employer or Taxpayer Identification Number as assigned by the IRS or certify to the Liquidation Trustee's satisfaction that Distributions to the Beneficiary are exempt from backup withholding. The Liquidation Trustee may condition any Distribution to any Beneficiary upon receipt of such identification number. If after reasonable inquiry, any Beneficiary fails to provide its identification number to the Liquidation Trustee, then the Liquidation Trustee may deem such Beneficiary's Claim as Disallowed and no Distribution shall be made on account of such Beneficiary's Claim.

**R.      Wind Down**

In addition to the Liquidation Trustee's rights and duties with respect to the Liquidation Trust, on and after the Effective Date, the Liquidation Trustee will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court that pertain to the Liquidation Trust. The Liquidation Trustee shall retain the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates or take any other action of the Debtors required or permitted under the Bankruptcy Code.

As soon as practicable after the Effective Date, the Liquidation Trustee shall: (i) cause the Debtors to comply with, and abide by, the terms of the Purchaser's APA; (ii) to dissolve one or all of the Debtors upon the Filing of a notice of such dissolution with the Bankruptcy Court, notwithstanding any requirements of applicable state law, and upon such filing such Debtor(s) shall be deemed dissolved for all purposes and of no further legal existence under any applicable state or federal law, without the need to take any further action or file any plan of dissolution, notice, or application with the Secretary of State of the Delaware or any other authority; (iii) complete and file all final or otherwise required federal, state, and local tax returns for the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of each Debtor or its Estate for any tax incurred during the administration of such Debtor's

66

Chapter 11 Case, as determined under applicable tax laws; and (iv) take such other actions as may be necessary or desirable to carry out the purposes of the Plan. From and after the Effective Date, the Debtors (i) for all purposes shall be deemed to have withdrawn their business operations from any state in which they were previously conducting, or were registered or licensed to conduct, their business operations, and (ii) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. In addition, the Debtors shall be deemed to have cancelled all Interests pursuant to this Plan. For the avoidance of doubt, (x) the dissolution of the Debtors shall not have any effect, in any manner, on the Retained Causes of Action that the Liquidation Trustee may assert in accordance with the Plan and the Liquidation Trust Agreement and (y) notwithstanding the dissolution of each Debtor, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

As of the Effective Date, any director or officer of the Debtors shall be deemed to have resigned automatically without the need for any action or approval and without the need for any company filings, and shall have no continuing obligations to the Debtors following the occurrence of the Effective Date.

## S.    Termination of the Liquidation Trust and Liquidation Trustee

Notwithstanding any provision of the Plan to the contrary, the Liquidation Trust shall be dissolved upon the earlier of the distribution of all Liquidation Trust Assets required to be made by the Liquidation Trust under the Plan or the fifth anniversary of the creation of the Liquidation Trust, *provided, however*, notwithstanding the foregoing, the Liquidation Trust shall be dissolved no later than five years from the Effective Date unless the Bankruptcy Court, upon a motion filed within six months of the fifth anniversary of the Effective Date or the end of any extension period approved by the Bankruptcy Court (the filing of which shall automatically extend the term of the Liquidation Trust pending the entry of an order by the Bankruptcy Court granting or denying the motion), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the Liquidation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets; *provided, however*, that adequate funding exists for such extension period as determined by the Bankruptcy Court; *provided, further*, that each request for an extension shall be approved by the Bankruptcy Court within six months prior to the conclusion of the extended term. After (i) the final Distribution of the balance of the Assets or proceeds of the Liquidation Trust pursuant to the Plan, (ii) the filing by or on behalf of the Liquidation Trust of a certification of dissolution with the Bankruptcy Court in accordance with the Plan, and (iii) any other action deemed appropriate by the Liquidation Trustee, the Liquidation Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

The duties, responsibilities, and powers of the Liquidation Trustee will terminate in accordance with the terms of the Liquidation Trust Agreement.

4913-3097-6006

## T.      Transfer of Beneficial Interests

Notwithstanding anything to the contrary in the Plan, Liquidation Trust Interests shall not be transferrable except upon death of a Beneficiary (and solely with respect to such Beneficiary's Liquidation Trust Interests) or by operation of law.

## ARTICLE XII
## PROVISIONS GOVERNING DISTRIBUTIONS

## A.      Timing and Calculation of Amounts to Be Distributed

Each Holder of an Allowed Claim shall receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class from the Debtors, or the Liquidation Trustee, on behalf of the Debtors or the Liquidation Trust, as applicable.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due.  Distributions on account of any Disputed Claims or Disputed Interests shall be made in accordance with Article XIII.  Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

## B.      Delivery of Distributions and Undeliverable, Unclaimed, or Forfeited Distributions

### 1.      Record Date for Distribution

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making Distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

### 2.      Delivery of Distributions

All Distributions to Holders of Allowed Claims not made by wire transfer shall be made at the address of each such Holder as set forth in (i) any Proof of Claim Filed by such Holder (subject to any transfer effectuated pursuant to Bankruptcy Rule 3001(e) or, after the Distribution Record Date, a change of address notification provided by such Holder in a manner reasonably acceptable to the Liquidation Trustee) or (ii) in the absence of a Filed Proof of Claim, the Schedules and Statements.  Notwithstanding the foregoing, the manner of each Distribution shall be determined at the discretion of the Debtors or the Liquidation Trustee, as applicable.

### 3.      Undeliverable Distributions and Unclaimed Property

If any Distribution to a Holder of an Allowed Claim is returned as undeliverable, then the Debtors or the Liquidation Trustee, as applicable, shall make reasonable inquiry for a correct current address. If reasonable inquiry does not yield a correct current address, then the Liquidation Trustee shall have no further obligation to determine the correct current address of such Holder and no Distribution to such Holder shall be made unless and until the Liquidation Trustee is notified, in

68

writing, by the Holder of the correct current address of such Holder within ninety (90) days of such Distribution, at which time a Distribution shall be made to such Holder without interest. Amounts in respect of undeliverable Distributions shall be held in trust on behalf of the Holder of the Allowed Claim to which they are payable by the Liquidation Trust or the Estates until the earlier of the date that such undeliverable Distributions are claimed by such Holder and the date that is ninety (90) days after the date the undeliverable Distributions were made. Thereafter, (i) such Holder shall be deemed to have forfeited its right to any Distributions from the Liquidation Trust or the Estates, and the Claims of such Holder shall be forever barred and (ii) the amounts in respect of undeliverable Distributions shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Liquidation Trust or Estates, as applicable, automatically and without the need for a further order of the Bankruptcy Court, for distribution in accordance with the Plan.

4.   **Payments and Distributions on Disputed Claims**

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims shall, in the Liquidation Trustee's reasonable discretion, be deemed to have been made by the Liquidation Trustee on the Effective Date, unless the Liquidation Trustee and the applicable Holder of such Claim agree otherwise.

5.   **Special Rules for Distributions to Holders of Disputed Claims and Interests**

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Liquidation Trustee and the Holder of a Disputed Claim or Interest, no partial payments and no partial Distributions shall be made with respect to any Disputed Claim or Interests, other than with respect to Professional Fee Claims, until all Disputed Claims or Interests held by the Holder of such Disputed Claims have become Allowed Claims by a Final Order of the Bankruptcy Court.

6.   **Fractional Cents**

No payment of fractional cents shall be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

7.   **Minimum Distributions**

Notwithstanding anything to the contrary in the Plan, the Liquidation Trustee shall not be required to distribute, and shall not distribute, Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim is less than $100. Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than $100 shall be forever barred from asserting such Claim against the Liquidation Trust.

4913-3097-6006

8.      **Forfeiture of Distribution**

If the Holder of a Claim fails to cash a check payable to it within the time period set forth in this Article XII.B, fails to claim an undeliverable Distribution within ninety (90) days after issuance thereof, or fails to complete and return to the Liquidation Trustee the appropriate Form W-8 or Form W-9 within ninety (90) days of a request by the Liquidation Trustee, then such Holder shall be deemed to have forfeited its right to any reserved and future Distributions from the Liquidation Trust or the Estates, and the Claims of such Holder shall be forever barred.  The forfeited Distributions shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Liquidation Trust or Estates automatically and without the need for a further order of the Bankruptcy Court for Distribution in accordance with the Plan.

9.      **Further Distributions Not Feasible**

Notwithstanding anything to the contrary in the Plan, if the Liquidation Trustee determines that any Beneficiaries no longer exist or cannot otherwise be reasonably ascertained, or the Liquidation Trustee determines that the Liquidation Trust Assets are insufficient to make any further Distribution economically justifiable, the Liquidation Trustee shall distribute the Liquidation Trust Assets that constitute Cash in accordance with the Liquidation Trust Agreement and thereafter seek to terminate the Liquidation Trust.

10.     **Manner of Payment Pursuant to the Plan**

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Debtors or the Liquidation Trustee, as applicable, by check, wire transfer or such other method as the Debtors or the Liquidation Trustee, as applicable, deem appropriate under the circumstances.  Cash payments to foreign creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction in the Debtors or the Liquidation Trustee's sole discretion.  For purposes of effectuating Distributions under the Plan, any Claim denominated in foreign currency shall be converted to U.S. dollars pursuant to the applicable published exchange rate in effect on the Effective Date.  Cash payments in the form of checks issued by the Liquidation Trustee shall be null and void if not cashed within ninety (90) days of the date of the issuance thereof and shall be deemed undeliverable Distributions.

**C.      Compliance with Tax Requirements**

In connection with the Plan, to the extent applicable, the Debtors or the Liquidation Trustee, as applicable, shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all Distributions pursuant hereto shall be subject to such withholding and reporting requirements.  The Liquidation Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements. The Liquidation Trustee may require, in the Liquidation Trustee's sole and absolute discretion and as a condition to the receipt of any Distribution, that the Holder of an Allowed Claim complete and return to the Liquidation Trustee the appropriate Form W-8 or Form W-9, as applicable to each Holder.  Notwithstanding any other provision of the Plan, (i) each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive

70

responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution, and including, in the case of any Holder of a Disputed Claim that has become an Allowed Claim, any tax obligation that would be imposed upon the Liquidation Trust in connection with such Distribution, and (ii) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements reasonably satisfactory to the Liquidation Trustee for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Liquidation Trust in connection with such Distribution.

**D.    Allocations**

If any Allowed Claim consists of indebtedness and accrued but unpaid interest thereon, then any Distributions on account of such Allowed Claim shall be allocated first to the principal amount of such Allowed Claim (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claim, to any portion of the Allowed Claim for accrued but unpaid interest.

**E.    No Postpetition Interest on Claims**

Unless otherwise specifically provided for in section 506(b) of the Bankruptcy Code, a Final Order, the Plan, or the Confirmation Order, or required by applicable law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.

**F.    Setoffs and Recoupment**

The Liquidation Trustee may, but shall not be required to, set off against any Claim or any Allowed Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors or the Liquidation Trust may have against the Holder of such Claim; *provided, however*, that neither the failure to do so nor the allowance of any Claim shall constitute a waiver or release by the Liquidation Trust of any claim that it may have against such Holder.  If the Liquidation Trustee exercises setoff rights against payment or other Distributions made pursuant to the Plan, then the Liquidation Trustee shall indicate the amount of the setoff in the distribution letter and shall notify the affected claimant that such claimant may challenge the setoff in the Bankruptcy Court.

**G.    Claims Paid or Payable by Third Parties**

**1.    Claims Paid or Payable by Third Parties**

The Debtors or the Liquidation Trustee, as applicable, shall be authorized to reduce in full a Claim, and such Claim shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or, as applicable, the Liquidation Trust, including on account of recourse to collateral held by third parties that secure such Claim.  No Distributions under the Plan shall be made on account of a

71

Claim that is payable pursuant to one of the Debtors' Insurance Policies, other non-debtor payment agreements, or collateral held by a third party, until the Holder of such Claim has exhausted all remedies with respect to such Insurance Policy, other non-debtor payment agreement, or collateral, as applicable. To the extent a Holder of a Claim receives a Distribution on account of a Claim and receives payment from a party that is not a Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the Distribution to the applicable Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan. The failure of such Holder to timely repay or return such Distribution shall result in the Holder owing the applicable Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid. To the extent that one or more of the Debtors' Insurers or non-debtor payors pays or satisfies in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), or collateral or proceeds from such collateral are used to satisfy such Claim, unless such Claim is withdrawn, then, reasonably promptly following the Debtors or the Liquidation Trustee becoming aware of any such payment or satisfaction, the Debtors or the Liquidation Trustee shall object to such claim on notice to the affected claimants or file a notice of claims satisfaction and serve such notice on the affected claimants.

2.  **Applicability of Insurance Policies**

Except as otherwise provided in the Plan, payments to Holders of Claims shall be in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by any Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

### ARTICLE XIII
### PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS AND INTERESTS

A.  **Allowance of Claims and Interests**

Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Liquidation Trustee, shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim or Interest, except with respect to any Claim or Interest deemed Allowed as of the Effective Date. Except as expressly provided in the Plan or in any Final Order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim. Notwithstanding anything to the contrary herein, if a timely objection to a Proof of Claim has not been Filed or the Schedules and Statements have not been amended with respect to a Claim that was scheduled and not identified as contingent, unliquidated, or disputed, then the Claim to which the Proof of Claim relates or the Claim set forth in the Schedules and Statements will be treated as an Allowed Claim.

## B.    Prosecution of Objections to Claims and Interests

Other than with respect to Professional Fee Claims, prior to the Effective Date, the Debtors, and on or after the Effective Date, the Liquidation Trustee, or their designees, as applicable, shall have the authority to File objections to Claims or Interests, and to settle, compromise, withdraw, or litigate to judgment objections on behalf of the Estates or the Liquidation Trust, as applicable, to any and all Claims or Interests, regardless of whether such Claims or Interests are in a Class or otherwise.

Subject to the foregoing sentence, from and after the Effective Date, the Liquidation Trustee (i) may settle or compromise any Disputed Claim in accordance with the Liquidation Trust Agreement and Article XIII hereof and (ii) shall succeed to the Debtors' rights with respect to any objections Filed by the Debtors that remain pending as of the Effective Date.  From and after the Effective Date, the Liquidation Trustee shall have the sole authority to administer and adjust the Claims Register to reflect any settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court.

## C.    Estimation of Claims

On and after the Effective Date, the Liquidation Trustee, may, at any time, request that the Bankruptcy Court estimate (i) any Disputed Claim pursuant to applicable law and (ii) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Liquidation Trustee previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 to the maximum extent permitted by law as determined by the Bankruptcy Court to estimate any Disputed Claim, contingent Claim, or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.  Notwithstanding any provision in the Plan to the contrary, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of Distributions, and the Debtors or the Liquidation Trustee, as applicable, may elect to pursue additional objections to the ultimate Distribution on such Claim.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Liquidation Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate Distribution on account of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

4913-3097-6006

**D.**    **Expungement or Adjustment to Claims Without Objections**

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled, or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Debtors or the Liquidation Trustee (or the Notice, Claims, and Solicitation Agent at, as applicable, the Debtors' or the Liquidation Trustee's direction), without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**E.**    **Time to File Objections to Claims**

Any objections to Claims shall be Filed on or before the later of (i) 120 days after the Effective Date and (ii) such other period of limitation as may be specifically fixed by a Final Order of the Bankruptcy Court for objecting to such Claims.

**F.**    **Disallowance of Claims**

Any Claims held by Entities whom the Bankruptcy Court has determined are Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until the Cause(s) of Action against that Entity has been settled or a Final Order of the Bankruptcy Court with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Liquidation Trustee.  All Claims Filed on account of an indemnification obligation to a director, manager, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as provided herein or otherwise agreed, any and all Proofs of Claim Filed after the applicable Bar Date may be deemed Disallowed and expunged as of the Effective Date upon the filing of an objection to such Claims on notice to any affected claimant.  If the Bankruptcy Court deems such Claims Disallowed and expunged as of the Effective Date following a hearing, Holders of such Claims shall not receive any Distributions on account of such Claims.

**G.**    **Amendments to Claims**

After the Effective Date, a Claim, other than a Claim on account damages for the rejection of an Executory Contract, may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Debtors or the Liquidation Trustee, as applicable, or upon a motion to file a late Claim.  Absent such authorization or the Bankruptcy Court granting such motion, any new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

4913-3097-6006

**H.**     **No Distributions Pending Allowance**

If an objection to a Claim or portion thereof is Filed as set forth herein, no payment or Distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

**I.**     **Distributions After Allowance**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Liquidation Trustee shall provide to the Holder of such Claim the Distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous Distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law.

**ARTICLE XIV**
**SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS**

**A.**     **Termination of Claims and Interests**

To the maximum extent provided by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the Distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in, the Debtors or any of their Assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted the Plan. Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the termination of all Claims and Interests subject to the occurrence of the Effective Date.

**B.** <u>Release of Liens</u>

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan, and in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, and required to be satisfied pursuant to the Plan, all mortgages, deeds of trust, liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Liquidation Trustee to evidence the release of such lien, including the execution, delivery, and filing or recording of such releases, and shall authorize the Debtors and the Liquidation Trustee to file UCC-3 termination statements (to the extent applicable) with respect thereto.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such liens.

**C.** <u>Releases by the Debtors</u>

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed released by each and all of the Debtors and their Estates (collectively, the "<u>Releasing Parties</u>"), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action by, through, for, or because of the foregoing Entities, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted or assertable on behalf of any of the Releasing Parties whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Releasing Parties would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors or their Estates, the business operations of the Debtors, actions taken by the Board of Directors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court sale and restructuring efforts, the Prepetition Term Loan, the DIP Facility, the Sale, the Chapter 11 Cases, the Stalking Horse APA, the Purchaser's APA, the Liquidation Trust, the Liquidation Trust Agreement, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Combined Plan and Disclosure Statement, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Combined Plan and Disclosure Statement, the Plan Supplement, or the Liquidation Trust Agreement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other

4913-3097-6006

related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided, however*, that any right to enforce the Plan, the Confirmation Order, or the Liquidation Trust Agreement is not so released; *provided, further*, that nothing herein shall release any party from their obligations under the Purchaser's APA.

## D.    <u>Exculpation</u>

Notwithstanding anything herein to the contrary, the Exculpated Parties shall neither have nor incur, and each Exculpated Party is exculpated from, any liability to any Holder of a Cause of Action, Claim, or Interest for any act or omission taking place between the Petition Date and the Effective Date of the Plan in connection with, relating to, or arising out of, the Chapter 11 Cases, Consummation of the Sale, the formulation, preparation, dissemination, negotiation, filing, or Consummation of the Combined Plan and Disclosure Statement, the Plan Supplement, the Liquidation Trust Agreement, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Combined Plan and Disclosure Statement or the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for actions determined by Final Order to have constituted bad faith, breach of fiduciary duty, willful misconduct, actual fraud or gross negligence, but in all respects such Entities shall be entitled to assert appropriate affirmative defenses, including reliance upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

## E.    <u>Injunction</u>

Except as otherwise expressly provided in the Combined Plan and Disclosure Statement or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims or Interests that have been released pursuant to the Combined Plan and Disclosure Statement or are subject to the exculpation set forth in this Article XIV.E, with respect to any such Causes of Action, Claims, or Interests in the Debtors or the Estates, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, any of the Debtors' Assets, including property that is to be distributed under the terms of the Combined Plan and Disclosure Statement (including Liquidation Trust Assets), on account of any such Claims or Interests: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind; (iv) asserting any right of setoff, subrogation, or recoupment of any kind, other than any rights of setoff and recoupment that were exercised prior to the Petition Date or otherwise permissible under applicable law; and (v) commencing or continuing in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Combined Plan and Disclosure Statement, *provided, however*, this provision does not enjoin setoff or recoupment related to any Claims or Interests arising after the Effective Date.

**F.** **Protections Against Discriminatory Treatment**

To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors, or another Entity with whom the Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**G.** **Document Retention**

On and after the Effective Date, the Liquidation Trustee may maintain documents in accordance with its standard document retention policy, as may be altered, amended, modified, or supplemented by the Liquidation Trustee.

**H.** **Reimbursement or Contribution**

If the Bankruptcy Court Disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (i) such Claim has been adjudicated as non-contingent or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**I.** **Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay. All injunctions or stays in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**ARTICLE XV**
**CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN**

**A.** **Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article XV.B hereof:

1. The Bankruptcy Court shall have entered the Confirmation Order (and such order shall be a Final Order) in form and substance acceptable to the Debtors, and shall:

78

(a) authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(b) decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(c) authorize the Debtors, as applicable or necessary, to: (i) make all Distributions and issuances as required under the Plan; and (ii) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement; and

(d) authorize the implementation of the Plan in accordance with its terms.

2. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

3. the Liquidation Trustee shall have been appointed and the Liquidation Trust Agreement shall have been executed and become effective;

4. the Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount;

5. the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with the Plan; and

6. the Debtors shall have implemented all transactions contemplated herein in a manner consistent in all respects with the Plan.

## B.    <u>Waiver of Conditions</u>

The conditions to Consummation set forth in this Article XV may be waived by the Debtors without further notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

## C.    <u>Effect of Failure of Conditions</u>

If Consummation of the Plan does not occur, then the Plan shall be null and void in all respects and nothing in the Combined Plan and Disclosure Statement shall: (i) constitute a waiver or release of any Claims by the Debtors, any Holders of Claims or Interests, or any other Entity; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect.

4913-3097-6006

## ARTICLE XVI
## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

### A.    Modification and Amendments

Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on the modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend, or modify the Combined Plan and Disclosure Statement, one or more times, before or after Confirmation, with the consent of the Committee, such consent not to be unreasonably withheld, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Combined Plan and Disclosure Statement, or remedy any defect or omission or reconcile any inconsistencies in the Combined Plan and Disclosure Statement or the Confirmation Order in such matters as may be necessary to carry out the purposes and intent of the Plan.

### B.    Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

### C.    Revocation or Withdrawal of Plan

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of the Debtors, any Holder, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, any Holder of a Claim or Interest, or any other Entity.

## ARTICLE XVII
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any

4913-3097-6006

request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals (including Professional Fee Claims) authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed (or assumed and assigned); (c) the Liquidation Trustee amending, modifying, or supplementing, after the Effective Date, pursuant to Article IX, the Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.      ensure that Distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Combined Plan and Disclosure Statement or the Plan Supplement;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code, including but not limited to the Sale Order;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.     resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article XIV, and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.     resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of Distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article XII.G.1;

13.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     determine any other matters that may arise in connection with or that relate to the Combined Plan and Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Combined Plan and Disclosure Statement;

15.     enter an order or Final Decree concluding or closing any of the Chapter 11 Cases;

16.     adjudicate any and all disputes arising from or relating to Distributions under the Plan;

17.     consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Restructuring Transactions, whether they occur before, on, or after the Effective Date;

21.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, injunctions, and releases granted in connection with and under the Plan, including under Article XIV;

23.     hear and determine all Causes of Action;

24.     enforce all orders previously entered by the Bankruptcy Court; and

25.     hear any other matter not inconsistent with the Bankruptcy Code.

4913-3097-6006

## ARTICLE XVIII
## MISCELLANEOUS PROVISIONS

**A.**     **Immediate Binding Effect**

Subject to the terms hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Debtors' Estates, the Liquidation Trustee, the Liquidation Trust, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all counterparties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim, Interest, or debt has voted on the Plan.

**B.**     **Additional Documents**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Liquidation Trust, as applicable, and all Holders receiving Distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.**     **Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Combined Plan and Disclosure Statement, any statement or provision in the Combined Plan and Disclosure Statement, or the taking of any action by any Debtor with respect to the Combined Plan and Disclosure Statement or the Plan Supplement is an admission or waiver of any rights of any Debtor unless and until the Effective Date has occurred.

**D.**     **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**E.**     **Dissolution of the Committee**

The Committee shall dissolve on the Effective Date and the members of such Committee shall be released and discharged from all further rights and duties arising from or related to the Chapter 11 Cases, except with respect to, and to the extent of any applications for Professional Fee Claims or expense reimbursements for members of such Committee.  The Committee and its retained

4913-3097-6006

Professionals may also participate in any appeal pending as of the Effective Date or filed thereafter, the outcome of which could affect the treatment of prepetition creditors, including, but not limited to, any cases, controversies, suits, or disputes arising in connection with the Consummation, interpretation, implementation or enforcement of the Plan or the Confirmation Order.  The Professionals retained by the Committee shall not be entitled to assert any Administrative Claims nor shall they have an Allowed Administrative Claims for any services rendered or expenses incurred after the Effective Date, except in respect of the preparation and prosecution of or any objection to any Filed fee application and participation in any appeals.

**F.**    **Notices**

To be effective, all notices, requests and demands to or upon the Debtors shall be in writing (which may be by email), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by email, when received and telephonically confirmed, addressed to the following:

| Debtors | Counsel to the Debtors |
|---|---|
| J. Michael Issa<br>Wen Tan<br>**NOVEMBER 26, INC.**<br>**(F/K/A BIOLASE, INC.)**<br>c/o B. Riley Advisory Services<br>19800 MacArthur Blvd, Suite 820<br>Irvine, CA 92612<br>Email: missa@brileyfin.com<br>wtan@brileyfin.com | Joshua D. Morse<br>Dania Slim<br>Caroline Tart<br>**PILLSBURY WINTHROP SHAW PITTMAN LLP**<br>Four Embarcadero Center, 22nd Floor<br>San Francisco, CA 94111-5998<br>Email: joshua.morse@pillsburylaw.com<br>dania.slim@pillsburylaw.com<br>caroline.tart@pillsburylaw.com<br><br>- and -<br><br>M. Blake Cleary<br>Brett M. Haywood<br>Maria Kotsiras<br>Shannon A. Forshay<br>**POTTER ANDERSON & CORROON LLP**<br>1313 North Market Street, 6th Floor<br>Wilmington, Delaware 19801<br>Email: bcleary@potteranderson.com<br>bhaywood@potteranderson.com<br>mkotsiras@potteranderson.com<br>sforshay@potteranderson.com |

4913-3097-6006

| U.S. Trustee | Counsel to the Committee |
|---|---|
| Malcolm M. Bates<br>**UNITED STATES DEPARTMENT OF JUSTICE**<br>Office of the United States Trustee<br>District of Delaware<br>844 King Street, Suite 2207<br>Wilmington, Delaware 19801<br>Email: Malcolm.m.bates@usdoj.gov | Daren Brinkman<br>Jory Cook<br>**BRINKMAN LAW GROUP, PC**<br>543 Country Club Drive, Suite B<br>Wood Ranch, CA 93065<br>Email: dbrinkman@brinkmanlaw.com<br>jory@brinkmanlaw.com<br><br>- and -<br><br>Scott J. Leonhardt<br>**ESBROOK P.C**<br>1000 N. West Street, Suite 1200<br>Wilmington, DE 19801<br>Email: scott.leonhardt@esbrook.com |

## G.   Entire Agreement

Except as otherwise indicated, the Combined Plan and Disclosure Statement and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## H.   Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Notice, Claims, and Solicitation Agent at https://dm.epiq11.com/biolase or the Bankruptcy Court's website at http://www.deb.uscourts.gov.   To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

## I.   Non-Severability of Plan Provisions

The provisions of the Plan, including its release, injunction, exculpation, and compromise provisions, are mutually dependent and non-severable.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the Debtors' consent consistent with the terms set forth herein; and (iii) non-severable and mutually dependent.

4913-3097-6006

**J.**    <u>**Votes Solicited in Good Faith**</u>

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and, therefore, no parties will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan.

**K.**    <u>**Post-Effective Date Limitation of Notice**</u>

After the Effective Date, in order to continue receiving documents pursuant to Bankruptcy Rule 2002, Persons and Entities must file with the Bankruptcy Court a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Liquidation Trustee is authorized to limit the list of Persons and Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Persons and Entities that have filed with the Bankruptcy Court such a renewed request; *provided, however*, that Liquidation Trustee shall also serve those parties directly affected by, or having a direct interest in, the particular filing in accordance with Local Bankruptcy Rule 2002-1(b).

**L.**    <u>**Inconsistency**</u>

To the extent that the Combined Plan and Disclosure Statement conflicts with or is inconsistent with any agreement related to the Combined Plan and Disclosure Statement, the provisions of the Combined Plan and Disclosure Statement shall control; *provided, however*, that nothing in the Combined Plan and Disclosure Statement shall be deemed to supersede, amend, or modify the provisions of the Sale Order or the Final DIP Order.  In the event of any inconsistency, ambiguity, or conflict between any provision of any of the foregoing documents, and any provision of the Confirmation Order, the Confirmation Order shall control.

**M.**    <u>**Closing of Chapter 11 Cases**</u>

The Liquidation Trustee shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

Dated: December 23, 2024

By:    *John R. Beaver*
Name: John R. Beaver
Title:   Chief Executive Officer

86

4913-3097-6006